UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

SANDRA LORUSSO and
DEBORAH EVANGELISTA

        Plaintiffs

V.

H. RICHARD BORER, JR.

        Defendant

: Civil No. 3:03CV00504 (MRK)
:
:
:
:
: July 22, 2004
:
:

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**I.**    **INTRODUCTION**

In this action, the defendant Richard Borer, Mayor of West Haven, Connecticut, is accused of malicious adverse actions against the plaintiffs, two long-term city employees, in retaliation for their support of the defendant's electoral opponent. The plaintiff Sandra Lorusso, the former Risk Manager for the City, lost her employment entirely. The plaintiff Deborah Evangelista, employed as the Administrative Assistant to the Democratic Registrar of Voters, suffered a reduction in her work hours from 35 hours per week to 19 hours per week, which served to eliminate her entitlement to all benefits, including health insurance[1]. Plaintiffs aver that the mayor, lacking grounds to

---

[1]    To be entitled to health insurance and other benefits, City employees must work a minimum of 20 hours per week. Mayor Borer is alleged to have effected the reduction in Evangelista's hours to just under 20 hours per week for the malicious purpose of causing her as much financial and other harm as possible. Exh. 2 at pp. 57-58.

discharge them outrightly instead used, or more correctly abused, the budget process and later manipulated job titles and work schedules to accomplish the desired result.

Notably absent from defendant's moving papers is any denial that the elimination of Sandra Lorusso's job and the reduction of Deborah Evangelista's hours were retaliatory and politically motivated. Indeed, defendant tacitly suggests this court accept as true the fact that he was motivated to retaliate against and harm these women and then dares all to discover a way to hold him accountable, since, he claims, the doctrine of legislative immunity and the buffer of the City Council stands between him and liability for his conduct.

As is shown below, there is overwhelming evidence that this defendant brazenly abused the power of his office to harm those who would not support and contribute to his campaign. He cannot escape liability as his conduct during the budget process cannot fairly be characterized as legislative acts. Moreover, defendant's motion fails entirely to address pertinent facts alleged in the complaint, among them, the allegation that the Mayor deprived Lorusso of opportunities for continued employment and available positions notwithstanding the alleged abolishment of her job and further deprived Evangelista of health insurance and benefits, acts which are far removed from the city council's adoption of a budget. Upon these allegations there is no immunity available. Thus, defendant's motion is more properly characterized as one for partial summary judgment. Plaintiffs do not brief the cause asserted pursuant to Conn. Gen. Stat. § 31-51, and this Court may consider the claim withdrawn.

## II.   THE PLAINTIFFS' CLAIMS AND EVIDENCE

Sandra Lorusso's employment with the City of West Haven dates back to April of 1987 when she first worked as an Administrative Assistant to the Registrar of Voters. She continued in that position until 1991 when the defendant Richard Borer was first elected Mayor and Lorusso became his Executive Secretary. Exh.1 at pp. 7-8[2]. As Executive Secretary, Lorusso "did everything for [the Mayor], down to even making his doctors' appointments. She managed his correspondence, fielded his phone calls, handled all paperwork that came into the Mayor's office, "oversaw his budget" and handled the budgeting process for him. She wrote speeches for him, conducted research for him, handled department heads and was the troubleshooter for constituents who came into or contacted the Mayor's office. Exh. 1 at p. 11. After performing all of these duties for five years, Lorusso requested a transfer to the position of Risk Manager which had become vacant upon the retirement of the incumbent. Exh.1 at p. 12. There was some minor controversy over the appointment of plaintiff to the position which was within the collective bargaining unit. The job was posted but no members of the bargaining unit bid for it. Despite this, the union representing city employees complained that Lorusso did not meet a qualification in the job description, namely a bachelor's degree. Mayor Borer defended the appointment, stating that plaintiff was more than qualified for the position and the matter came to rest. Exh.1 at pp. 13-14.

---

[2]   Exhibit 1 contains the transcript of the deposition of Sandra Lorusso.

