(see Def.'s Exhs. 5, 6) the documents contain but a terse and uninformative account of the motions and votes of the council. Defendant has not submitted any minutes of council proceedings or other documents which disclose how these changes were accomplished procedurally. Yet it is clear (or at least, the inference which may be drawn from this) is that at some point the Mayor's budget proposal was altered after its submission to the council and after the notice to the public of his proposals and the public hearing.

Sandra Lorusso addressed council members at the public hearing and advised them that elimination of funding for the position of Risk Manager would be foolish because it would result in an increase in insurance premiums. Knowledgeable about such matters because of her position, Lorusso advised that insurance carriers, in setting premiums for municipal coverage, take into account whether a municipality has a Risk Manager since it is believed that such results in reduced risk and hence fewer claims. Lorusso recalls that some council members expressed concern and questioned the financial benefit to the city by elimination of the Risk Manager if the elimination will result in increased premium costs. In response to these questions, Richard Legg is recalled as having offered a suggestion to retain a "Risk Manager" who had a duel role in another position. This exchange apparently spawned an idea for Mr. Legg and the Mayor. Exh. 8 at ¶15.

The totality of this evidence including most especially Lorusso's account of a council challenge to the elimination of a risk manager, suggests the Mayor was faced with the task of accomplishing the elimination of Lorusso while retaining a risk manager in city service. Somehow

20

and at some point, the Mayor's budget "proposal" was altered to include recommended funding for a "Risk Manager/Procurement Officer".[9] The Department Personnel Summary for the purchasing department contained in Defendant's Exhibit E, however, makes no reference to such a position. The procedural circumstances under which the subject of the substituted summary found its way to the council, if it did at all, is unexplained. Defendant's moving papers and exhibits contain no clear evidence on this point. It well appears that the council merely appropriated funds for the Finance Department which were later assigned by defendant to the newly created position in a document created by personnel officials after the public hearing concluded or perhaps even after the adoption of the budget.

### The Testimony of H. Richard Borer, Jr.

The defendant testified that throughout Lorusso's years as his Executive Secretary, she never gave him any cause to discipline or criticize her in any manner. Exh. 7 at p. 29. He conceded that he later chose her as the city's new Risk Manager despite the fact that she did not possess the college degree called for by the job description. He did this because she was, in his opinion, well qualified to perform the duties. Id. at pp. 31-33. He conceded his control and influence as the Chief Executive

---

[9] The exact title of the position, temporarily filled by Carol Silverstein and later officially awarded to her, is that of "Risk/Procurement Manager". See Exhibit 29.

21

over the hiring of city employees in the various departments. The Mayor personally approved the hiring of Carol Silverstein, for example, into the position of Assistant Purchasing Agent. Although the Mayor gave a self-serving account of Silverstein's appointment as having been made "through the Finance Department" headed by Richard Legg, it was upon the Mayor's recommendation that Legg appointed Silverstein. Id. at pp. 91-92. When asked whether Silverstein contributed to his campaign, the Mayor answered, "She might have donated, yeah." Silverstein "probably had early on" contributed to the Mayor's campaign because Silverstein's family owned Apps' Restaurant in West Haven and the Mayor held campaign events at App's. The Mayor did indicate, however, that "you would find Carol Silverstein" as a contributor on his campaign finance disclosure statements. Id. at pp. 93-94.

As for Lorusso's unsuccessful attempts to bid for or bump into other positions, the Mayor conceded that when it comes to such matters, "the personnel department" consults him on the selections. He had discussions with Ralph DeLucca regarding Lorusso's bid for the zoning enforcement position and "who was best qualified for the job". Id. at 100-102. The Mayor has a failure of recollection as to whether he had discussions with any other city officials regarding the continued employment or re-employment of Lorusso. Id. at 102. The Mayor expressly approved the hiring of Kevin Clark over Sandra Lorusso into the position of Zoning Enforcement Officer. He made the decision, he claims, based on the relative qualifications of the two. He claimed ignorance about the official excuse given to Lorusso, to wit: her lack of a state certification. Accordingly, the

22

Mayor did not explain at his deposition how it was that Kevin Clark was hired for the position despite lacking the very same certification. Although he decided to hire Clark, he admitted that Clark did not possess the required certification. He further conceded that Clark had no experience at all working as a zoning compliance officer for West Haven or any other municipality for that matter. Id. at pp. 174-175.

