UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF CONNECTICUT

*******************************

| | | |
|---|---|---|
| SANDRA LORUSSO and DEBORAH | * | CIVIL ACTION NO. |
| EVANGELISTA | * | 3:03CV00504 (MRK) |
| | * | |
| PLAINTIFFS | * | |
| | * | |
| VS. | * | |
| | * | |
| H. RICHARD BORER, JR. | * | AUGUST 9, 2005 |
| DEFENDANT | * | |

*******************************

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT'S FIRST MOTION FOR JUDGMENT AS A MATTER OF LAW

## I.    INTRODUCTION

Pursuant to Fed. R. Civ. P. 50 (a), Defendant in the above-captioned matter hereby moves for the entry of judgment as a matter of law in his favor and against Plaintiffs on the ground that Plaintiffs have failed to adduce sufficient evidence to make out a *prima facie* case for the violation of their First Amendment rights by Defendant.

Plaintiffs' proffered evidence at trial ultimately demonstrates only that, following the City budget process, it was Defendant's subordinates, without the personal and direct involvement of Defendant, who made decisions in relation to Plaintiffs' employment. First, Plaintiffs' evidence does not show that they suffered by any adverse actions. The evidence also fails to meet the requirement of personal and direct involvement by Defendant. Finally, the evidence does not demonstrate that the exercise of Plaintiffs' rights was a motivating factor behind any alleged adverse action. Accordingly, pursuant to Fed. R. Civ. P. 50 (a), judgment as a matter of law should enter in Defendant's favor because there is no legally sufficient evidentiary basis to support a finding that Defendant violated Plaintiffs' First Amendment rights.

## II.    STANDARDS OF LAW

### A.    Standard of Review

"Under Rule 50, a court should render judgment as a matter of law when 'a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'" Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 149 (2000), citing Fed. R. Civ. P. 50 (a).[1]  The standard for judgment as a matter of law under Rule 50 mirrors the standard for summary judgment under Rule 56 and, therefore, the inquiry under each rule is the same.  Id. at 150.  Accordingly, when considering a motion made under Rule 50, the court must review all of the evidence in the record and draw all reasonable inferences in favor of the nonmoving party, but make no credibility determinations or weigh any evidence.  Id.  Although the court must review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe.  Id. at 151.  Nevertheless, the court should give credence to "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses."  Id.

### B.    Substantive Issues

### 1.    Elements of *Prima Facie* Case

Under 42 U.S.C. § 1983, to establish a *prima facie* case of retaliation for engaging in protected speech, a public employee must prove by a preponderance of the evidence that (1) [her] speech addressed a matter of public concern, (2) [s]he suffered an adverse employment action, and

---

[1]Fed. R. Civ. P. 50 (a) provides: "If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law  be maintained or defeated without a favorable finding on that issue."

(3) a causal connection existed between the speech and the adverse employment action, so that it can be said that [her] speech was a motivating factor in the determination." Velez v. Levy, 401 F.3d 75, 95 (2d Cir. 2005); Feingold v. New York, 366 F.3d 138, 160 (2d Cir. 2004). The employee's essential burden is to show that she was punished for having engaged in the protected speech. See Gill v. Pidlypchak, 389 F.3d 279, 382 (2d Cir. 2004).

**2.      Adverse Employment Action Element**

"Adverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand." Phillips v. Bowen, 278 F.3d 103, 109 (2d Cir.2002). In order to satisfy the burden of proving that an adverse employment action occurred, a plaintiff must first establish "basic eligibility for the position at issue." Slattery v. Swiss Reinsurance America Corp., 248 F.3d 87, 92 (2d Cir.), cert. denied, 534 U.S. 951, 122 S.Ct. 348, 151 L.Ed.2d 263 (2001). In order to establish this basic eligibility, a Plaintiff must offer more than her subjective opinion that she is qualified for the job. See Castro v. Local 1199, 964 F. Supp. 719, 726 (S.D.N.Y. 1997) (court found plaintiff failed to make out *prima facie* case of age discrimination based on plaintiff's failure to offer any evidence apart from plaintiff's own testimony that she was qualified); Layaou v. Xerox Corp., 999 F. Supp. 426, 432 (W.D.N.Y.1998) (employee's subjective opinion about his qualifications is insufficient to give rise to a triable issue of fact).

**3.      Requirement of Personal Involvement**

It is well settled in this Circuit that, as a prerequisite to an award of damages under Section 1983 in an action against an official in his personal capacity, a plaintiff must allege and prove by a preponderance of the evidence the direct, personal involvement of the defendant in the alleged constitutional deprivation. Feingold v. New York, supra, 366 F.3d at 159; Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995); Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994); Soto v. Schembri,

960 F.Supp. 751, 756 n.3 (S.D.N.Y. 1997).  Liability for damages in such cases may not be based on

the doctrines of *respondeat superior* or vicarious liability.  See Soto v. Schembri, supra, 960

F.Supp. at 756 n.3.  This is because personal capacity suits seek to impose individual liability upon

a government officer for actions taken under color of law.  See Hafer v. Melo, 502 U.S. 21, 25

(1991).  Moreover, a defendant official sued in his individual capacity cannot be held personally

liable for the wrongful acts of his subordinates simply because he was in a high position of

authority.  See Colon v. Coughlin, supra, 58 F.3d at 874; Wright v. Smith, supra, 21 F.3d at 501.  A

plaintiff must show more than a defendant's linkage in the official chain of command.  See Wright

v. Smith, supra, 21 F.3d at 501.

