UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SANDRA LORUSSO and<br>DEBORAH EVANGELISTA<br><br>    Plaintiffs<br><br>V.<br><br>H. RICHARD BORER, JR.<br><br>    Defendant | Civil No. 3:03CV00504 (MRK)<br><br><br><br><br>August 26, 2005 |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR NEW TRIAL**

**I.  INTRODUCTION**

The frequency of use by federal trial courts of their long-established power to grant new trials has spiked over the past decade, although it well appears that defendants are more commonly the beneficiaries of this exercise. Indeed, the frequency with which trial courts order plaintiffs to accept a remittitur of jury awards under threat of a new trial has so increased that a Rule 59 Motion is an imperative for any defense lawyer. Perhaps for sound reasons, the occasions on which trial courts will order a new trial in the wake of a defendant's verdict are considerably rarer. For the reasons set forth below, however, the plaintiffs submit that this is one such occasion. In contrast to cases where there was substantial and credible evidence on both sides, and consequently a trial court was loath to interfere with a verdict, in the instant case the trial evidence supports a conclusion that a seriously erroneous result occurred and the verdict represents a miscarriage of justice.

## II. STANDARD OF REVIEW

Unlike a motion for judgment as a matter of law under Rule 50, a trial judge, in considering a Rule 59 motion for a new trial, may not only weigh the evidence but need not do so in a light most favorable to the verdict winner. See, e.g., Manley v. AmBase Corp., 337 F.3d 237 (2d Cir. 2003). In addition, under Rule 59, a court may grant a new trial even if substantial evidence supports the verdict in favor of the defendant. Id. A grant of a new trial is in order, if, in the court's opinion, the jury reached "a seriously erroneously result" or the verdict is a "miscarriage of justice". Sorlucci v. New York City Police Dep't., 971 F.2d 864, 875 (2d Cir. 1992) quoting Smith v. Lightning Bolt Prods., Inc., 861 F.2d 363, 370 (2d Cir. 1988). Case authority is also clear, and plaintiffs recognize, that Rule 59 is not to be viewed as a procedure by which disappointed litigants can take a second shot at proving their claim absent good cause under the standard just set forth. Sequa Corp. v. G.B.J. Corp. 159 F.3d 136, 144 (2d Cir. 1988) (Motion for new trial is not a method to seek a "second bite at the apple.")

## III. ARGUMENT

    A.    <u>Sandra Lorusso</u>

        1.    <u>The Verdict In Favor Of The Defendant In Sandra Lorusso's Claim Was Against The Clear Weight Of The Evidence.</u>

Many of the pertinent facts in this case were undisputed. Among them were

2

Lorusso's trouble-free performance for 15 years in city service, including her stint as the city's risk manager. Neither plaintiff suffered any adverse actions or ill treatment throughout the years that they were political supporters of Mayor Borer. Indeed, but for the grant of legislative immunity, no rational person could fail to conclude that the Mayor would otherwise be liable in connection with his elimination of Lorusso's job and reduction of Evangelista's hours.[1] Bearing in mind the preponderance standard and the issue whether it was "more likely true than not" that plaintiffs' shift of political support to defendant's political opponent made the difference in Lorusso's not being retained on the payroll or given one of several open positions, and in Evangelista remaining the sole uninsured employee, the verdict strikes one as clearly against the weight of the evidence.

Apart from the credibility of the defendant and his witnesses, addressed later herein, certain pertinent uncontested facts should be noted:

> 1) Lorusso worked in city service for 15 years, performing ably in various positions. Throughout this time she had not only been a supporter but a campaign manager for defendant.
>
> 2) In making appointments, the mayor readily dispensed with technical job

---

[1] Indeed, in addition to the events disclosed in the telephonic proceedings with the court on August 11 and 12, 2005, which were interesting to say the least, another juror, self-described as "extremely angry" at press reports of the verdict, weighed in on the strong evidence of political retaliation. See Exhibit 1. Plaintiff's counsel was contacted by a reporter from the New Haven Register regarding the juror's communication and was asked to comment in connection with a yet-to-be-published article on the matter. Exhibit 2 (Affidavit of Plaintiffs' Counsel).

