UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF CONNECTICUT

*******************************

| | | |
|---|---|---|
| SANDRA LORUSSO and DEBORAH EVANGELISTA | * * * | CIVIL ACTION NO. 3:03CV00504 (MRK) |
| PLAINTIFFS | * | |
| VS. | * | |
| H. RICHARD BORER, JR. | * | SEPTEMBER 16, 2005 |
| DEFENDANT | * | |

*******************************

## DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR NEW TRIAL

## I.    INTRODUCTION

The Plaintiffs' motion for a new trial on the grounds that the verdict is against the weight of the evidence should be denied.  Ample evidence supports the jury's verdict that: (1) the Plaintiffs suffered no adverse employment action; (2) the Plaintiffs support of the Defendant's political opponent was not a substantial or motivating factor in the post-budget employment decisions; and (3) the same decisions would have been made as concerned the Plaintiffs' post-budget employment regardless of their protected conduct.  Moreover, the evidence established that, contrary to the Plaintiffs' speculative arguments, the Defendant had no direct and personal involvement in the post-budget decisions affecting the employment of Ms. Lorusso and Ms. Evangelista. Although the Plaintiffs are understandably disappointed in the verdict, there has been no miscarriage of justice such as would warrant the highly unusual action of disregarding the jury's verdict.

In seeking a new trial, Plaintiffs choose to ignore the overwhelming evidence in support of the verdict.[1]  Plaintiffs also overlook the significant fact that, at the request of Plaintiffs' counsel,

---

[1]Notably, Plaintiffs' Memorandum contains no citations to any of the trial exhibits nor any reference to the trial transcript.  Pursuant to Local Rule 7(a), in ruling on a motion, a judge is not "require[d] ... to review portions of the record in response to a motion, where the moving papers do not make specific reference to such portions of the record."  In fact, not only does Plaintiffs' Memorandum contain no specific references to the record, it refers to "evidence" that is absent from the record and

following the publication of the verdict, each juror was individually polled and indicated unanimity

in the verdict.   Indeed, Plaintiffs' argument primarily hinges upon their assertion that the testimony

of Mayor Borer is not credible.   Jurors, however, not the Plaintiffs or their counsel, are entrusted

with the task of assessing credibility.

Plaintiffs' motion also seeks an end-run around the Court's ruling on legislative immunity

through the interjection of a juror's posttrial e-mail, which criticizes a newspaper article reporting on

the jury's verdict.  Plaintiffs' Memo. at 3; n. 1.  This effort to relitigate the issue of legislative

immunity under the guise of a motion for a new trial is, of course, impermissible.  To the extent that

this email from a juror indicates that the jury wrestled with or was troubled by the concept of

legislative immunity, it demonstrates that the jury took its oath and jury instructions seriously and

thus undercuts the Plaintiffs' argument that the jury erred in evaluating the evidence.

The Court should deny the Plaintiffs' motion as an impermissible attempt to take a second

bite at the apple.

---

conveniently overlooks evidence present in the record which contradicts the Plaintiffs' preferred
version of events. For example, Plaintiffs' Memorandum states that the evidence established that, after
Paul Dorsi had contributed to the Mayors' campaign and reached the donation cap, his mother Helen
Dorsi, appears on the donation list. Plaintiffs' Memo. at p. 7. Although the record shows that Helen
Dorsi contributed to the Mayor's campaign, there is no evidence that such donations were made after
Paul Dorsi's donations had reached a certain threshold. See Transcript, hereinafter "T" at 885.
Likewise, Plaintiffs' Memorandum states that no explanation was offered for Joann Mapes
reappointment to the Assistant to the Registrar job after her retirement in light of the City Charter
provision barring the rehire of retirees. Plaintiffs' Memo. at p. 8. Plaintiff ignores, however, the
Mayor's testimony that statutes concerning the Registrar's office, which governed how staff positions
in the Registrars Office were awarded, would supercede the provisions of the City Charter. See T at
677, 683.

## II.     STANDARDS OF LAW

### A.     Standard of Review

In deciding Rule 59 motions, "[t]he trial judge, exercising a mature judicial discretion, should view the verdict in the overall setting of the trial, consider the character of the evidence and the complexity or simplicity of the legal principles which the jury was bound to apply to the facts, and abstain from interfering with the verdict unless it is quite clear that the jury has reached a seriously erroneous result.  The judge's duty is essentially to see that there is no miscarriage of justice.  If convinced that there has been then it is his duty to set the verdict aside; otherwise not." Bevevino v. Saydjari, 574 F.2d 676, 684 (2d Cir. 1978).  A court should only grant a new trial when it "is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." Sorlucco v. New York City Police Department, 971 F.2d 864, 875 (2d Cir. 1992).  "[A]bsent a showing of clear error or manifest injustice, it [is] appropriate to deny relief pursuant to Rule 59 since litigants should neither be required nor without good cause permitted to relitigate already-decided matters.  Bergstein v. Jordache Enterp., Inc., 1996 WL 271910, at *2 (S.D.N.Y. 1996).  A Rule 59 motion should not be used as "a vehicle for relitgating old issues, presenting the case under new theories, securing a rehearing on the merits or otherwise taking a 'second bite at the apple.'" Sequa Corp. v. GJB Corp., 159 F.3d 136, 144 (2d Cir. 1988).