3

For many years, Sandra Lorusso was politically active, having run for election to a seat on the Democratic Town Committee and for a seat on the Board of Education on Mayor Borer's ticket. She was elected to the Board of Education in 1999 and upon the Mayor's election, Lorusso was appointed to the Democratic Town Committee to assume the Mayor's seat which he relinquished upon his election to the Office of Mayor. Lorusso was an early political supporter of Mayor Borer, performing many duties in his campaigns for office. Exh.1 at pp. 35-36.

Lorusso's decision in 1996 to leave her position as Executive Secretary to the Mayor and transfer to the position of Risk Manager stemmed from her growing concerns over questionable conduct by the Mayor which she believed was serious and put her at risk. She believed that her status as Executive Secretary placed her in the position of having to abet and cover up such activities and she wished to extricate herself from the dilemma. Exh.1 at pp. 38-41. Although Lorusso "lost respect" for the Mayor on account of such conduct, she did not officially break from him politically until the Mayor's run for re-election in 2001. In the spring of that year, Borer approached Lorusso and expressed his expectation that she would aid his campaign. Lorusso informed Borer of her decision to support one John Picard who would seek the democratic party's nomination for Mayor. In response, the Mayor lobbed the following threat: "If you don't care if I have a job, maybe I won't care if I have a Risk Manager after I'm re-elected". Exh.1 at p. 42.

4

Deborah Evangelista, who is Lorusso's sister, has worked for the City of West Haven since December 1991 as Administrative Assistant to the Registrar of Voters. Each Registrar of Voters is elected quadrennially to hold office for a term of four years. Pursuant to the City Charter, "[t]hey shall appoint deputies and assistant registrars as provided in the general statutes". Charter of the City of West Haven, Ch. VIII (Defendant's Exhibit 1) (Hereafter referred to as "Charter"); Exh. 2 at p. 9[3]. She handles all of the everyday tasks of running that office, including telephone calls, filing, voter registration, computer data and management of all elections. She reports to the Democratic Registrar of Voters. There is also a Republican Registrar who is likewise entitled to an administrative assistant. Exh.2 at p. 12. For over a decade, Evangelista worked a 35 hour-a-week schedule and enjoyed full benefits, including health insurance and retirement savings plan. She has also been active in democratic party politics and is in her eighth term as an elected member of the Democratic Town Committee. Exh.2 at p. 18. Driven for the most part by the same reasons which motived her sister, Evangelista lost regard for the Mayor and decided to part political company.

In July of 2001, the Mayor summoned Evangelista to his office for the purpose of ascertaining whether she would support his re-election. She said that she would not, whereupon the Mayor stated that she should "reconsider" and "do what's in [her] best interest". Evangelista left the Mayor's office convinced that the Mayor would retaliate. She was also astute enough to predict that he would

---

[3]     Exhibit 2 contains the deposition testimony of Deborah Evangelista.

5

do it through the budget process and said as much to her Republican counterpart, Joann Mapes, immediately after the meeting with the Mayor. Exh. 2 at pp. 30-31.

Shortly after the Mayor summoned Evangelista to his office to determine where she stood on his re-election, the Mayor appeared in Lorusso's City Hall office, confronted her again and asked, "are you going to support me or not?". Lorusso answered, "No".

John Picard was unsuccessful in his bid for the nomination and Mayor Borer was re-elected in the November ballot of 2001. Several months into his new term, the Mayor, in accordance with the City Charter, commenced preparation of the budget for fiscal year 2002-2003. On March 21, 2002, hours before the Mayor was to present his budget proposal to the City Council at its evening meeting, Richard Legg, the city's Finance Director, summoned Lorusso to his office. Upon her arrival, Legg privately revealed the circumstances which he claimed would lead to the loss of her job. Legg stated that he had been present in the Mayor's office earlier in the day while the Mayor was in the midst of a telephone conversation with the Chairman of the City Council. Legg described the conversation as a "shouting" or "screaming" match. According to Legg, when the Mayor ended the call, he opened a drawer and retrieved an old newspaper article about the hiring of Lorusso as Risk Manager in which the Mayor was quoted as defending her appointment as Risk Manager and lauding her abilities. The Mayor was angry, showed the article at Legg and stated to him, "I want you to cut her job. She has to pay for her betrayal." Since the Mayor was Legg's immediate superior, Legg heeded the direction and immediately changed the budget proposal so as to eliminate Lorusso's