The Mayor made the decision to appoint Romana Cortese to the position of Commissioner of Human Resources despite the job description's two degree requirements. The Mayor conceded that he is able and willing to exercise his authority to appoint candidates who do not meet the specific job requirements. Id. at pp. 180-181.

Confirming Richard Legg's testimony, the Mayor could not point to any other budget proposal of his that had the purpose or effect of reducing any other employees' hours to below twenty hours per week with a resulting loss of health insurance and benefits. Id. at pp. 188-192. He could not recall any other employees whose hours he proposed to reduce at all although he pointed to two clerical employees in his own office who actually requested a reduction in their work hours, but not below twenty per week. On the matter of Republican Registrar's Assistant Joann Mapes being equally affected by the Mayor's proposal as Evangelista, the Mayor stated that he "would say no" to the question of whether he could treat the Republican Registrar and her assistants differently from the

23

Democratic Registrar and her assistants. Id. Vol. II at pp. 4-6.[10] He knew that although Joann Mapes' hours were reduced, she was eligible to retire and did in fact do so thus preserving her health insurance. He conceded that Mapes was immediately re-employed in the registrars' office in the same position and thus did not suffer the harm that Evangelista did[11]. Id. at pp. 7-8.

In respect to Lorusso's unsuccessful attempt to bid into the position of Assistant to the Commissioner of Public Works, which became open upon the retirement of Mary Annunziata, the Mayor admitted that he authorized the arrangement under which the city contracted with Mary Annuziata to perform the duties of the position post-retirement on a consulting agreement basis. Although this position was one into which Lorusso could have bid given her seniority, but which was denied to her on the ground that the job was not yet "posted", the Mayor denied arranging this for the purpose of sabotaging Lorusso's exercise of her bumping rights until such time as her rights were foreclosed by retirement. Id. at pp. 60-63.

As to Deborah Evangelista, while the Mayor appears to suggest an economic necessity to his budget proposal as it affected her, the Mayor conceded that he formulated his proposal with the understanding that he would deprive Evangelista of health insurance and benefits. Id. at p. 134. The

---

[10] Exhibit 7 contains excerpts from two volumes of transcripts of the deposition of Mayor Borer as he was deposed initially on May 25, 2004 with the examination concluding on May 28, 2004. The court reporter commenced a new pagination with the second volume.

[11] Mapes' immediate re-employment is still another anomaly in this string of events for the Charter expressly states that no person on retirement compensation shall be eligible for employment by the municipality. Charter, Ch. XX §5.

24

Mayor could not identify any other city employees whose hours were reduced to less than twenty hours per week. Id. at p. 135. With respect to the Economic Development Commission, the Mayor testified that the EDC is a separate corporation whose executive director and clerical assistant are considered employees of EDC and not the city of West Haven. Notwithstanding this, he commits city funds to provide health insurance and other benefits to EDC employees. Id. at p. 139. The Mayor and his counsel confirmed that the resulting cost to taxpayers is in the range of $7,100.00 to $8,100.00 for the period 2001-2003. Id. at pp. 137-138.

A mere three weeks after depriving Deborah Evangelista of her health insurance, the Mayor sent a memo to Richard Legg directing him to take steps to provide health insurance for one Joyce Meizies, an administrative assistant with the EDC. Exhs. 35; 9 at ¶¶ 5-6. The Mayor also renewed the terms of an agreement he signed as the city's Chief Executive Officer on July 1, 2000 which afforded city-paid health insurance coverage to the EDC's Executive Director. Id.