Accordingly, officials in a supervisory role can only be found personally liable for the

wrongful acts of their subordinates under the following circumstances: "(1) the defendant

participated directly in the alleged constitutional violation, (2) the defendant, after being informed of

the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a

policy or custom under which unconstitutional practices occurred, or allowed the continuance of

such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who

committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the [violation

of rights] by failing to act on information indicating that unconstitutional acts were occurring."

Colon v. Coughlin, supra, 58 F.3d at 873, citing Wright v. Smith, supra, 21 F.3d at 501; see Soto v.

Schembri, supra, 960 F.Supp. at 756 n.3.  The failure to show a supervisory defendant's actual or

constructive knowledge of the alleged constitutional violation by a subordinate precludes liability

when a plaintiff claims that an official was personally involved.  See Wright v. Smith, supra, 21

F.3d at 501.  Plaintiffs have not alleged claims in relation to the last four scenarios set forth above.

Their allegations fall within the bounds of only the first scenario, if any. Consequently, the analysis of their claims is so limited.[2]

###    4.        Causal Connection / Motivating Factor Element

As to the third element, if an employee fails to establish that her protected speech was at least a "substantial" or "motivating" factor behind an alleged adverse employment action, her First Amendment claim must fail. White Plains Towing Corp. v. Patterson, 991 F.2d 1049, 1058-1059, cert. denied, 510 U.S. 865 (1993). To prove this causation element, "a plaintiff may not rely on conclusory assertions of retaliatory motive . . . ." Cobb v. Pozzi, 363 F.3d 89, 108 (2d Cir. 2004), citing Morris v. Landau, 196 F.3d 102, 111 (2d Cir. 1999). Indeed, a plaintiff in a First Amendment retaliation case where the defense of qualified immunity has been asserted must prove with particularized evidence of direct or circumstantial facts that a defendant had the specific subjective and unlawful intent to retaliate against her for the exercise of her First Amendment rights. See Locurto v. Safir, 264 F.3d 154, 169-170 (2d Cir. 2001) (evidence of such motive is an essential component of plaintiff's affirmative case); Shepphard v. Beerman, 94 F.3d 823, 827-28 (2d Cir.

_____

2 Plaintiffs in this case might try to establish Defendant's personal liability by demonstrating that Defendant ratified the actions of one of his subordinates. To show ratification, "a plaintiff must prove that the 'authorized policymakers approved a subordinate's decision and the basis for it.'" See Christie v. Iopa, 176 F.3d 1231, 1239 (9th Cir.), cert. denied sub nom, County of Hawaii v. Anderson, 528 U.S. 928 (1999). Moreover, even if plaintiffs prove Defendant's knowledge of an alleged adverse action, "a policymaker's mere refusal to overrule a subordinate's completed act does not constitute approval." Id. Nevertheless, it is clear that the ratification doctrine is an improper ground for establishing Defendant's personal liability in this matter because the rule is applied toward issues of municipal liability, which are not involved here. See Amnesty America v. Town of West Hartford, 361 F.3d 113, 126 (2d Cir. 2004) (discussing policymaker's ratification as means of finding municipality liable for employee's unconstitutional conduct). Moreover, Plaintiffs failed to allege such a theory in their complaint. Consequently, they are precluded from obtaining relief on this ground. See, e.g., Martinez v. New York State Department Of Correctional Services, 1997 WL 129386, *2 (N.D.N.Y. 1997).

1996); Rapkin v. Rocque, 228 F.Supp.2d 142, 148 (D.Conn. 2002). Thus, a plaintiff must provide "some tangible proof to demonstrate that [her] version of what occurred was not imaginary." Cobb v. Pozzi, supra, 363 F.3d at 108, citing Morris v. Landau, supra, 196 F.3d at 111.

The necessary causal connection "can be established either indirectly by means of circumstantial evidence, for example, by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus. See Mandell v. County of Suffolk, 316 F.3d 368, 383 (2d Cir. 2003), citing Morris v. Landau, supra, 196 F.3d at 110. Nonetheless, any causal connection that may be demonstrated "must be sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action, that is to say, the adverse employment action would not have been taken absent the employee's protected speech." Morris v. Landau, supra, 196 F.3d at 111; see Mount Healthy City School Dist. Bd. of Educ. V. Doyle, 429 U.S. 274, 287 (1977); Mandell v. County of Suffolk, supra, 316 F.3d at 382. Accordingly, an employee engaging in protected conduct that played a part, substantial or otherwise, in a decision not to rehire should not be able "to prevent his employer from . . . reaching a decision not to rehire . . . simply because the protected conduct makes the employer more certain of the correctness of its decision." Mount Healthy City School Dist. Bd. of Educ. V. Doyle, supra, 429 U.S. at 285-86; see White Plains Towing Corp. v. Patterson, supra, 991 F.2d at 1059. This is particularly true where "a dramatic or abrasive incident is inevitably on the minds of those responsible for the decision to rehire, and [it] does indeed play a part in that decision even if the same decision would have been reached had the incident not occurred." Id. at 285.