3

requirements, particularly those involving the possession of educational degrees. He appointed Lorusso to the risk manager position despite her lack of a requisite degree. He also appointed Ramona Cortese, a political supporter, to the position of Director of Human Resources despite the fact that Cortese lacked both the Bachelor's and Master's degree mandated by the job description.

3. Carol Silverstein, with far less seniority than plaintiff and no experience whatever performing the duties of the risk manager position, was, unlike Lorusso, permitted to remain on the payroll after July 1, 2002 despite the elimination of her own position of purchasing agent, and was later awarded the position of risk manager/purchasing agent.

4. In contrast to Silverstein's lack of experience performing any of the duties of risk manager, Lorusso had in fact throughout her years performed most, if not all, of the duties set forth in Silverstein's job description of purchasing agent.

5. Carol Silverstein was a financial contributor to the Mayor's 2001 campaign and her family's restaurant was used for campaign events.

6. The Mayor allowed Silverstein the opportunity to assume the newly-merged risk manager/purchasing agent position in the absence of a written job description and before the position was posted. At the same time, defendants' subordinates cited the need to write such a description post the job as excuses for refusing to consider Lorusso for employment in the position of Assistant to the Commissioner of Public Works and refusing to consider her for the Risk Manager/Purchasing Agent positions.

7. With respect to the Public Works position, former Public Works Director Arthur Ferris confirmed that he neither requested nor saw a need for a rewrite of the description, that a rewrite was done without consulting him, that Lorusso had performed duties akin to those of the Assistant to the Commissioner job and, that had Lorusso been presented to him as a candidate, he saw no reason why she would not have qualified for hire.

8. Lorusso was denied consideration for the zoning position for lack of a certificate, yet another Borer campaign supporter and contributor who lacked

4

the same certificate was awarded the position, and the predecessor in the job likewise did not possess such a certificate.

9. The Mayor, both in his deposition and at trial, admitted his decisional role respecting Silverstein's continued employment after July 1, 2002, the grant to her of the newly-merged position and the appointment of Kevin Clark to the zoning position.

10. Apart from the Mayor's authority and responsibility under the charter for all personnel decisions, and his admitted decisional role respecting Silverstein's and others' employment, Finance Director Richard Legg admitted that: A) he knew defendant's elimination of Lorusso was fueled by political animus and B) he knew defendant did not want Lorusso to get back into city service in the post-budget period. Legg also admitted having made such statements to other employees at the time of the events and, with respect to the carrying out of his duties as Director, he obeyed the orders of defendant and carried out his known wishes.

11. Carol Silverstein did not appear at trial, nor, apart from a reference to her later attainment of a master's degree, was her very brief performance as purchasing agent discussed with any substance.

12. The Mayor conceded on cross-examination that the greater number of job duties in the description of the merged position, which had been bracketed on the exhibit by plaintiff's counsel, were in fact the duties of Lorusso's job as risk manager.[2]

---

[2] It was uncontested at trial that Lorusso, throughout her fifteen years, had performed all of the tasks described in Silverstein's job description. The description for the merged position contained more of Lorusso's risk manager duties than Silverstein's purchasing duties. In any event, as this court aptly noted in commenting on defendant's Rule 50 motion at the close of evidence, with respect to the merged position, "Lorusso knew half of the job and Silverstein knew the other half of the job," thus reducing the issue once again to whether it was more likely true than not that Lorusso's support of Picard, or more accurately, Silverstein's support of Borer, tipped the balance on who got the job. The paucity of evidence surrounding Silverstein's performance, when weighed against the extensive evidence regarding Lorusso's many years of performance, should be considered in passing