The mere possibility that the jury might have returned a favorable verdict does not entitle Plaintiffs to a new trial.  See Carrier Services, Inc. v. Omni Mail, Inc., 2000 WL 1072300, *4 (S.D.N.Y. 2000).  Moreover, under circumstances such as those here, where all of the conflicting versions of events were before the jury, who are free to determine which witnesses they believe, a trial court would overstep its bounds and usurp the jury's function of judging credibility if it were to grant a new trial.  See Sorlucco, supra, 971 F.2d at 875; see also Wade v. Orange County Sheriff's Office, 844 F.2d 951, 955 (2d Cir. 1988) (credibility assessments of the jury are entitled to

deference); Densburger v. United Technologies Corp., 125 F.Supp.2d 585, 597 (D.Conn. 2000),

aff'd 297 F.3d 66 (2d Cir. 2002), cert. denied, 537 U.S. 1147, 123 S.Ct 876, 154 L.Ed.2d 849 (2003)

(court should refrain from setting aside verdict and granting new trial where resolution of issues

depended on assessment of credibility of witnesses).  Thus, a court should rarely disturb a jury's

evaluation of credibility and should only grant a new trial if the jury's verdict is egregious.  See DLC

Management Corp. v. Town of Hyde Park, 163 F.3d 124, 134 (2d Cir. 1998).

### B.    Substantive Law

Under 42 U.S.C. § 1983, to establish a *prima facie* case of retaliation for engaging in

protected speech, a public employee must prove by a preponderance of the evidence that (1) [her]

speech addressed a matter of public concern, (2) [s]he suffered an adverse employment action, and

(3) a causal connection existed between the speech and the adverse employment action, so that it can

be said that [her] speech was a motivating factor in the determination." Velez v. Levy, 401 F.3d 75,

95 (2d Cir. 2005); Feingold v. New York, 366 F.3d 138, 160 (2d Cir. 2004).  The employee's

essential burden is to show that she was punished for having engaged in the protected speech.  See

Gill v. Pidlypchak, 389 F.3d 279, 382 (2d Cir. 2004).

To prove an adverse employment action occurred, a plaintiff must first establish "basic

eligibility for the position at issue." Slattery v. Swiss Reinsurance America Corp., 248 F.3d 87, 92

(2d Cir.), cert. denied, 534 U.S. 951, 122 S.Ct. 348, 151 L.Ed.2d 263 (2001).  To establish this basic

eligibility, a Plaintiff must offer more than her subjective opinion that she is qualified for the job.

See Castro v. Local 1199, 964 F. Supp. 719, 726 (S.D.N.Y. 1997) (plaintiff failed to make out *prima*

*facie* case of age discrimination due to failure to offer any evidence apart from plaintiff's own

testimony that she was qualified); Layaou v. Xerox Corp., 999 F. Supp. 426, 432 (W.D.N.Y.1998)

(employee's subjective opinion about his qualifications is insufficient).  Moreover, as a prerequisite

to an award of damages under Section 1983 in an action against an official in his personal capacity, a plaintiff must allege and prove by a preponderance of the evidence the direct, personal involvement of the defendant in the alleged constitutional deprivation. Feingold v. New York, supra, 366 F.3d at 159; Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995); Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994); Soto v. Schembri, 960 F.Supp. 751, 756 n.3 (S.D.N.Y. 1997).

An employee also must establish that her protected speech was at least a "substantial" or "motivating" factor behind an alleged adverse employment action. See White Plains Towing Corp. v. Patterson, 991 F.2d 1049, 1058-1059, cert. denied, 510 U.S. 865 (1993). To prove this causation element, "a plaintiff may not rely on conclusory assertions of retaliatory motive . . . ." Cobb v. Pozzi, 363 F.3d 89, 108 (2d Cir. 2004), citing Morris v. Landau, 196 F.3d 102, 111 (2d Cir. 1999). A plaintiff must provide "some tangible proof to demonstrate that [her] version of what occurred was not imaginary." Cobb v. Pozzi, supra, 363 F.3d at 108, citing Morris v. Landau, supra, 196 F.3d at 111. The necessary causal connection "can be established either indirectly by means of circumstantial evidence, for example, by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus. See Mandell v. County of Suffolk, 316 F.3d 368, 383 (2d Cir. 2003), citing Morris v. Landau, supra, 196 F.3d at 110; Cifra v. General Electric Co., 252 F.3d 205, 217 (2d Cir. 2001) (causal connection can be established indirectly by showing protected activity followed closely in time by adverse action). Any causal connection demonstrated "must be sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action, that is to say, the adverse employment action would not have been taken absent the employee's protected speech." Morris v. Landau, supra, 196 F.3d at 111; see Mount Healthy City School Dist. Bd. of Educ. V. Doyle, 429 U.S. 274, 287 (1977); Mandell v. County of Suffolk, supra, 316 F.3d at 382.

### III.  ARGUMENT

**A.  The Evidence Supports the Jury's Verdict that the Plaintiffs Did Not Suffer Adverse Employment Actions.**

Plaintiffs failed to prove they suffered any actual and actionable adverse employment actions. This was confirmed by the jury, who was asked whether either plaintiff "suffered an adverse employment action." See Verdict Form, Part I.A.1. & Part III.A.1. The jury unanimously answered "No" as to each plaintiff.  T at 1096-1098.