6

position and the budget proposal was submitted to the city council that evening. Exh. 1 at pp. 44-45. According to Lorusso, Legg was apologetic. He informed her of what transpired because he wanted her to understand that it was not something that he (Legg) wanted to do but that he was ordered to eliminate her job "at the last minute" by the Mayor. Exh.1 at pp. 47-48.

Upon receipt by the City Council of the Mayor's proposed budget the matter is set down for public hearing at which members of the public may appear and comment. As a matter of procedure, the Mayor's budget becomes effective by one of two ways. The city council can approve the budget by simple majority vote or do nothing in which case the budget proposal becomes effective. In order for a particular line item, however, to be amended or modified in any way, a majority vote is insufficient and instead a two-thirds vote of the council is required. See Charter, Ch. XIX, § 4.

The Charter invests executive authority in the Mayor. The Charter, Ch. III, § 4. The legislative power of the city is vested in the city council. Id., Ch., IV, § 5. As Mayor, Richard Borer has broad executive authority with respect to the city's work force and is "directly responsible for the administration of all departments and agencies and all officers in charge of persons or boards appointed by him, and [h]e supervise(s) and direct(s) the same." Charter, Ch., III, § 4.

In the wake of his unsuccessful attempts to gain the plaintiffs' support for his re-election, and consistent with his not-so-subtle threats, the Mayor's budget proposal to the city counsel did not contained a requested appropriation for Lorusso's job as Risk Manager. The proposal also requested a reduced appropriation for the office of the Registrar of Voters. See Defendant's Exhs. B & C.

7

Before and during a public hearing on the Mayor's recommended budget, the Mayor's proposal is bound in book form ("the budget book") and circulated to employees and the public. The plaintiffs reviewed the contents and saw the Mayor's recommendations with respect to funding of positions in the Finance Department, including the position of Risk Manager and certain other positions in the Purchasing Office. The Mayor's proposal did not seek to eliminate or reduce funding for any purchasing positions. Exhs. 8 at ¶ 14; 37.

During the budget debate, one councilwoman expressed the opinion that the actions were inappropriate and politically motivated. The Republican Registrar of Voters also addressed the council and advised that the Mayor's attempt to eliminate funding for Deputy Registrars would violate state statutes. She also questioned why the two assistants to the Registrars appeared to be singled out for a peculiar reduction to 19 hours per week. Exh. 11. The council approved the Mayor's recommended budget with some amendments on May 2, 2002, see Def.'s Exh. 7, but, for reasons discussed infra at pp. 19-20, it appears that the council believed that failure to fund risk management was unwise and thus appropriated funds for this purpose with the job functions and title to be determined later by personnel.

After the council action, Deborah Evangelista later confronted the Mayor, had words with him and stated her intent to bring a civil action against him, using the phrase "payback is a bitch". In reference to that saying, the Mayor responded, "you're absolutely right Debbie, it is and you're living proof of it". Former City Councilman Antonio Buonomo witnessed this conversation as did

8

West Haven Probate Clerk Tracy Morrissey. Both confirmed the remark by the Mayor and, like the plaintiff, clearly interpreted it as a boasting admission that he had exacted retribution for Evangelista's support of his electoral opponent. <u>See</u> Exhs. 4, 5. According to Evangelista, the political nature of the adverse actions against her and her sister were not unknown to the council. An effort by motion of councilwoman Martha Bell to reinstate Evangelista's hours to the budget fell shy of the minimum nine votes required.