On the general issue of budgeting for health insurance, the Mayor's proposals for appropriations for each job in the various city departments do not include the cost of health insurance for the employee holding the job. The monetary figures in the line items represent only wages and salaries for an identified job. The proposal and appropriation to fund health insurance coverage is made in a separate city-wide line items in the form of a lump sum.[12] In the 2002-03 budget vote, the

---

[12]    The obvious reason for this is that once the budget is adopted, either by council approval or by default, there is no way to tell precisely how many employees will in fact be covered by

25

city council appropriated more money for health insurance coverage than requested by Mayor Borer. The Mayor requested $3,861,558 and the council appropriated $3,955,573 in an unallocated lump sum. Exh. 9 at ¶ 12.

Since Evangelista is divorced and self-supporting, she was devastated by the loss of her health insurance and benefits. She suffers from a severe form of hypertension of which the Mayor was aware. Exhs. 9, ¶4; 2 at pp. 62-67. She was forced to withdraw funds from her 401K account to pay out-of-pocket for insurance premiums but could no longer afford it after six months. She described the embarrassment she suffered at visiting a doctor's office and advising that she was uninsured. Exh. 2 at pp. 65-67. With health insurance a high priority, Evangelista asked Mr. DeLucca whether she could work one extra hour per week at a reduced hourly rate so as to keep within the total wage appropriation for her position. Evangelista is not a member of the bargaining unit but receives annual increases as part of the city's across-the-board adjustment of wages and salaries to match union-negotiated increases. Evangelista along with everyone else was given a 3% wage increase. She discussed with DeLucca the possibility of foregoing the wage increase and working one additional hour per week. DeLucca said it could not be done. Exh. 9 at ¶ 9.[13]

---

health insurance throughout the next fiscal year. Employees may come and go, positions may be abolished, employees laid off and so forth. The Mayor of course does not have to go to the council for approval of an appropriation each and every time an individual becomes covered by the policies.

[13]   Evangelista is not a bargaining unit member so union contract provisions, including any which set minimum work hours for entitlement to benefits, would not have stood in the

26

III.  **ARGUMENT**

A.  **Defendant's Motion Does Not Address or Even Assert a Claim For Legislative Immunity From Liability for the Deprivations He Caused By Conduct Which Occurred After and Independent of the City Council Budget Proceeding and Thus His Motion is More Properly Characterized As One For Partial Summary Judgment.**

It is beyond cavil that retaliatory adverse actions against a public employee on account of her political speech or associations is anything but a clearly established violation of the first amendment to the United States Constitution. See, e.g., Rutan v. Republican Party of Ill., 497, U.S. 62, 110 S. Ct. 2729 (1990); Branti v.. Finkel, 445 U.S. 507, 100 S. Ct. 1287 (1980); African Trade & Info. Ctr. v. Abromaitis, 294 F. 3d 355 (2d Cir. 2002). Aware of this well-established principle, defendant does not attempt to defend against allegations that his conduct, stripped from the immunity context, violated the plaintiffs' constitutional rights. He in essence invites the Court to presume a vindictive purpose in his budget proposals as they related to plaintiffs and further to presume that his animus was fueled by a desire to retaliate against the women on account of first amendment-protected activity.

Defendant's motion is based on a constrained set of facts. Unrelated to the city council process in adopting the budget, there is a specific allegation in the complaint that "[t]he defendant proceeded to abuse his power as Mayor and manipulate and eliminate job titles and positions in order

---

Mayor's way.

27

to cause the loss of the plaintiffs' employment. See Complaint at ¶14. The complaint also includes the allegation that "[d]espite the fact that [Lorusso] had bumping rights under the applicable collective bargaining agreement, and further, that vacant positions were available for which she was qualified, the plaintiff was repeatedly denied employment in another available position". Complaint, ¶15. In the opening paragraphs of the complaint, it is alleged that the Mayor at all times was the Chief Executive Officer of the city and had overall administrative responsibility over the affairs of the city and its personnel. He is further alleged to have control over the appointment, hiring, promotion, transfer and discharge of employees of the city. Complaint, ¶3.