The causal connection can be established indirectly by showing that the protected activity was followed closely in time by the adverse action. See Cifra v. General Electric Co., 252 F.3d 205, 217 (2d Cir. 2001). An inference of causation based on closeness in time is not justified, however,

where the time which has elapsed between the protected speech and the alleged adverse action is too great.  Morris v. Landau, supra, 196 F.3d at 113, citing Conner v. Schnuck Markets, Inc., 121 F.3d 1390, 1395 (10th Cir. 1997) (affirming, in Fair Labor Standards Act action, that four-month time lag between events would not by itself be sufficient to support finding of causation and ruling that unless adverse employment action is "very closely connected in time to the protected conduct, the plaintiff will need to rely on additional evidence beyond mere temporal proximity to establish causation"); see Hollander v. American Cyanamid Co., 895 F.2d 90, 85-86 (2d Cir. 1990) (in ADEA discrimination case, passage of three months between protected activity and alleged retaliatory adverse action too long to suggest causal relationship); see also Filipovic v. K & R Express Systems, Inc., 176 F.3d 390, 398-399 (7th Cir. 1999) (in Title VII retaliation action, four-month time period between protected activity and adverse action insufficient to establish causal link); Richmond v. ONEOK, Inc., 120 F.3d 205, 209 (10th Cir. 1997) (affirming, in FLSA and FMLA action, that three-month period between protected activity and adverse action was insufficient, standing alone, to establish causal connection).  Indeed, "a substantial time lapse between the protected activity and the adverse employment action 'is counter-evidence of any causal connection.'"  Filipovic v. K & R Express Systems, Inc., supra, 176 F.3d at 399.

### III.    ARGUMENT

Even when viewed in the most favorable light, Plaintiffs' evidence is insufficient to shore up their claims.  First, Plaintiffs must prove that they, in fact, suffered actionable adverse employment actions.  Also, Plaintiffs are charged with providing sufficient evidence to demonstrate Defendant's personal and direct involvement in any post-budget conduct that constitutes adverse employment actions in violation of their rights.  Plaintiffs must then prove that their protected speech played a substantial or motivating role in taking any alleged adverse action.  As shown by the facts and fair

inferences drawn from the evidence, Plaintiffs' evidence fails to support these elements. Consequently, their claims must fail as a matter of law and judgment should be rendered in Defendant's favor.

### A.    Plaintiffs' Evidence Fails To Show Actionable Adverse Employment Actions

At the outset, Plaintiffs have failed to prove that they suffered any actual and actionable adverse employment actions.  Accordingly, judgment should be rendered for Defendant.

### 1.    Plaintiff Lorusso

The evidence fails to show that Lorusso suffered any actual adverse employment action. First, in order for Lorusso to have truly suffered an adverse employment action here, she must have been qualified for the position she was denied.  See, e.g., Gadsden v. Jones Lang Lasalle Americas, Inc., 210 F.Supp.2d 430, 442 (S.D.N.Y. 2002) (summary judgment granted in favor of defendants in Title VII case, based, in part, on plaintiff's failure to establish he was qualified for the position in question); Marlow v. Office of Court Administration, 820 F.Supp. 753 (S.D.N.Y. 1993) (summary judgment granted for defendant in age discrimination case where plaintiff failed to show he was qualified for job).  Other than offering her own assertions of qualification, Lorusso has not demonstrated that she was qualified for the position of Zoning Enforcement Officer.  In fact, Lorusso admitted she did not meet all the requirements for this position, including code and law enforcement experience and holding a required state certification.  See Exs. 5, 6, 503 & 512; Trial Transcript from 8/3/05 ("TT1") at 88-91, 162, 170-171; Trial Transcript from 8/4/05 ("TT2") at 138-139. Moreover, under the City's bumping policy, Lorusso was not qualified for the position.  See Exs. 4 & 502; TT1 at 86-87, 166; TT2 at 135-136, 186.  Moreover, Plaintiffs' evidence fails to rebut the inescapable fact that Lorusso retired voluntarily before the other two positions she sought became available and that, as a result of her retirement, she lost her bumping and bidding rights.

8

See Exs. 11, 12 & 513; TT1 at 112-113, 127; TT2 at 153-154, 168, 170.  Had Lorusso taken a layoff instead of retiring, she could have exercised her recall rights for up to two years, which would have given her further opportunity for re-employment.  <u>See</u> Ex. 501; TT1 at 116; TT2 at 208-209.  Further, there is no evidence indicating that anyone improperly held up the processing of job descriptions, which had to be union approved before the two positions could be posted legally.  <u>See</u> Exs. 14, 18, 20, 510, 511, 514, & 519; TT1 at 174, 177-179; TT2 at 153-155.  Moreover, despite the power to do so under the union contract, Lorusso never filed a grievance in relation to the denial of any of the three positions she sought.  <u>See</u> Ex. 501; TT1 at 185-186; TT2 at 206-207.  This failure suggests strongly that even Lorusso does not believe in the veracity of her claims.  Accordingly, there is no evidence that Lorusso experienced any actual and, therefore, actionable adverse employment actions.

### 2.    Plaintiff Evangelista

Plaintiffs' evidence also fails to show that Evangelista suffered an adverse action in that it fails to demonstrate that the failure to reinstate her benefits was the result of anything more than the budget process and its interaction with a City Council resolution.  <u>See</u> Exs. 529 & 531; TT1 at 199-200, 203-204; TT2 at 11-12, 83-84, 117.  Evangelista admitted, in fact, that Personnel Director Ralph DeLucca could not override the actions of the City Council.  <u>See</u> TT2 at 14.  Moreover, Evangelista admitted that she approached no one other than DeLucca with respect to reinstatement of her benefits The defendant confirms that Evangelista never approached him with such a request.  Accordingly, Evangelista's claim that the defendant retaliated against her by failing to reinstate her benefits must fail for the simply fact that he was never asked.