5

### The Defendant's Credibility

While matters of credibility are the traditional province of jurors, it bears mention that the Mayor's credibility on some key and even ancillary points was impeached to such a degree as to be meaningful in passing on the overall weight of the evidence. First, his testimony with respect to the circumstances of the elimination of Amy Schenkle-Warren's job in the Office of Corporation Counsel was pointedly, indeed completely, belied, by documentary and other evidence. The Mayor denied responsibility for eliminating the position only to be confronted with his own budget recommendation which showed that, in response to the requisition submitted by Corporation Counsel's office, Warren's job was the only one that the Mayor changed to effect an elimination. Once confronted, he claimed that Corporation Counsel's office, in an amended requisition, requested Warren's elimination. This testimony was completely belied by Richard Legg, who admitted that Corporation Counsel attorneys appeared at the City Council's budget hearing to protest the elimination of Warren's position and seek ways to keep her employed. Corporation Counsel Michael Farrell, whom defendant claimed was responsible for the amended request to eliminate Warner's position, did not testify at trial. This impeachment should be weighed in tandem with the testimony of Margaret Schenkle, Warren's mother, who recalled clearly her conversation with the Mayor during which he raised the issue of the employment of

---

on the instant motion.

6

Schenkle's daughter in that office, after questioning Schenkle's placement of a Picard campaign sign on her lawn. The fact that Amy Warren was the sole budgetary victim out of the Corporation Counsel's office should also be weighed against the complete disintegration, under cross-examination, of the Mayor's attempt to place the plaintiffs' misfortune in the context of an overall reduction affecting "forty" city employees. As the court may recall, when pressed on this, the Mayor conceded the following: Included among the "forty" were both plaintiffs, Silverstein, Registrar's Office Assistant Joanne Mapes, Kevin Clark, eight maintenance workers later rehired and twenty itinerant once-a-year voter canvassers. While this evidence no doubt was offered by defendant to lend a less sinister character to his budget axe, upon conclusion of this phase of cross-examination, the Mayor was left to concede that there was in reality but a tiny handful of victims, all of whom (save one Republican) were Picard supporters. Not a single one was a supporter or financial donor to defendant's campaign.

Compounding this, defendant's other effort to whiten his pattern of personnel decisions, by pointing to his appointment of Assistant Corporation Counsel Paul Dorsi and Chief of Staff John O'Connor, likewise failed when the Mayor conceded that both were repeat financial contributors to his campaigns. Indeed, when Mr. Dorsi reached the donation cap, his mother, Helen Dorsi, showed up on the donor list. In the end, the Mayor conceded that he could not identify a single supporter or contributor to his campaign who

7

lost employment or benefits in the year 2002.

### DEBORAH EVANGELISTA

The uncontested evidence shows that Evangelista was the only one of hundreds of city employees who lost her health insurance as a result of the Mayor's budget action. Defendant's portrayal of Evangelista's office counterpart, Joanne Mapes, as another unfortunate victim of the budget was again completely undermined by the uncontested fact that Mapes immediately took an available retirement, which gave her health insurance for life, and was just as quickly re-employed in her position in the Registrar's Office despite an unequivocal provision of the City Charter which prohibits such re-employment. No one could explain how this blatant illegality occurred, and while the Mayor denied responsibility for it, he knew about it and, as chief executive officer of the city, he is responsible for enforcement of the Charter. It was also uncontested that the City Council did not vote to eliminate Evangelista's health insurance but only to limit the appropriation to her office. Richard Legg conceded that the city council does not fund the cost of employee insurance through line item appropriations for each department but rather appropriates a large lump sum to account for uncertainties throughout the fiscal year in respect to the changing number of employees active on the payroll at any given time. Likewise uncontested was the Mayor's grant, by executive fiat, of health insurance benefits, including the most expensive family plan, to non-city employees of the Economic Development Commission.

8

This was done in direct contradiction of the Mayor's claim that depriving Evangelista of health insurance was an economic necessity. The Mayor also conceded that, by another questionable maneuver, he granted health insurance to an employee fired for sexual misconduct, a man who was not otherwise entitled to such insurance. When it came to Evangelista, the Mayor stood on the technicalities of a City Council resolution limiting insurance to <u>city employees</u> who work twenty or more hours per week. The same resolution, however, did not stop his grant of benefits by executive fiat to non-employees and a fired employee who were likewise ineligible. Finally, the Mayor corroborated Evangelista's account of their exchange on the evening of the Council's passage of the 2002-2003 budget after Evangelista angrily confronted the Mayor. Since there were several witnesses to the exchange, the Mayor conceded having made the statement that Evangelista was "living proof" of the adage that "payback is a bitch," but again attempted to place his comment in a less sinister context. He was, he swore, referring not to the consequences shortly to befall Evangelista as a result of the budget action which occurred minutes earlier, but to an event that occurred more than two years ago, a claim which, it is submitted, is flatly ridiculous.