The evidence supports this conclusion and the jury's verdict should stand.

**1.  Plaintiff Lorusso**

In order for Lorusso to have truly suffered an adverse employment action, she must have been qualified for a job she was denied. See, e.g., Gadsden v. Jones Lang Lasalle Americas, Inc., 210 F.Supp.2d 430, 442 (S.D.N.Y. 2002) (summary judgment for defendants in Title VII case, based, in part, on plaintiff's failure to establish qualifications for position); Marlow v. Office of Court Administration, 820 F.Supp. 753 (S.D.N.Y. 1993) (summary judgment for defendant in age discrimination case where plaintiff failed to show he was qualified).  The evidence shows Lorusso did not suffer any actual adverse employment action because she was not qualified or eligible for the positions she sought.

**a.  Zoning Enforcement Officer Position**

Other than offering her own subjective assertion, Lorusso did not demonstrate that she was qualified for the position of Zoning Enforcement Officer.  In fact, Lorusso admitted she did not meet the requirements for this job, including code and law enforcement experience and holding a state certification.  See Exs. 5, 6, 503 & 512; T at 88-91, 162, 170-171, 138-139. Moreover, under the

City's bumping policy, Lorusso was not qualified. <u>See</u> Exs. 4 & 502; T at 86-87, 166; T at 135-136, 186.

The city's bumping policy provided that a bumping employee must have more seniority than the bumped employee, the bump must be to a lateral or lower job classification and the bumping employee must meet the job's basic qualifications. Ex. 502, T at 166, 393. If an employee does not meet the qualifications of the job sought, the employee is prohibited from bumping into that job. T at 444. When an employee seeks to bump into a position, the determination of the employee's qualifications for the job sought was made solely by the Personnel Director, Ralph DeLucca. T at 166. By contrast, when an employee bids on a vacant position that has been posted for bid, the appropriate department head interviews the candidates who respond and selects which of the applicants to hire based on their qualifications and seniority. <u>See</u> Ex. 501, T at 168, 393-394, 443-444.

After Lorusso's job was eliminated in the 2002-2003 budget, effective June 30, 2002, DeLucca advised Lorusso that her decisions during the bumping process would determine her future. <u>See</u> Exs. 2 & 534; T at 85, 395. Although Lorusso was eligible for an early retirement buy-out, Lorusso chose instead to seek to remain employed via her bumping and bidding rights. <u>See</u> Ex. 536; T at 69, 94, 168-169, 354, 461-62, 203-04.

On June 21, 2002, Lorusso met with DeLucca and a union representative. <u>See</u> Ex. 512, T at 88-91. She was given her bumping rights and told she could bump into positions for which she was qualified. T at 88-91, 395-401. Despite her lack of appropriate qualifications, Lorusso sought to bump into the position of Zoning Enforcement Officer, which had been previously posted for bid on May 8, 2002 and filled by Kevin Clark. T at 395-401. Clark was selected for the job by the department head despite Clark's lack of a required certification. <u>Id</u>. Lorusso did not bid on the job

7

when it was posted but sought instead to bump into the position. T at 446-447. Thus, her

qualifications for the position were determined solely by DeLucca. T at 166, 395-401. DeLucca

determined her qualifications based on the written job description. Id. Among other requirements,

the job description required state certification, training in law enforcement and code enforcement

experience. Ex. 503. DeLucca told Lorusso she was not qualified based on her lack of any code

enforcement experience. T at 395-401. Although Lorusso claims DeLucca's stated reason for her

lack of qualifications is her lack of certification, she admitted at trial that she has no training in law

enforcement or code enforcement, deficiencies which render her unqualified for the position

regardless of the ability of  the department head to waive the certification requirement.  T at 162,

169-171. Upon refusing Lorusso's request to bump into the zoning job, DeLucca explained to her

and informed her in writing that she could retire or take a layoff. T at 106. Lorusso elected to retire

effective June 30, 2002. Ex. 11.

Although Lorusso had the option of bidding on the job along with Kevin Clark and thus

competing with him (and other bid applicants) directly for the award of the job, she chose not to do

so. See T at 446-447. This suggests that Lorusso herself did not believe that she was qualified for

the job. Most importantly, the Mayor had no knowledge of the events concerning this job until after

they occurred. See T at 402, 757.

### b.     Public Works and Finance Department Positions

Due to Lorusso's retirement effective June 30, 2002, she was ineligible to bid on the

Assistant to Commissioner of Public Works position ("Assistant position") and the Risk /

Procurement Manager position ("Manager position") when these positions were posted.  Moreover,

there is no evidence that the Mayor had any direct and personal involvement in the decisions

concerning these jobs.  Instead, DeLucca and Arthur Ferris, the Commissioner of Public Works,

acted independently and properly in every respect with regard to the Assistant position. As to the

Manager position, DeLucca and Dick Legg, the Finance Director, also acted independently from the

Mayor.

Despite Lorusso's testimony that she expressed an interest in the Assistant position before it

was open and posted, the evidence supports the jury's finding of no adverse employment action

because the position was not posted until after she had elected to retire. See Ex. 513, 514, T at 403-

404. Similarly, despite Lorusso's trial testimony that she believes herself to be qualified for the

Manager position, the evidence supports the jury's verdict because Lorusso never, in fact, applied for

the position nor did she ever express an interest in the position prior to her retirement, despite her

awareness of the fact that the new position had been created and funded by City Council. See Ex.