In consequence of these events, Sandra Lorusso received a letter advising that her employment would be terminated effective July 1, 2002. Exh. 12. As a member of the classified civil service and bargaining unit, Lorusso possessed bumping rights which ordinarily allow one to avoid unemployment by bumping into another available position based on seniority. Exh. 14. Lorusso, however, ran into one barrier after another in her efforts to stay employed. She expressed interest in the position of Zoning Enforcement Officer, an open position, but was told by city officials that she was not qualified for lack of a state certification. Exh. 15[4]. A previous Zoning Enforcement Officer, however, (an ex brother-in-law of Lorusso) had in fact been hired into the position despite the fact that he did not possess such a certification - he was allowed post-hire to gain the certification. Moveover, upon denying Lorusso the job for the stated reason, the job was filled with an individual <u>who did not possess</u> that very certification. The defendant made the decision. Exh. 7 at pp. 134-35.

---

[4] The letter advising her of this decision came from Personnel Director Ralph DeLucca, who holds an appointive position and reports to the Mayor.

9

Lorusso also applied for the position of Administrative Assistant to the Commissioner of Public Works but was denied the opportunity despite being perfectly qualified for it. This position became open by the retirement of Mary Annunziata. Based on her experience, Lorusso was well qualified to perform the duties of the position which were virtually indistinguishable from the natureo of the duties that she performed in her previous positions. Exhs. 8 at ¶¶ 7-8; 28. At the time Lorusso sought this position and was denied it, the city was paying Mary Annunziata to perform the duties as a contractor. Richard Legg authorized the committal of funds for these payments. Exhs. 8 at ¶8; 18 (voucher records reflecting payments to Annunziata). Personnel Director DeLucca claimed the refusal to consider Lorusso for the position was due to an alleged intent to re-write the job description. A mere 8 days after the plaintiff's forced retirement, however, the job was posted for bid. Exh. 30. Plaintiff could find no evidence of a re-written job description. Since, given the duties of the position, Lorusso would have been a natural selection, Legg never explained why Lorusso was barred from consideration because of an intent to re-write the job description while Carol Silverstein was not barred from the Risk/Procurement Manager position before a job description was even written. There was also no explanation for why Lorusso was not given consideration when, assuming the city did re-write the job description (and there is no evidence of that) the re-write was immediate as the job was posted only days after Lorusso's retirement. Exh. 8 at ¶8. Facing a July 1, 2002 deadline, the plaintiff had no choice but to opt to retire or face the loss of her health benefits. The availability of open positions posted shortly after the plaintiff's retirement was not communicated to

the plaintiff by any city official. The plaintiff's communications to city officials regarding her bumping rights were ineffective and went unanswered. Exhs. 21, 22, 23.

As it turned out, the job of "Risk Manager" was eliminated in form but not in substance as the duties of the position held by Lorusso still needed to be performed. While orchestrating Lorusso's removal from the city payroll, the Mayor later arranged for the position of Risk Manager to be merged with that of Assistant Purchasing Agent, resulting in a new position and title of "Risk Manager/Procurement Officer". Exh.1 at pp. 58-59. The term "Procurement Officer" is a refashioning of the title "Assistant Purchasing Agent" held by one Carol Silverstein, an employee with much less seniority than the plaintiff. Ms. Silverstein, however, was allowed to remain actively employed on the city payroll beyond July 1, 2002, the effective start of the fiscal year, despite the elimination of her own position. (For the purpose of later "merging" it with the plaintiff's position). Exh. 8 at pp. 17-19; 27. The circumstances surrounding appropriated funds used by the Mayor to pay Silverstein is a murky issue. See infra pp. 18-20. Ms. Silverstein was later awarded the newly created position of Risk Manager/Procurement Officer. Exh. 29.