Defendant's moving papers speak to the issue of legislative immunity in the narrow context of his submission of the budget proposal and the council action on it. He does not even mention, much less discuss, entitlement to legislative immunity in connection with the allegations set forth in paragraphs 3, 14 and 15. He simply ignores them. No doubt aware that most of the pertinent facts take this case right out of the immunity equation, defendant predicates his argument for a grant of absolute immunity entirely on the city council's vote on his municipal budget proposal[14]. The Court should thus treat defendant's motion as one for partial summary judgment. Nonetheless, should defendant seek permission to re-brief the issues, the plaintiff's argument on these claims follows.

---

[14]   Defendant's Local Rule 9(C)1 Statement makes no mention of these factual allegations. The plaintiffs do not concede that defendant is immune in this regard. See Argument infra. at pp. 38-40.

28

**B.     The Defendant is Not Entitled to Legislative Immunity Upon Allegations That, Apart From and After the City Council's Approval of a Budget, He Acted to Deprive Lorusso of Continued Employment and Evangelista of Benefits as Such Acts are Executive and Administrative in Nature.**

While it is generally true that legislators and, in some cases, an executive official who plays a role in the legislative process are entitled to absolute immunity, see Bogan v. Scott-Harris, 523 U.S. 44 (1998); Carlos v. Santos, 123 F. 3d. 61 (2d Cir. 1997), the allegations against Mayor Borer in this case do not qualify him for immunity. Employing a functional approach, courts have instructed that the test for determining whether an act is legislative depends on the nature of the act and not necessarily the identity of the actor. See Bogan at 54; Forrester v. White, 484 U.S. 219, 224 (1988). To be granted absolute immunity, one's challenged acts must have been taken "in a sphere of legitimate legislative activity". Bogan, 523 U.S. at 54. Administrative or executive actions of officials including legislators, however, are not subject to immunity. Id. The Mayor's acts of formulating and submitting budget proposals to the council aside, (but addressed infra at pp. 38-40), his actions against the plaintiffs, well after the conclusion of the council's legislative proceeding, were unquestionably of an administrative character. It is undisputed that the Charter vests all legislative authority in the city council and all executive authority in the Mayor. Moreover, by charter, the city's personnel director, a mayoral appointee, is charged with performing all manner of personnel management functions including hiring, transfers and the classification of jobs - functions which are quintessentially administrative in nature. See also Ballas v. City of Reading, 168 F. Supp. 2d (E.D.

29

Pa. 2001) (city personnel director, although his position is established by the City Charter, is not a "high public official" for purposes of state's immunity law as he is responsible for administering the personnel system and effectuating employee actions requested by the city council or the Mayor; as such, his duties are administrative in nature).

Apart from the fact that Ralph DeLucca likewise administers the personnel system for the City of West Haven, and, according to the overwhelming evidence, not only reports to the Mayor but takes direction from the Mayor with respect to personnel decisions, the Mayor's role in personnel administration is just that - administrative. There is absolutely no evidence, (nor does defendant suggest otherwise), that the city council plays any role whatever in decisions as to which individuals will be hired, demoted, transferred or permitted to bump into an open position. By all accounts, including that of the Mayor, those decisions are made by the Mayor in collaboration with his appointed administrators who perform under his direct supervision. There is also no evidence to suggest that the city council has any role to play in a decision as to who will be permitted to have health insurance[15]. It is uncontested that with respect to health insurance, the city council merely approves a generalized lump sum allocation for this purpose and the funds are later applied and expended by the administration.

Under the Charter, the Mayor "shall be directly responsible for the administration of all

---

[15] If it did, the Mayor could not issue the executive orders reflected in Exhibit 35.