9

**B.    The Evidence Demonstrates That Defendant Was Not Directly Or Personally Involved In Lorusso's Failure To Obtain Re-Employment Or Any Decision To Not Reinstate Evangelista's Benefits**

As an initial point, Defendant does not deny that, as part of the legislative process, he proposed a budget that eliminated many jobs, including Lorusso's job, and resulted in the reduction of Evangelista and her counterpart's hours with a loss of their benefits.  The propriety of this conduct is no longer at issue, however, and it certainly does not reasonably demonstrate that Defendant was personally involved in any alleged post-budget conduct.  Plaintiffs' case, therefore, depends upon the wholly speculative claims that the procedures followed were all subterfuges designed to allow the Mayor's purposeful violation of their rights.  Nevertheless, there is no evidence to support a finding of the Mayor's personal involvement.

Indeed, it is undisputed that the Mayor has not engaged in a pattern of withholding employment based on who supported his reelection.  Several people who supported the Mayor's opponent have retained employment with the City.  Tom Reilly, remains employed with the City although he supported Defendant's opponent in the election.  TT2 at 190-191.  In fact, Reilly continues to be employed by the City and continues to support Picard, who ran again in 2003 and is running again in 2005.  See Mayor's Testimony.  Further, although her daughter's job was eliminated in the budget, Margaret Schenkle supported the Mayor's opponent in 2001 and her job with the City was not eliminated.  See TT2 at 22-27, 30-32.  In addition, since July 2001, Lorusso has held the appointed part-time position of Deputy Registrar of Voters, for which she enjoys a stipend from the City.  She also was hired in 2005 as the clerk to the food service manager at the Board of Education, despite the fact that the Mayor sits as an *ex officio* member of the Board.  Of course, Evangelista retained her employment as well.  Moreover, the evidence establishes that many of Plaintiffs'

relatives have and currently do work for the City.  TT1 at 137-138, 160-161, 182-183, 186-187, 199-200, 203-204; TT2 at 7-8.

     **1.**     **Plaintiff Lorusso**

     **a.**     **Zoning Enforcement Officer Position**

Plaintiffs' own decisions following the budget process carry the great weight, if not all, of the blame here.  Moreover, there is no evidence that the Mayor played any role in DeLucca's decisions concerning Lorusso's attempt to bump into the position of Zoning Enforcement Officer. To the contrary, the evidence indicates prominently, fairly and conclusively that Lorusso opted herself out of re-employment without any involvement by the Mayor.

On June 11, 2002, Personnel Director Ralph DeLucca advised Lorusso that her job was eliminated and that her decisions during the bumping process would determine her future.  See Exs. 2 & 534; TT1 at 85; TT2 at 137.  Lorusso informed DeLucca she would refuse a buy out, although it was one of the best ever offered by the City.  See Ex. 536; TT1 at 69, 168-169; TT2 at 96, 203-204. Instead, she chose to exercise her bumping and bidding rights in an attempt to obtain a new job before July 1, 2002, when she would either have to take a layoff or retire.  TT1 at 94, 169.

The city's bumping policy provided that a bumping employee must have more seniority than the employee being bumped, the bump must be to a lateral or lower job classification and the bumping employee must meet the job's basic qualifications.  If an employee does not meet the qualifications, no bump occurs and the employee may consider bumping into another position. DeLucca, as the Personnel Director, was empowered to solely determine whether an employee met a job's basic qualifications.  See Exs. 4 & 502; TT1 at 86-87, 166; TT2 at 135-136, 186.  By contrast, when a job is filled by bidding, the appropriate Department Head determines an employee's qualifications for the job.

On June 21, 2002, Lorusso met with DeLucca and a union representative. She was given her bumping rights and told she could bump into positions for which she was qualified. Despite her lack of appropriate qualifications, Lorusso requested to bump into the position of Zoning Enforcement Officer, which had been posted on May 8, 2002. Lorusso did not bid on the position when it was originally posted. Through the bidding process, this position had been filled earlier by another department head, who, in his sole discretion, chose Kevin Clark for the job despite his lack of a required certification.

Because Lorusso did not bid on the job as did Kevin Clark, and sought instead to bump into the job, her qualifications were determined solely by DeLucca. When determining whether to allow Lorusso to bump into the job, DeLucca viewed her qualifications only in comparison to the job's description. Among other requirements, the job description required one to be a state certified Zoning Enforcement Official and to have training in law enforcement and code enforcement. DeLucca told Lorusso she was not qualified for this position based on her lack of any code enforcement experience and, afterwards, he notified the Mayor that he declined to bump Lorusso into the job. Upon refusing Lorusso's request, DeLucca explained to her and informed her in writing that she could retire or take a layoff. Lorusso elected retirement effective June 30, 2002. Although Lorusso claims that DeLucca's stated reason for her lack of qualifications is her lack of certification, she admits that she has no training in law enforcement or code enforcement. See Exs. 5, 6, 11, 503, 512 & 513; TT1 at 88-91, 106, 162, 169-171; TT2 at 137-143, 188-189. Moreover, she had the option of bidding on the job along with Kevin Clark and leaving the waiver of her state certification to the Department Head, but chose not to do so. Most importantly, the Mayor had no knowledge of these events until after they had occurred and played no role in Lorusso poor choices regarding re-employment.