As before stated, in passing upon this motion, not only may this court independently weigh this evidence, it need not view it in the light most favorable to defendant. Further, the presence of substantial and credible evidence supporting the verdict is likewise not

9

dispositive, although it is worth suggesting that the court should be hard-pressed to even find "substantial and credible evidence" to support the verdict.

This court had previous occasion to pass on a new trial motion in Svege v. Mercedes-Benz Credit Corp., No. 3:01CV1171 (MRK). See Ruling on Rule 59 Motion for a New Trial dated September 28, 2004. In denying the Rule 59 motion in Svege, this court took note of Judge Hall's decision in Densberger v. United Technologies Corp., 125 F.Supp. 2d 585 (D. Conn. 2000) in which the court likewise noted that a new trial was inappropriate in cases where there is "substantial credible evidence" on both sides. In Svege, this court as well observed that there was evidence aplenty in support of the respective positions of the parties and that defendants in particular "submitted substantial and credible evidence" of equal force and in diametric opposition to the plaintiff's evidence. It is respectfully submitted that no such finding can be made respecting the trial evidence in this case.

The proffer at trial of equal or even minimally comparative competing evidence was glaringly absent in this case. Neither the plaintiffs nor the court need speculate as to the reason for a verdict which makes one scratch one's head for a determination in that regard does not appear to be required by the case law. Nor, to grant a new trial, does this court need to find that the verdict shocks the court's conscience. Cf. Ismail v. Cohen, 899 F.2d 183, 186 (2d Cir. 1990) (standard for review of damage awards, either compensatory or punitive, is whether the award is so high as to "shock the judicial conscience and constitute

10

a denial of justice").

It may well be that the jurors' unusual task of navigating in and around the issue of legislative immunity, and the extent to which they understood clearly that they could consider the evidence of defendant's retaliatory animus displayed in the budget process as informing their decision respecting post-budget events, played a role in the outcome. However, as before stated, this court need not make a finding in this regard or otherwise discern the jury's thought process. As in the many cases where trial courts have intruded upon a jury's decision with respect to awards, this is not possible. All the court can do is assess the weight of trial evidence. Even then, in such cases, the court is expected to accord substantial deference to a jury's determination of monetary damages. Ismail v. Cohen at 186. On a Rule 59 motion, however, and in independently weighing the evidence, it is not required that it be done in a manner most favorable and deferential to the defendant. In this case, it is respectfully submitted that the totality of the evidence weighed so heavily in favor of plaintiffs and the defendant's evidence or, on many issues, lack of evidence, was so weak that this case represents one of those occasions on which Rule 59 relief is called for and required by the interests of justice.

**IV      CONCLUSION**

For all the foregoing reasons, the plaintiffs respectfully requests that this motion be granted.

11

THE PLAINTIFFS,
SANDRA LORUSSO and
DEBORAH EVANGELISTA

BY: /s/ Karen Lee Torre
KAREN LEE TORRE
Fed. Bar No. ct01707
Law Offices of Karen Lee Torre
51 Elm Street, Suite 307
New Haven, Connecticut 06510
Tel. (203) 865-5541
Fax: (203) 865-4844

Their Attorney

**CERTIFICATION**

      I hereby certify that a copy of the foregoing was hand-delivered on this 26th day of August, 2005 to:

Jennifer L. Schancupp, Esq.
Susman, Duffy & Segaloff, P.C.
PO Box 1684
New Haven CT 06507

Paul J. Dorsi, Esq.
Donahue Votto & DeGennaro PC
415 Main Street
PO Box 411
West Haven CT 06516-0411

                                      Karen Lee Torre

LAW OFFICES OF KAREN LEE TORRE • 51 ELM STREET, SUITE 307, NEW HAVEN, CONNECTICUT 06510 • TEL: (203) 865-5541