522, T at 372-373. In addition, as to both positions, the evidence supports the jury's finding that,

even in the absence of Lorusso's protected conduct, she would still not have been selected for the

jobs. Specifically, as to the Assistant position, the evidence shows that even if Lorusso had been

eligible to apply she would have had less seniority than all other applicants for the job. See Ex. 515;

T at 444-445. As to the Manager position, the evidence shows that even if Lorusso had been eligible

to apply, in the eyes of the Finance Director -- who made the hiring decision -- she was not qualified

for the position and the qualifications of the candidate selected far exceeded Lorusso's. See T at

302, 321-322, 335-336.

The evidence shows DeLucca was constrained in certain ways and empowered in other ways

by the City Charter, the union contract and specific actions taken by the union regarding approval of

the job descriptions for these positions. Under the contract, an existing employee could bid in

writing on a vacant position which had been posted. See Ex. 501; T at 166, 169-170, 394. The City

Charter and the union contract grant DeLucca the authority and duty to make up and issue all job

9

descriptions. See Exs. 29 & 501; T at 111, 170, 444. By contract and custom, when a job description was written for a newly created position or was rewritten to bring an old job description up to date, DeLucca could not post the jobs for union members to bid on until he obtained union approval of the written job description after the union had the opportunity to bargain on the impact of any changes. See T at 474-479.

In the Spring of 2002, both the Assistant position and the newly created Manager position required new job descriptions before they could be posted for bid. T at 404, 449-451, 456, 908-909. Although the job descriptions for these positions were submitted to the union well in advance of Lorusso's retirement, and although DeLucca repeatedly wrote to the union after the submission of the new job descriptions for union approval to urge union action, they were not approved and thus were not posted for bid until after Lorusso retired. See Ex. 505, 510, 511, 514, 519; T at 412-413, 452-453, 460, 486- 487, 908-909. At this time, the union had experienced a change in personnel in the New York office. T at 906. The new union contact in the New York office took a long time to review and approve the job descriptions of Local 1103. See T at 412-413.

### i. Assistant Position

By letter dated June 10, 2002, Lorusso sought to bump into this position. See Exs. 9 & 508. The Assistant job was not posted at that time, however, because the job description needed to be rewritten and approved by the union in advance of the posting of the job. See T at 409- 411. The rewritten job description was submitted to the union on June 18, 2002. See Exs. 7 & 510; T at 404- 405, 449-450, 452, 453. On June 11, 2002, DeLucca informed Lorusso that the job would not be open or posted for union members until its description was approved by the union. Ex. 509. The job description was being rewritten to make sure the listed duties accurately reflected the duties of the job and to remove duties properly belonging to the other union, that for clerical workers. T at

409- 411, 449- 451, 908-09.  The Mayor had no involvement in the job rewrite process or the posting of the job for bid.  Likewise, the Mayor had no involvement in the evaluation of the candidates who had expressed an interest in the position. See T at 107-109, 172-173, 188, 411, 429-430, 449-452, 477-79, 642-643, 757, 779, 781-782, 905-912.  By letter dated June 18, 2002, DeLucca submitted the new job description to the union for approval and requested that the union act quickly so that he could post the position as quickly as possible.  See Ex. 510; T at 412-413.

Ferris was aware that the position was being rewritten.  See Exs. 29 & 501, T at 59, 406-409, 488, 493, 562-564.  Ferris did not place a priority on filling the job quickly because he had retained the retired Assistant, Mary Annunziata, to fill in on the job pending the hiring of a replacement.  See Ex. 8; T at 103-104, 403, 409, 493-95, 555-556, 562, 564.  The rewritten job description was finally approved on July 8, 2002.  It was then promptly posted for bid on July 9, 2002. See Exs. 20, 510 & 514; T at 106, 109, 115, 174, 177-178, 188, 412.  On July 10, 2002, Lorusso informed DeLucca she was interested in the job despite her retirement. However, Lorusso  was unable to bid on the job because at the time it was posted she was no longer an employee of the City.  Lorusso also admitted she knew that the description for this job was being rewritten. See Exs. 11, 12 & 513; T at 106, 112-113, 116, 127, 411-412, 425, 427-29, 482; 544, 561-562, 918.

Four union members bid on the job and were interviewed by Ferris. See Ex. 515; T at 414, 424, 454, 556-557, 913, 916.  Ferris selected Mark Bisaccia for the position, based on his qualifications and experience. See Ex. 21; 516; T at 556- 562.  Ferris had confidence in Bisaccia's ability to do the job. In evaluating Bisaccia's abilities,  Ferris took into account the fact that Bisaccia held a bachelor's degree, was involved in similar work before, would be sensitive to union concerns, had supervisory experience, and had experience in preparing a computerized budget which distinguished him for the other candidates. Id. Moreover, Bisaccia had more seniority than the other

11

applicants and Lorusso. T at 178-179, 568-569, 780. Thus, even if Lorusso had been qualified and eligible to bid, Bisaccia's seniority would have controlled. Ex. 501; T at 568-569, 780. Ferris's selection of Bisaccia was based on his qualifications and experience and was made without input from the Mayor. T at 556-562, 912. Bisaccia has never contributed time or money to the Mayor's campaigns. T at 913.