Finance Director Legg could not point to any authority which allowed the City to employ and pay Ms. Silverstein after July 1, 2002 when her position was ostensibly abolished but he conceded the reason why this was done - it was predetermined that Silverstein would be appointed to the new position of Risk Manager/Procurement Officer. Exh. 3, pp. 31-36. Sandra Lorusso was neither considered for the job nor given the opportunity to apply for it. Forced to retire no later than July

11

1, 2002 or face the loss of her health benefits, Lorusso, once retired, was no longer an "employee" entitled to bumping rights nor could she bid on posted jobs, since, per established rules, jobs were posted internally with preference given to existing bargaining unit employees. Carol Silverstein of course remained in the bargaining unit per the aforementioned irregular arrangement orchestrated by the Mayor. Faced with this Hobson's choice and with health care benefits a priority given her medical conditions, Lorusso retired, obviously of the mind that no matter what her efforts, she would not be re-employed. Exhs.1 at pp. 65-69; 21.

Personnel Director Ralph DeLucca, with whom the plaintiff communicated in her effort to remain employed, authored the various letters of response on behalf of the City. See Exhs.12, 15, 20, 25. DeLucca, like Richard Legg, had a troubled conscience about these events and disclosed the following to the plaintiff during a meeting with her. DeLucca stated that the Mayor was advised that what he was doing to Lorusso and Evangelista was illegal and that the Mayor "can't do it". The Mayor was advised that Lorusso and Evangelista would no doubt sue in court, in response to which the Mayor answered, "so what, we have insurance for that." The Mayor was further advised that if a jury were to find malice and award punitive damages, the insurance carrier would not cover such an award. According to DeLucca, the Mayor responded to this by stating, "So let the taxpayers pay for it". Exh. 8 at ¶ 13.[5]

---

[5] Given their titles and positions the statements of Ralph DeLucca and Richard Legg to Lorusso do not constitute hearsay. See Fed. R. Evid. 801 (d)(2)(D) (Admission by party opponent

12

### The Testimony of Finance Director Richard Legg

City Finance Director Richard Legg holds a political appointment and thus serves at the pleasure of the Mayor. Exh. 3 at p. 7. He still held the position at the time of his deposition examination by plaintiffs' counsel on May 25, 2004. Exh. 3 at p. 4. He confirmed that he met with Sandra Lorusso shortly before the budget was sent over to the city council and informed her that the Mayor had ordered her eliminated from the budget. Id. at p. 21. He confirmed, albeit reluctantly, Lorusso's account of the meeting in several key respects. He was in the Mayor's office while the Mayor was speaking to someone by telephone. He has, he claims, "no personal knowledge" of who was on the phone with the Mayor but he "can speculate" who it is. Upon ending his phone call, the Mayor turned to Legg and ordered him to eliminate Lorusso from the budget. He also confirmed that the Mayor "brought [him] over to a file cabinet and pulled out some clippings of the controversy that surrounded [Lorusso's] initial movement from his office to the Risk Manager's position." When asked directly whether the Mayor made the statement attributed to him (to wit: "cut her job - she has to pay for her disloyalty") Mr. Legg hedged a bit:

> And he then brought me over to a file cabinet and pulled out some clippings of the controversy that surrounded her initial movement from his office to the Risk Manager's position. I guess there was some union difficulty because she wasn't - - didn't appear to be qualified or something or other, and he said he had gone to bat for her in this particular situation and he was, you know, sorry this whole

---

made through agent or servant concerning a matter within the scope of employment.)

13

> thing went in this direction, went in the direction that it did. There is
> bits and pieces that I agree with.

Exh. 3 at p. 22.