30

departments and agencies and all officers in charge of persons or boards appointed by him, and shall supervise and direct the same". He also has the right to remove for cause any officer or employee appointed by him which would include of course Richard Legg and Ralph DeLucca as both hold mayoral appointments[16]. With respect to the budget, the city council may only increase or decrease a <u>line item</u> in the Mayor's budget by a two-thirds vote of the entire council. In other words, the council votes on an appropriation. There is nothing in Chapter XIX, Section 4 of the Charter which may remotely can be construed as empowering the council in such matters as personnel administration and the awarding of jobs. By extension, the Mayor can not be heard to claim that his role in personnel administration is inextricably entwined with the budget vote so as to cloak his personnel decisions with a legislative character. If this inherently illogical proposition were true the Mayor would be immune from liability for every employment action he takes on the ground that the affected employee's job on some previous date was funded by a vote of the city council.

Personnel actions taken against specific employees do not constitute legislative conduct; they reflect personnel decisions rather then general legislative policymaking, nor are such actions rendered legislative in nature by virtue of the fact that they occurred in the wake of a legislative act. <u>Katzenmoyer v. City of Reading</u>, 158 F.Supp. 2d 491, 501 (E.D. Pa. 2001) citing <u>In Re: Montgomery</u>

---

[16]    As to the credibility of these officials, any suggestion that there is no jury issue is wholly belied by the evidentiary record in this case which shows that both, if called to testify, would do so with apprehension as the Mayor is brazenly vindictive and quite capable of concocting a pretext for their dismissal.

31

> question must be taken 'in the sphere of legitimate legislative activity'. Bogan, 523 U.S. at 54 (quoting Tenney v. Brandhove, 341 U.S. 367 376, 95 L. Ed. 1019, 71 S. Ct. 783 (1951) Discretionary personnel decisions, even if undertaken by public officials who otherwise are entitled to immunity, do not give rise to immunity because such decision-making is no different in substance from that which is enjoyed by other actors..... .

323 F. 3d. 206 at 210-211[18]

Although defendant does not speak to this issue ( and thus does not argue the sufficiency of the evidence), in anticipation that defendant may advance such a claim by way of reply brief, plaintiffs address it now. There is not only sufficient, but overwhelming and compelling evidence that the Mayor is liable for each and every impediment to Lorusso's continued employment. These compelling facts are uncontested:

1. The Mayor set the stage for this series of events by voicing his intention to retaliate to Finance Director Richard Legg.

2. Lorusso was shut out of the zoning enforcement position for alleged lack of a certification although the predecessor was hired without one as was the person granted the job over Lorusso;

3. Plaintiff was shut out of the assistant position in Public Works on the ground that the job was not vacant or "open" while the person who vacated the job was paid to perform the duties on a contract basis. The position was posted and filled right after the plaintiff's retirement with an individual whose previous job involved supervising the city pool and aquatic activities. The

---

[18] The Court of Appeals did reverse the District Court's decision in part with respect to plaintiff's due process claim, an issue not relevant to the instant case.

33

       plaintiff's pre-retirement written request that she be considered for the position, a request known to the Mayor, was ignored.

4. Lorusso was not granted, nor even considered for, continued employment as the" unofficial Risk/Procurement Manager" pending official creation and posting of the position, while Carol Silverstein, who had less seniority, (whose own position was abolished in the unusual circumstances aforedescribed) was allowed to continue working in this position beyond the start of the new fiscal year;

5. Evangelista was the only employee whose hours were reduced to less than 20 per week and the <u>only</u> one to lose her benefits.

6. Joann Mapes was allowed to retire, secure her health and other benefits and return immediately to work despite the fact that the charter expressly prohibits the employment of retired city employees.

7. The Mayor, by his own admission as well as other ample evidence, has influence over and indeed controls the selection of employees in the various departments and ignores technical job qualifications (such as certificates and educational degrees) in making his selections.

For like reasons, and upon the same authority cited <u>supra</u> at pp. 30-32, the act of depriving Deborah Evangelista of her health insurance and benefits cannot fairly be considered a legislative act. While the city council appropriated funds for her department, the city council does not decide the issue of work hours or health insurance. The council's appropriation of funds to cover health insurance premiums is not connected to a budget line item for Evangelista's department but rather

34