12

### b.     Public Works and Finance Department Positions

Lorusso's decisions also failed her in her attempts to bid on the Assistant to Commissioner of Public Works position ("Assistant position") and the Risk / Procurement Manager position ("Manager position").  There also is no evidence that the Mayor had any direct and personal involvement in DeLucca and Legg's decisions concerning these positions.  Instead, DeLucca acted alone and lawfully in every respect with regard to the Assistant position.  As to the Manager position, DeLucca and Legg acted with complete independence from each other and the Mayor.

First, the evidence shows DeLucca was constrained in certain ways and empowered in other ways by the city charter, the union contract and specific actions taken by the union in relation to the job descriptions for the two positions.  Under the union contract, an employee could bid in writing on an open and posted position based on seniority and whether they possessed a position's required qualifications.  Only if no union member bid on a posted position could a non-employee seek it. See Ex. 501; TT1 at 166, 169-170; TT2 at 136.  The City Charter and the union contract, however, grant DeLucca the authority and duty to make up and issue all job descriptions.  See Exs. 29 & 501; TT1 at 111, 170; TT2 at 186.  Nevertheless, by contract and custom, DeLucca could not post jobs for union members to bid on until he obtained union approval of any rewritten positions after the union had the opportunity to bargain on the impact of any changes.  See TT2 at 216-221.

DeLucca operated within these constraints as to the Assistant position without any input from the Mayor.  By letter dated June 10, 2002, Lorusso sought to bump into or bid on the Assistant position.  Although this letter was sent to DeLucca and cc'd to Mayor's office, Lorusso did not expect the Mayor to get involved.  See Exs. 9 & 508; TT1 at 97, 106-107, 171-172, 191.  The Assistant job was not posted at that time, however, because DeLucca needed union approval of a new job description, which was submitted to the union on June 18, 2002.  See Exs. 7 & 510; TT2 at

146-147, 191-192, 194-195.  Accordingly, on June 11, 2002, DeLucca informed Lorusso that the position would not be open or posted for union members until its description, which was being rewritten to address union concerns, was approved.  This letter was also copied to the Mayor's office, but Lorusso admitted the Mayor never contacted her about her efforts.  See Exs. 10, 14 & 509; TT1 at 107-109, 172-173, 188; TT2 at 153, 171-172, 191-194, 219-221.  On June 18, 2002, DeLucca requested in writing that the union approve the description so he could post it as quickly as possible.  See Ex. 510; TT2 at 154-155.

Arthur Farris, then the Commissioner of Public Works, acceded to the rewriting of the Assistant position.  See Exs. 29 & 501, TT1 at 59; TT2 at 148-151, 230, 235.  Farris was under no pressure to fill the job quickly because Mary Annunziata, although retired, performed the duties of the job as a paid consultant while its description was being processed.  See Ex. 8; TT1 at 103-104; TT2 at 145; TT2 at 151, 235, 237.  On July 10, 2002, Lorusso informed DeLucca she was interested in the job despite her retirement, but he did not share her interest with Farris.  The evidence shows, however, that Lorusso simply was unable to bid on the job because it was not posted prior to her retirement, which, by her own request, was effective June 30, 2002.  In fact, Lorusso admitted that she knew that the description for this position was being rewritten and, therefore, she had no hope that the approval process would be completed before July 1, 2002.  See Exs. 11, 12 & 513; TT1 at 106, 112-113, 116, 127; TT2 at 153-154, 167, 169-171, 224.

After the rewritten job description was approved on July 8, 2002, the Assistant position was posted on July 9, 2002.  Lorusso did not bid on the position, was not invited to interview for it and was not contacted by DeLucca or the Mayor about the job.  See Exs. 20, 510 & 514; TT1 at 106, 109, 115, 174, 177-178, 188; TT2 at 154.   Farris interviewed four union members at DeLucca's direction.  See Ex. 515; TT2 at 156, 166, 196.  Effective August 5, 2002, Farris awarded the

position to Mark Bisaccia, whom he determined to be best qualified for the position. Bisaccia also had more seniority than Lorusso, which would have controlled even if Lorusso had been qualified and eligible to bid. In any event, Farris selected Bisaccia without input from the Mayor or anyone else. DeLucca then posted this result. See Exs. 21, 501, 516 & 517, TT1 at 109-110, 178, 179; TT2 at 155, 197; Farris' Testimony.

The evidence also shows that Finance Director Richard Legg acted without the Mayor's direct and personal involvement when he retained Carol Silverstein and chose her to fill the Manager position. Here, Lorusso sought to bid on the new Manager position. During the budget process, Legg had determined to combine the duties of the assistant purchasing agent, Carol Silverstein, with the eliminated risk manager position. Silverstein's position also had been eliminated but was replaced in the budget with a higher paying position in anticipation of the combined Manager position. This new position was accidentally titled by the same name as Silverstein's former position in the rush to get the proposed budget together. Subsequently, the position was renamed to reflect the combined duties.[3] Legg created the position in response to the need for someone to do the risk management functions inherent in Lorusso's eliminated position. Thus, in May 2002, after he knew the Manager position had been approved in the budget, Legg drafted a description for the merged position and submitted it to personnel, which sent it to the union for approval on June 3, 2002. See Exs. 13, 14, 16, 28, 505 & 511; TT1 at 84-88, 116, 123-124, 128-130; TT2 at 60-61, 65-67, 98-99, 102, 109-110, 198.