**ii. Manager Position**

Although Lorusso claims that Mayor actively barred her from consideration for this position, the evidence established that this job was not posted for bid until after Lorusso's retirement. The job was not posted for bid prior to Lorusso's retirement due to the fact that a new job description needed to be created for the new position. T at 456. Although the job description was submitted to the union for approval in early June, it was not approved until mid July, by which time Lorusso had retired. See Ex. 505, 510, 511, 519; T at 456-460, 486-487. Although Carol Silverstein's position of Assistant Purchasing Agent was also eliminated effective June 30, 2003, she was retained as a city employee by the Finance Director, Dick Legg. T at 368. Legg made the decision to retain Silverstein without any input from or consultation with the Mayor. T at 372, 754-757. Prior to July 1, 2002, the Mayor was not advised of Legg's decision to retain Silverstein. Id. Likewise, Legg's selection of Silverstein to fill the job once posted, was made without any involvement from the Mayor. Id. The evidence also established that Dick Legg considered Silverstein to have superior qualifications to that of Lorusso. T at 321-322, 335- 336. Thus, even if Lorusso had been eligible to bid on this position and to compete against Silverstein, Dick Legg considered Silverstein to be the superior applicant. See id.

During the budget process, when the Mayor decided to eliminate the positions of Assistant Purchasing Agent and Risk Manager, the duties of these two jobs were combined into one position.

See T at 356-357.   After the new position was approved by City Council in early May, Legg drafted

a job  description and forwarded it to personnel.  T at 367- 368.  The duties of the new position were

roughly evenly split among the former duties of the Risk Manager job and the Assistant Purchasing

Agent job.  T at 866-868. Personnel then submitted it to the union for approval on June 3, 2002.  The

Mayor played no role in these events or their timing.  See Exs. 13, 14, 16, 28, 505, 511, 531; T1 at

84-88, 116, 123-124, 128-130, 318-319, 323-325, 356-357, 360, 367-368, 456, 607-608, 613-14,

752-756.  In addition, there is no evidence that anyone improperly held up the processing of job

descriptions, which had to be union approved before the two positions could be posted.  See Exs. 14,

18, 20, 510, 511, 514, & 519; T at 174, 177-179, 411-412.

      The union elected to bargain over this position.  On June 18, 2002, DeLucca reminded the

union that he was still awaiting approval of the description for the Manager position.  Finally, on

July 22, 2002, the union approved the job and it was then promptly posted on July 23, 2002. See

Exs. 15, 16, 18, 510, 518, 519 & 523; T at 117, 120-122, 124-125, 366, 460. Carol Silverstein and

Carl Guarnieri responded to the posting and were interviewed by Dick Legg without any

involvement by the Mayor.  See Ex. 520; T at 331, 333-334, 482, 458-459, 756-757, 781-782.

Silverstein was selected by Legg alone to fill the job. T at 754-757.  Lorusso admitted she was not

eligible to bid on this position when it was posted due to her retirement.  Likewise, Lorusso admitted

that she never even expressed an interest in the job prior to her retirement.  See T at 125, 135-136,

181, 188, 334, 372.  Moreover, neither the Mayor nor anyone else told Legg not to consider Lorusso

for the job or how to fill it.  T at 754-757.

      The evidence shows no involvement by the Mayor in the creation of the job description for

this position, the submission of the description to the union for approval, the posting of it for bid, or

the evaluation of applicants responding to the posting.  Id.  Legg acted without input from the

Mayor in creating the job description and in evaluating and selecting Silverstein to fill the job. Lorusso was not considered because she had never expressed an interest in the job. Regardless, she had retired at the time the job was posted and was thus ineligible to bid. See Exs. 19 & 525; T at 126-127, 321-322, 331, 333, 335-336, 367, 372, 380-382, 626, 631-632, 754-757, 781-782, 841-842. Thus, the evidence does not support Plaintiffs' speculation that the Mayor orchestrated Silverstein's eventual hire or barred Lorusso from consideration.

The evidence also established that had Lorusso taken a layoff instead of retiring, she could have exercised her recall rights for up to two years, which would have given her further opportunity for re-employment. See Ex. 501; T at 116, 466-467. Furthermore, despite the ability to file a grievance concerning her claim that she should have been awarded the three positions she claims to have sought, Lorusso did not do so. See Ex. 501; T at 185-186, 464-465, 925-926. Rather, Lorusso sat on her union rights and then sought redress through this lawsuit. The jury's determination that Lorusso did not suffer an adverse employment action is amply supported by the evidence and should be sustained.

### 2.    Plaintiff Evangelista

The evidence also overwhelmingly supports the jury's verdict as to Evangelista. The alleged failure to reinstate Evangelista's health care benefits was the result of nothing more than the budget process and its interaction with a City Council resolution. See Exs. 529 & 531; T at 199-200, 203-204, 269-270, 341-342, 375, 772-774. Most significantly, although Evangelista complains that the Mayor retaliated against her by failing to reinstate her health care benefits, the evidence shows that Evangelista never asked the Mayor to do so and that the Mayor was never made aware of the lone request that Evangelista made to DeLucca.T at 271, 272, 772. Accordingly, Evangelista did not suffer an adverse action.