When pressed on the issue whether Lorusso's account of his report of the exchange with the Mayor was correct, Mr. Legg hedged once again but in terms that are more telling:

> Q: Did you make a statement to Sandra Lorusso that when the Mayor reached for the newspaper article he was angry; he pointed the article out to you and said 'she needs to pay for her disloyalty. Take her out of the budget". Did you tell that to Sandy Lorusso?
> A: **I don't recollect. I could have but I don't recollect those comments, those words, no.**
> Q: Is it that you have a failure of recollection, sir, or can you state here under oath under penalty of perjury that that statement was never made by you.
> A: **I don't know.**
> Q: You don't know?
> A. **I do not have recollection of making that statement in that particular way.**
> Q: Is it a failure of recollection or can you rule out having made that statement to her?
> A. **It's a failure of recollection at this point.**

Id. at pp. 23-24. (Emphasis supplied)

Sandra Lorusso recounted a later conversation with Legg, in which Legg expressed his sympathy and understanding for the harm she suffered and went so far as to advise that her best course would be resort to the federal courts and avoidance of the CCHRO because, in his opinion,

14

the state agency was ineffective.[6] Legg admitted that he made these statements to the plaintiff. Exh.3 at p. 28.

Richard Legg further confirmed that despite the "elimination"of the Risk Manger position, the duties of Risk Manager still had to be performed. Id. at p. 31. He confirmed that the job of Risk Manager was combined with the position of Assistant Purchasing Agent which he claims was also eliminated effective July 1, 2002. Legg conceded that the incumbent in the purchasing position, Carol Silverstein, although eliminated along with Lorusso, was allowed to remain an active employee after July 1, 2002 on the city payroll. The explanation for this anomaly, according to Legg, was the understanding that the two positions would later be combined and Carol Silverstein was the pre-ordained selection for the new title. Accordingly, despite the fact that Silverstein's job was abolished, she continued to receive a paycheck after July 1, 2004. Exh. 3 at pp. 31-36; 27. While Sandra Lorusso had 15 years of seniority, Carol Silverstein had but four years of seniority.

While Legg could not point to any authority which allowed for Silverstein to be retained on the active payroll beyond July 1, 2002, he justified the presumption that Silverstein would get the appointment because the job description (not yet written, however,) required a college degree and further, Silverstein was thought to be "perfectly capable of picking up the thing that we had consolidated in that job description". "The thing" is obviously the duties of Risk Manager. Exh. 3

---

[6]   "CCHRO" is a reference to the Connecticut Commission on Human Rights and Opportunities.

15

at pp. 35-36. He stated while the purchasing position required a college degree, the position of Risk Manager did not. Id. at p. 36. He later recanted that and admitted that the Risk Manager position held by Lorusso also required a college degree. He claimed to be uninformed as to whether the Mayor waived not only a bachelor's degree but a master's degree requirement in the appointment of Ramona Cortese to the position of Commissioner of Human Resources. Id. at p. 37. Carol Silverstein, and her husband, Attorney Richard Silverstein, were, according to Lorusso, political supporters of and financial contributors to Mayor Borer. Exh. 8 at ¶ 23.

The job description later crafted for the position is identical in many respects to the job description for Lorusso's former position of Risk Manager, with the exception of added purchasing duties which Lorusso was more than capable of performing given her many years of administrative experience which included handling bids for the procurement of services. Exhs. 8 at ¶ 17; 13, 26.

In the matter of Deborah Evangelista, Legg testified that the Economic Development Corporation ("EDC") is not a city agency but a private organization which is "privately incorporated" but supported by the city. He stated that employees who worked for the EDC received health insurance and benefits paid for by the city and further, that Mayor Borer did not propose eliminating or reducing any clerical position at the EDC or otherwise seek by appropriation proposal to eliminate any EDC employee's entitlement to health insurance. Exh. 3 at pp. 45-46. He also confirmed that Evangelista, and her Republican counter-part Mapes, were the only employees whose hours were reduced to just below twenty per week resulting in a loss, only to Evangelista, of health insurance

and benefits. Id. at pp. 63-64. With respect to the submission of the Mayor's budget proposal to the city council, Legg stated that he was responsible for advocating for the Mayor before the city council and that is was not his place to express disagreement with the Mayor before the council. He confirmed that it takes nine votes of the council to alter any particular line item in the Mayor's proposed budget. When asked if it were true that in the 2002 budget process, the Mayor had influence over a minimum of nine of the city council members, Legg answered, "He had a certain amount of influence, yes". Id. at p. 66.