_____

[3] Notably, the adopted budget refers to the Risk Manager job as the Claims and Loss Coordinator. Thus, Lorusso's contention that the failure of the Recommended Budget to reflect the eventual title of this position is a non-starter.

The union elected to bargain over this position.  Accordingly, the new job was not posted due to union delays.  On June 18, 2002, DeLucca reminded the union that he still needed approval of the description for the Manager position.  On July 22, 2002, the union approved the job and it was posted by July 23, 2002.  On August 1, 2002, DeLucca informed Lorusso of these developments.  See Exs. 15, 16, 18, 510, 518, 519 & 523; TT1 at 117, 120-122, 124-125; TT2 at 108, 202. Carol Silverstein and Carl Guarnieri responded to the posting and were interviewed for the job.  See Ex. 520; TT2 at 73, 75-76, 112, 200-201.  Lorusso admitted she was not entitled to bid on this position because she had retired before it was posted and that she never spoke to the Mayor about the job.  See TT1 at 125, 135-136, 181, 188; TT2 at 76.  Neither the Mayor nor anyone else told Legg not to consider Lorusso for the job or how to fill it.  Legg simply never considered her for the position because she had retired.  Moreover, Legg stated that Lorusso was not qualified.  Ultimately, Legg chose Silverstein for the position based on her strong qualifications, which include a bachelor's degree in economics, a masters' degree in management and six years of significant purchasing experience.  Thus, even if Lorusso could have bid, Silverstein's qualifications far outweighed those of Lorusso and Lorusso's seniority over Silverstein would not have aided her.  DeLucca posted the result on August 2, 2002.  See Exs. 19 & 525; TT1 at 126-127; TT2 at 63-64, 75, 77-78, 109, 114; Mayor's Testimony.

This evidence fails to show that the Mayor was personally involved in decisions concerning these two positions.  Moreover, the evidence supports a finding that the job rewrites and Lorusso's retirement were the legitimate reasons for Lorusso's failure to secure these positions.  It is undisputed that DeLucca timely submitted the descriptions to the union, but was required to wait for approval before posting the positions, which the union delayed despite his requests and without any involvement of the Mayor.  Further, the fact that Legg played a bit loose with the rules does not

implicate the Mayor.  Legg acted independently and did not inform the Mayor of his actions regarding Silverstein until after he had implemented them.  Silverstein also proceeded through the normal bidding process once the Manager job was posted.  In addition, the fact that Lorusso and DeLucca copied the Mayor's office on some correspondence concerning the Assistant position is unimportant.  There is no indication that the Mayor knew of this or acted in any way on such information.  Finally, DeLucca had no authority to reverse Lorusso's decision to retire or to ignore its impact on his duties to the remaining union members.  Thus, DeLucca and Legg's independent acts do not show personal involvement by the Mayor and Lorusso's case fails on this element.

### 2.        Plaintiff Evangelista

In addition, no evidence supports Evangelista's claim on the personal involvement element. The evidence shows that under a 1996 resolution of the City Council, appointed employees who worked less than 20 hours per week, such as Evangelista and her counterpart, Joann Mapes, were not entitled to such benefits.  Thus, because the budget cuts resulted in a reduction in her hours, Evangelista and Mapes lost their benefits.  See Exs. 501, 529 & 531; TT1 at 78, 203; TT2 at 12, 84.

The evidence also shows that in May 2002, right after a City Council meeting concerning the proposed budget, Evangelista threatened the Defendant and said he should live a clean life because she would be coming after him.  She thanked Defendant sarcastically for the budget cuts and said, "Payback's a bitch."  Defendant replied, "That's right, Debbie; and you're living proof of it." Witnesses confirmed parts of this exchange.  Defendant meant this comment, however, to refer to Evangelista's loss of her seat in March 2002 as Deputy Vice Chairman of the Democratic Party. See TT1 at 201-202; TT2 at 5, 17; Mayor's Testimony.

17

On June 13, 2002, Evangelista requested information from DeLucca about the impact of the budget cuts on her hours and benefits.  On June 17, 2002, DeLucca informed her that her hours would be reduced to 19 hours per week and she would lose her benefits under the City Council resolution.  Evangelista also requested documents from the City concerning the West Haven Economic Development Corporation ("EDC") because two EDC employees were receiving benefits via contracts with the City.  Evangelista admits, however, that the EDC is a private organization, whose positions are not City positions.  Finally, Evangelista asked DeLucca if she could forego a pay increase and work an extra hour to get benefits.  DeLucca said it was not possible because he had no authority to grant the request.  Evangelista never approached the Mayor, however, about reinstating her benefits.  Instead, she directed all her efforts in that regard to DeLucca.  Nevertheless, she admits that DeLucca cannot override the acts of the City Council.  See Exs. 23, 24, 25 & 26; TT1 205-212; TT2 at 13-15, 85-90, 204-205.

This evidence shows only that, although Evangelista inquired about her loss of benefits and asked DeLucca to restore her benefits, DeLucca refused her request because it violated the 1996 City Council resolution.  See Ex. 529.  No evidence suggests that the Mayor was personally involved in not reinstating Evangelista's benefits.  To the contrary, Evangelista admits that she never requested that the Mayor reinstate her benefits, who, in any event, also had no authority to grant such a request.  Moreover, the fact that EDC employees received benefits has no impact here.  It would be improper to superimpose this arrangement onto the context of Evangelista's situation, given that Evangelista, as a City employee, was limited by the City Council Resolution and the EDC employees are not.  Accordingly, this evidence again fails to demonstrate the Mayor's direct and personal involvement.