14

Pursuant to a City Council resolution, appointed employees, such as Evangelista and her Republican counterpart, Joann Mapes, were entitled to the same health care benefits offered to union employees provided that the appointed employees work at least 20 hours per week. See Ex. 529. When the budget cuts reduced Evangelista and Mapes' hours to a level less than 20 hours per week, they lost their health care benefits. See T at 78, 203, 270, 342, 675, 771-774. After the budget was approved by City Council, Evangelista wrote to DeLucca on June 13, 2002 and requested information about the impact of the budget cuts on her hours and benefits. Ex. 23. DeLucca informed her that her hours would be reduced to 19 hours per week and she would lose her benefits under the City Council resolution. Ex 24. Evangelista then asked DeLucca if she could forego a pay increase and work an extra hour to get benefits. T at 205-212. DeLucca advised her that he had no authority to grant the request, which would violate the City Council resolution. T at 462. Although Evangelista introduced evidence that two employees of the West Haven Economic Development Corporation ("EDC") were receiving health care benefits via contracts with the City, Evangelista acknowledged that the EDC is a private organization, whose positions are not City positions. Ex. 25, 26; T at 273. Thus, the evidence established that the EDC employees are not governed by the City Council resolution which applied to her.

Furthermore, Evangelista admitted that she never approached the Defendant or attempted to contact him in any fashion in order to request that her health care benefits be reinstated. T at 271, 772. In addition, even if Evangelista had made an effort to contact the Defendant, he did not have authority to override the actions of City Council. T at 462-463. Rather, Evangelista's only efforts to have her health care benefits reinstated were directed to DeLucca whom, she admits, did not have the authority to override City Council. T at 271-273.

In the face of this evidence, the jury properly found against Evangelista's claim. DeLucca acted in accordance with the resolution and the Mayor was never approached and did nothing to prevent the restoration of Evangelista's benefits. Plaintiffs attempt to split hairs by arguing that the Council merely voted to reduce the appropriation to Evangelista's office and not to eliminate her benefits. The net effect of the vote, however, was to reduce her hours below the level required to receive benefits. T at 341, 375. Moreover, the reduction in hours was just one of several cost cutting measures implemented at the Registrar's office. T at 775-776. Accordingly, Evangelista did not suffer a post-budget adverse employment action at the hand of the Mayor.

**B.     The Evidence Supports the Jury's Verdict That The Protected Conduct Was Not A Substantial Factor In Decisions Concerning The Plaintiffs And The Same Employment Decisions Would Have Been Made Regardless Of Their Protected Conduct**

The jury unanimously answered "No" to the questions of whether Plaintiffs' protected conduct was a substantial or motivating factor behind any alleged improper actions. See Verdict Form, Part I.A.2 & Part III.A.2; T at 1096-1098. The determination of these issues was the sole province of the jury. See Gordon v. New York City Board of Education, 232 F.3d 111, 118 (2d Cir. 2000) (jury's job is to determine whether an impermissible factor is a motivating factor in employment cases dealing with retaliation). Underscoring this determination is the jury's further unanimous determination that these same decisions would have been made regardless of Plaintiffs' protected speech. See Verdict Form, Part I.A.3 & Part III.A.3; T at 1096-1098. The jury's verdict that the Plaintiffs' protected conduct was not the reason for the allegedly adverse post-budget employment decisions should stand.

Plaintiffs' case depends entirely upon their subjective characterization that the procedures followed for writing job descriptions, approving the job descriptions, posting the job descriptions

16

and evaluating the applicants based on qualifications and seniority were all subterfuges designed to further the Mayor's illegal violation of their rights. The evidence presented does not support this claim and the jury thus appropriately rejected the Plaintiffs' claims.

The evidence established that the Mayor has not engaged in a pattern of withholding employment based on who supported his reelection. Several people who have supported the Mayor's opponents have retained employment with the City. For example, although Tom Reilly's position as Electrical Inspector was eliminated in the 2002-2003 budget, Reilly successfully bumped into another position and has since been promoted, despite the fact that he was and remains an active supporter of John Picard. Another Picard supporter, Butch Treat, also remained employed and was promoted to a management position with the Mayor's express approval. At least two other Picard supporters, Mike McCurry and Cheryl Treat, also remain employed and moved to better paying jobs with the City. T at 448-449, 757, 760-765, 835, 917. Likewise, the Mayor retained Ferris as the Commissioner of Public Works, despite the fact that Ferris not only supported the Mayor's opponent in the 1991 campaign, but actively engaged in removing the Mayor's campaign signs for the 1991 election prior to the election. T at 551. Although Margaret Schenkle supported the Mayor's opponent in 2001 her employment at the Board of Education was not affected. See T at 279-285, 288-290. Following elimination of the Risk Manager position, Lorusso was hired in 2005 by the Board of Education, despite the fact that the Mayor sits as an influential *ex officio* member of the Board. Moreover, the evidence establishes that many of Plaintiffs' relatives have and currently do work for the City in some capacity. T at 137-138, 160-161, 182-183, 186-187, 199-200, 203-204, 265-266, 672, 815, 822-824.