### The Testimony of Margaret Schenkle

It is evident that Mayor Borer engaged in a brazen pattern of harming people who would not donate to or support his campaign. Margaret Schenkle is a twenty-year employee of the City of West Haven and works as a cook at the West Haven High School. She has been active in the democratic party. Exh. 6 at pp. 6-7, 12.

At the time of Mayor Borer's 2002-03 budget proposal, Schenkle's daughter, Amy Warren was employed as a legal secretary in the city's Office of Corporation Counsel. Schenkle made a decision to support John Picard in his bid for the democratic party nomination. She placed a pro-Picard campaign sign on her front lawn. Mayor Borer saw the Picard sign on Schenkle's lawn and proceeded to attempt to contact Schenkle, calling her private home several times unsuccessfully and

17

then telephoning her at work. The Mayor spoke to Schenkle's boss who passed on a message to Schenkle that the Mayor wished to speak to her. Schenkle later spoke with the Mayor by telephone. The Mayor told Schenkle that he saw the Picard sign on her lawn. He asked her to reverse and support him instead. Schenkle responded that she was going to continue to support John Picard, whereupon the Mayor "reminded" her that he had given Schenkle's daughter a job in the Corporation Counsel's office. Schenkle nevertheless indicated her intent to support Picard. In the wake of this conversation, Mayor Borer proposed the elimination of Amy Warren's job. This was accomplished despite vocal opposition from the lawyers in the Office of the Corporation Counsel on the ground that Warren was needed in the office. Schenkle drew the conclusion that her refusal to remove the Picard sign and support Borer cost her daughter her job. Exh. 6 at pp. 17-27.

### The Circumstances of the Creation of the Job of Risk Manager/Procurement Officer

The procedural circumstances surrounding the creation and funding of the job of Risk Manager/Procurement Officer as well as the abolished funding for Carol Silverstein's former position of Assistant Purchasing Agent are rather murky and also suspicious. According to plaintiffs, the Mayor's budget proposal did not seek to eliminate funding for the Assistant Purchasing Agent position. See Exhs. 37, 8 at ¶¶ 14. The Mayor's proposal merely moves money for Silverstein's position from one line to another, and increased the salary allotted to the position of Assistant

Purchasing Agent from $43,559.00 to $56,200.00 per year[7]

Chapter XIX, part A, Section 3 of the City Charter provides that with respect to his budget proposal, "[t]he Mayor shall present reasons for all his recommendations". Defendant's Exhibit C, attached to his motion, includes the Mayor's recommendation with respect to the Risk Management position. No reasons were given for the recommended withdrawal of funding for the position and the accompanying "Summary" and "2002-03 Goals" read as if nothing is to happen to this position and its functions.[8] It also says nothing whatever about a merger of the duties of the position with those of another. Likewise, defendant's Exhibit E, which contains the Departmental Analysis Sheet for the purchasing department, says nothing about a merger or expansion of the Assistant Purchasing Agent position; neither do the related "Summary of Budgetary Changes" or the "2002-03 Goals". Plaintiffs' Exhibit 37, the Mayor's proposal for continued, indeed much greater, funding for the Assistant Purchasing Agent position, is oddly missing from defendant's moving papers with no explanation for how the substitute document submitted to the Court as part of defendant's Exhibit E came about. While defendant has submitted a summary of the city council's proceeding on the budget

---

[7] According to Lorusso, the reason for the huge increase in Silverstein's salary, in contradiction to the alleged cost-cutting nature of the Mayor's proposal, was for the ill-motivated purpose of preventing Lorusso, once unemployed, from employing her superior seniority to bump Silverstein from the position. See Exhs. 8 ¶14; 14.

[8] This may fairly and readily be explained by the fact that Mayor Borer ordered Finance Director Legg to "cut" Lorusso mere hours before the submission of the budget book to the council. Legg didn't have time to square the related documents with the requested appropriation of "0".

19