18

     **C.**     **The Evidence Fails To Show Unlawful Intent And Demonstrates That There Was No Causal Connection Between Any Actions Or Statements Made By Defendant Prior To The Budget Process And The Post-Budget Events**

To prevail, Plaintiffs also were obligated to prove that the fact that they engaged in protected speech was a substantial or motivating factor underlying the alleged adverse actions.  See White Plains Towing Corp. v. Patterson, supra, 991 F.2d at 1058-1059.  Plaintiffs' evidence fatally fails to demonstrate this element.

First, plaintiffs have failed to show that the Mayor had the specific subjective and unlawful intent to deprive Plaintiffs' of re-employment and reinstated benefits.  See Locurto v. Safir, supra, 264 F.3d at 169-170; Shepphard v. Beerman, supra, 94 F.3d at 827-28; Rapkin v. Rocque, supra, 228 F.Supp.2d at 148.  Plaintiffs claim that the Mayor had the specific intent to and acted to block their re-employment and the reinstatement of benefits due to their protected speech.  As detailed above, however, the evidence fails to demonstrate that the Mayor's alleged wish was transformed into actual post-budget actions or that it played a substantial role or any role in the "failure" to re-employ Lorusso or reinstate Evangelista's benefits.  Even drawing the most favorable inferences for Plaintiffs, there is no evidence that Defendant ordered DeLucca or Legg to not rehire Lorusso or to refuse to reinstate Evangelista's benefits.  As such, there can be no finding that the Mayor held the specific, subjective and unlawful intent required.

Moreover, the Mayor's alleged statements before the budget passed do not show a specific intent to perform the alleged post-budget conduct.  There is a substantial disconnect between these alleged statements, both in time and in context, from the post-budget conduct.  Thus, even if one credits the plaintiff's contradicted testimony, no specific intent is shown.  For example, the alleged statement concerning Lorusso not keeping her job if she failed to support the mayor's reelection was

clearly targeted toward the loss of her position via the budget process.  As such, it does not correlate with the post-budget events.  See TT1 at 64-67.  In addition, the alleged statement the Mayor made in Legg's presence about Lorusso's betrayal is of no importance because Legg played no role in Lorusso's efforts to obtain the zoning position and there is no indication that Legg informed DeLucca of this statement.  See TT1 at 75-78; TT2 at 47-56, 98, 100.  Similarly, the singular exchange between Evangelista and the Mayor demonstrates, at best, only that Evangelista and others misinterpreted the Mayor's comments to mean that the reduction in her hours via the budget process was political payback.  Evangelista never spoke to the Mayor again after this and he was never made aware of her request to reinstate benefits.  Therefore, even if the Mayor was not misinterpreted, his comment was only made in the context of the proposed budget and not in relation to a rejected request for reinstatement of benefits.  See TT1 at 201-202; TT2 at 5, 17; Mayor's Testimony. Again, therefore, the evidence does not indicate that the Mayor held a subjective and unlawful intent to enact the post-budget events at issue.

In addition, the time span between when the Mayor first learned that Plaintiffs would not support his campaign and the post-budget events that comprise Plaintiffs' claims rebuts Plaintiffs' assertion that their protected speech was a motivating factor behind the alleged post-budget events. See Morris v. Landau, supra, 196 F.3d at 113, citing Conner v. Schnuck Markets, Inc., supra, 121 F.3d at 1395; Hollander v. American Cyanamid Co., supra, 895 F.2d at 85-86; Filipovic v. K & R Express Systems, Inc., supra, 176 F.3d at 398-399; Richmond v. ONEOK, Inc., supra, 120 F.3d at 209.  The Mayor first approached Lorusso in Spring 2001, when she informed him that she would remain neutral.  See TT1 at 64-65.  Thus, more than a full year passed before Lorusso's failed attempts at obtaining re-employment with the city.  Even if Evangelista's contradicted testimony is credited, the Mayor approached Evangelista for support by at least July 2001.  See TT1 at 195-198.

20

Accordingly, nearly a full year passed before Evangelista allegedly sought and was denied reinstatement of her benefits.  Far shorter time periods have been held to be insufficient to establish causation in cases such as this.  See Morris v. Landau, supra, 196 F.3d at 113, citing Conner v. Schnuck Markets, Inc., supra, 121 F.3d at 1395; Hollander v. American Cyanamid Co., supra, 895 F.2d at 85-86; Filipovic v. K & R Express Systems, Inc., supra, 176 F.3d at 398-399; Richmond v. ONEOK, Inc., supra, 120 F.3d at 209.  In fact, the lengthy time periods involved here actually constitute counter-evidence of a causal connection in this case.  See Filipovic v. K & R Express Systems, Inc., supra, 176 F.3d at 399.  As such, Plaintiffs have failed to demonstrate causation through such evidence.