Plaintiffs claim that the Mayor had the specific intent to and acted to block their re-employment and the reinstatement of benefits due to their protected conduct. As detailed above,

17

however, there is no evidence that the Defendant directed DeLucca, Legg, Ferris or any other person not to hire Lorusso or to refuse to reinstate Evangelista's benefits. In fact, the evidence establishes that the Defendant played no role in these decisions. DeLucca testified that the Mayor was not involved in the bumping process when Lorusso sought the position of Zoning Enforcement Officer and that he made this decision alone. T at 444. Ferris testified that neither the Mayor nor anyone else on his behalf contacted him as to whom he should select for the Assistant position or about ensuring that Lorusso did not get the job. See T at 565-566. Legg testified in the same manner in relation to the Manager job. T at 372. As such, the evidence supports the jury's finding that no unlawful intent was established.

Moreover, although the Plaintiffs introduced their own testimony about the Mayor's alleged statements to them or about them before the budget passed in order to support their claim of unlawful intent, the Mayor and Dick Legg denied making the statements attributed to them. See T at 64-67, 584-585, 721, 847, 851, 853 (claim that Mayor told Lorusso that if she didn't care if he had a job, he wouldn't care if the city had a Risk Manager); See T at 75-78, 305-314, 356, 358, 600, 750 (claim that the Mayor said that Lorusso should pay for her betrayal). While both the Defendant and Evangelista admitted the "living proof" exchange, they differed in their interpretations of what this conversation referred to. See T at 201-202, 263, 275, 693-694, 765-770, 857, 875. It is, however, the jury's province to determine the credibility of a witness. As such, although the Plaintiffs are understandably disappointed that the jury did not credit their version of events, this disappointment does not justify a new trial on the grounds that the verdict is against the weight of the evidence. See Sorlucco, supra, 971 F.2d at 875; see also Wade v. Orange County Sheriff's Office, 844 F.2d 951, 955 (2d Cir. 1988) (credibility assessments of the jury are entitled to deference); Densburger v. United Technologies Corp., 125 F.Supp.2d 585, 597 (D.Conn. 2000), aff'd 297 F.3d 66 (2d Cir.

18

2002), cert. denied, 537 U.S. 1147, 123 S.Ct 876, 154 L.Ed.2d 849 (2003) (court should refrain from setting aside verdict and granting new trial where resolution of issues depended on assessment of credibility of witnesses).

Further, the evidence shows the real reasons for the post-budget decisions made and that no one but DeLucca, Legg, Ferris, Lorusso and Evangelista were involved. As to the Zoning position, DeLucca denied Lorusso re-employment because she was not qualified, which Lorusso admits. See Exs. 5, 6, 11, 503, 512 & 513; T at 88-91, 106, 162, 169-171, 395-401, 446-447, 188-189. As for the Assistant position, once DeLucca determined he needed to rewrite the job, he was constrained by the union contract and union delays. See Exs. 7, 29, 501, 510; T at 111, 166, 169-170, 394, 404-405, 444, 449-453, 474-479, 905-911. DeLucca operated within these constraints without any input from the Mayor and as quickly as possible to make the job available. See Exs. 9, 10, 508, 509, 510; T at 97, 106-109, 171-173, 188, 191, 411-413, 429-430, 449-452, 477-479; 779. The evidence showed, however, that Lorusso simply was unable to bid on the job because it was not posted prior to her voluntary retirement. See Exs. 11, 12 & 513; T at 106, 112-113, 116, 127, 411-412, 425, 427-429, 482, 544, 561-562. Thus, Ferris interviewed four union members in accordance with union procedure and awarded the position to a qualified candidate with more seniority than Lorusso. See Exs. 21, 501, 515, 516 & 517; T at 109-110, 178, 179, 413-414, 424, 454-455, 548, 554, 556-562, 565-566, 568-569, 898-904, 912, 916. Finally, as to the Manager position, Legg acted without the Mayor's direct and personal involvement when he retained Carol Silverstein, created a new job description for the combined position, and chose Silverstein to fill it. He also acted against DeLucca's express advice that Silverstein should be laid off. See Exs. 13, 14, 16, 17, 28, 505 & 511; T at 84-88, 116, 120, 123-124, 128-130, 318-320, 323-332, 356-357, 360, 367-369, 373, 380-381, 418-419, 456- 458, 487, 617-618, 624-625, 756-757. Once the job description was submitted,

union delays again prevented DeLucca from posting the job before Lorusso's retirement. See Exs. 15, 16, 18, 510, 518, 519 & 523; T at 117, 120-122, 124-125, 366, 460. Legg then selected Silverstein, via the normal bidding process and without input from anyone, to fill the job. Lorusso also admitted she was not entitled to bid on the job. See Exs. 19, 520 & 525; T at 125-127, 135-136, 181, 188, 321-322, 331-336, 367, 370, 372, 458-459. Thus, there is a complete void of evidence indicating that DeLucca, Legg or Ferris, let alone the Mayor, was motivated by Plaintiffs' speech.

### C.    The Court Should Uphold The Jury's Assessment of Witness Credibility

Plaintiffs' motion is largely premised on the contention that the Defendant simply is not to be believed based on supposedly impeached testimony or his actions regarding matters irrelevant to the case. Credibility determinations, however, lie wholly within the jury's realm and are entitled to deference. See DLC Management Corp. v. Town of Hyde Park, 163 F.3d 124, 134 (2d Cir. 1998); Sorlucco, supra, 971 F.2d at 875; Wade v. Orange County Sheriff's Office, 844 F.2d 951, 955 (2d Cir. 1988); Densburger v. United Technologies Corp., 125 F.Supp.2d 585, 597 (D.Conn. 2000), aff'd 297 F.3d 66 (2d Cir. 2002), cert. denied, 537 U.S. 1147, 123 S.Ct 876, 154 L.Ed.2d 849 (2003). Moreover, Plaintiffs' contentions as to the credibility determinations the Plaintiffs believe the jury should have made are either rebutted by the evidence, misleading, unsubstantiated or encompassed within the legislative immunity afforded the Defendant.