    Further, the evidence fails to indicate that anyone but DeLucca, Legg, Farris, Lorusso and Evangelista were involved in the post-budget decisions that are the focus of this trial.  As to the Zoning position, DeLucca denied Lorusso re-employment because she was not qualified, which is a fact that Lorusso admitted.  See Exs. 5, 6, 11, 503, 512 & 513; TT1 at 88-91, 106, 162, 169-171; TT2 at 137-143, 188-189.  As for the Assistant position, once DeLucca determined he needed to rewrite the job, he was constrained by the union contract and union delays.  See Exs. 7, 29, 501, 510; TT1 at 111, 166, 169-170; TT2 at 136, 146-147, 186, 191-195, 216-221.  DeLucca operated within these constraints without any input from the Mayor and as quickly as possible to make the job available.  See Exs. 9, 10, 508, 509, 510; TT1 at 97, 106-109, 171-173, 188, 191; TT2 at 153-155, 171-172, 191-194, 219-221.  The evidence shows, however, that Lorusso simply was unable to bid on the job because it was not posted prior to her voluntary retirement.  See Exs. 11, 12 & 513; TT1 at 106, 112-113, 116, 127; TT2 at 153-154, 167, 169-171, 224.  Thus, Farris interviewed four union members in accordance with union procedure and awarded the position to a qualified candidate with more seniority than Lorusso.  See Exs. 21, 501, 515, 516 & 517; TT1 at 109-110,

21

178, 179; TT2 at 155-156, 166, 196-197; Farris' Testimony. Finally, as to the Manager position, Legg acted without the Mayor's direct and personal involvement when he retained Carol Silverstein, combined created the job description, and chose Silverstein to fill the position. He also acted against DeLucca's express advice to lay off Silverstein. See Exs. 13, 14, 16, 17, 28, 505 & 511; TT1 at 84-88, 116, 120, 123-124, 128-130; TT2 at 60-62, 65-74, 98-99, 102, 109-111, 115, 122-123, 160-161, 198-200, 229. Once the job description was submitted to the union, union delays again prevented DeLucca from posting the job before Lorusso's retirement. See Exs. 15, 16, 18, 510, 518, 519 & 523; TT1 at 117, 120-122, 124-125; TT2 at 108, 202. Legg then selected Carol Silverstein, via the normal process and without input from anyone else, to fill the position. Lorusso also admitted she was not entitled to bid on the job. See Exs. 19, 520 & 525; TT1 at 125-127, 135-136, 181, 188; TT2 at 63-64, 73-78, 109, 112, 114, 200-201. Thus, there is a complete void of evidence or indicating that DeLucca, Legg or Farris' decisions were in any way motivated by Plaintiffs' protected speech in acting or omitting to act.

Accordingly, Plaintiffs' evidence provides no proof that their version of events is not completely imagined and fabricated in an effort to tarnish the Mayor and retaliate against him for performing legitimate budgetary process functions for the welfare of the City. See Cobb v. Pozzi, supra, 363 F.3d at 108, citing Morris v. Landau, supra, 196 F.3d at 111. Plaintiffs' evidence does not constitute sufficient proof that they suffered adverse actions, that Defendant was in any way responsible for or connected with the post-budget events at issue, or that Plaintiffs' protected speech motivated these events. Consequently, the evidence is insufficient to warrant the inference that the protected speech was a substantial motivating factor behind the post-budget events and that the events would not have occurred even in the absence of the protected speech. See Mount Healthy City School Dist. Bd. of Educ. V. Doyle, supra, 429 U.S. at 287; Morris v. Landau, supra, 196 F.3d

at 111; <u>Mandell v. County of Suffolk</u>, <u>supra</u>, 316 F.3d at 382.  Ultimately, Plaintiffs have not met their basic burden of proving by a preponderance of the evidence that Defendant punished them for their protected speech.  Thus, no matter how distraught they may be over their fate, Plaintiffs should not be permitted here to further scandalize the Mayor or punish the City for its lawful acts.  <u>See Mount Healthy City School Dist. Bd. of Educ. V. Doyle</u>, <u>supra</u>, 429 U.S. at 285-86; <u>White Plains Towing Corp. v. Patterson</u>, <u>supra</u>, 991 F.2d at 1059.

**IV.    CONCLUSION**

Based on the foregoing, and pursuant to Fed. R. Civ. P. 50 (a), judgment as a matter of law should enter in Defendant's favor and against Plaintiffs because Plaintiffs have been fully heard and have failed to adduce sufficient evidence to make out a prima facie case for their First Amendment retaliation claims.  Therefore, there is no legally sufficient evidentiary basis for a reasonable jury to find in their favor upon their claims.

THE DEFENDANTS,
CITY OF WEST HAVEN AND
H. RICHARD BORER, JR.


By:_____
Jennifer L. Schancupp
Federal Bar No. ct11876
Susman, Duffy & Segaloff, P.C.
55 Whitney Avenue
P O Box 1684
New Haven, CT 06507
Phone: (203) 624-9830
Fax:    (203) 562-8430
Email: jschancupp@susmanduffy.com

23

<u>CERTIFICATION</u>

This is to certify that a copy of the Memorandum of Law in Support of Defendant's First motion for Summary Judgment as a Matter of Law was hand delivered and/or mailed this day, via first class mail, postage prepaid, to the following:

<u>Counsel for the Plaintiff</u>
Karen Lee Torre
Law Offices of Karen Lee Torre
51 Elm Street, Suite 307
New Haven, CT 06510

<u>Co-Counsel for the Defendants</u>
Paul J. Dorsi, Esq.
Assistant Corporation Counsel
Office of the Corporation Counsel
City of West Haven
355 Main Street
West Haven, CT 06516

_____
Jennifer L. Schancupp

I:\ATPK\Lorusso v. Borer\West.Haven.Lorusso.Memorandum.Of.Law.Supporting.Motion.For.Judgment.Matter.Of.Law.FINAL.8.8.05wpd.wpd

24