For example, Plaintiffs attempt to make much of the elimination of Amy Warren's position. As with the elimination of the Risk Manager position, or the roughly 20 other positions eliminated in the 2002-2003 budget, the Mayor is entitled to legislative immunity concerning this decision. Thus the jury may well have appropriately determined that the Plaintiffs' contention that the Mayor's credibility concerning his motives about the Plaintiffs post-budget employment should be undercut by budget decisions for which he is entitled to legislative immunity is untenable. Moreover, the

Mayor testified that the budget document is continually evolving after he makes and receives requests from his department heads and that his goals were geared toward promoting economic development and preventing a large tax increase. Thus, while the elimination of Warren's position was part of the Mayor's proposed budget, the evidence showed that the elimination of this position was based on the recommendation of Warren's department head. T at 597, 661-666, 668-671, 727-731, 743-748.

Plaintiffs' assertions as to the other 40 positions in the registrar's office that were cut are also unavailing. Again, the Mayor enjoys legislative immunity regarding these positions. Moreover, as pointed out above, the evidence showed that several supporters of the Mayor's opponents have kept their jobs, such as Margaret Schenkle, Butch and Cheryl Treat, Ferris, McCurry and Reilly. Conversely, others who supported the Mayor did have their positions eliminated, although they were able to remain employed via bumping or bidding. For example, Silverstein, a contributor to the Mayor, lost her job and was only able to bid on the Manager position because of actions taken by Legg without the Mayor's knowledge until after Lorusso had retired. T at 613, 617-618, 622-624. Similarly, Kevin Clark and Carmel Suntino remained with the City, after having lost their jobs and bumping into new ones. T at 833, 835, 864-865. It should be noted that Plaintiffs failed to explore the political affiliations of 31 of the 40 or so positions that were eliminated; thus, it is problematic, at best, to give any weight to the argument that no Borer supporters were left without jobs. In addition, although Plaintiffs attempt to discount this evidence, the Mayor appointed Paul Dorsi as his corporation counsel and Mike Macariano to an advisory committee despite their support for other candidates. T at 862-864, 879-880. The Mayor also assisted Melinda Fonda in obtaining a new job in another town despite the fact that she was not a supporter. T at 869.

Further, Plaintiffs' characterization concerning the granting of health benefits to an alleged sex offender who was a city employee grossly misstates the facts of the matter, which boil down to a settlement agreement following arbitration after a grievance by the employee and the desire to terminate the employee because his continued employment put the City in the untenable position of having a registered sex offender inspecting people's homes. T at 689-692; T at 819. Finally, in relation to Evangelista, Plaintiffs fail to recognize the independent power of the Registrar in reappointing Mapes following her retirement and the fact that the statute empowering the Registrar of Voters to appoint Mapes overrides the City Charter provision barring the re-hire of a retiree. T at 777-778; 683. In sum, Plaintiffs' argument that their perspective of what was proven by the evidence is to be credited and the jury's judgment rejected is insupportable.

### CONCLUSION

Ample evidence supports the jury's verdict that the Plaintiffs suffered no adverse employment action, that the Plaintiffs' speech did not motivate these events, and that the same decisions would have been made regarding the Plaintiffs employment regardless of their protected conduct. The jury appropriately found that the Defendant did not retaliate against the Plaintiffs for the exercise of their First Amendment rights. However understandably distraught the Plaintiffs are over the jury's verdict, it is solidly supported by the evidence. Plaintiffs' motion should thus be denied not only because it fails on the merits but also because it urges a cynical view of the appropriate function of the jury. No seriously erroneous result or miscarriage of justice has occurred. To the contrary, the jury's verdict demonstrates a careful consideration of the evidence and a manifestly just and sustainable result.

THE DEFENDANTS,
CITY OF WEST HAVEN AND
H. RICHARD BORER, JR.

By: _____
Jennifer L. Schancupp
Federal Bar No. ct11876
Susman, Duffy & Segaloff, P.C.
55 Whitney Avenue
P O Box 1684
New Haven, CT 06507
Phone: (203) 624-9830
Fax:    (203) 562-8430
Email: jschancupp@susmanduffy.com

## CERTIFICATION

This is to certify that a copy of the Reply to Plaintiffs' Motion For A New Trial was

hand delivered and/or mailed this day, via first class mail, postage prepaid, to the following:

<u>Counsel for the Plaintiff</u>
Karen Lee Torre
Law Offices of Karen Lee Torre
51 Elm Street, Suite 307
New Haven, CT 06510

<u>Co-Counsel for the Defendants</u>
Paul J. Dorsi, Esq.
Assistant Corporation Counsel
Office of the Corporation Counsel
City of West Haven
355 Main Street
West Haven, CT 06516

Jennifer L. Schancupp

I:\Client W\West Haven\Lorusso-Evangelista\Pleadings\reply to rule 59 motion 09 15 05.wpd

23