UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

SANDRA LORUSSO and
DEBORAH EVANGELISTA

                             :     Civil No.  3:03CV00504 (MRK)

        Plaintiffs         :
                             :

V.                         :

                             :

H.  RICHARD BORER, JR.       :   October 19, 2005
                             :

        Defendant        :

## <u>MEMORANDUM OF LAW IN SUPPORT OF<br>MOTION FOR RELIEF FROM JUDGMENT</u>

I.    <u>BACKGROUND</u>

      This employment case was tried to a jury and concluded on August 11, 2005 when the jury

rendered a verdict in favor of the defendant, H. Richard Borer, Jr.  Judgment in accordance with the

jury's verdict entered on the docket on August 12, 2005. Plaintiffs thereafter filed a timely motion

for a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure on August 26, 2005 which

is grounded on the claim that the verdict was against the weight of the evidence. On September 16,

2005 defendant filed a memorandum of law in opposition to that motion in which he relied

extensively on the trial testimony of Ralph DeLucca, Jr. in arguing that the evidence sufficed to

sustain the jury's verdict.  On or about August 25, 2005 Mr. DeLucca, evidently suffering from a

guilty conscience, approached the plaintiffs' brother, John Pascale, and confessed to having lied

under oath at the trial.   Mr. Pascale advised Deborah Evangelista of this development.

**ORAL ARGUMENT REQUESTED**

below and by the exhibits appended hereto, DeLucca again confessed to lying under oath at the trial. Upon these disclosures and new evidence, plaintiffs also seek relief under Fed.R.Civ.P. 60(b) and for the reasons which follow urge this Court to vacate the judgment and grant a new trial.

**DeLucca's Admission to John Pascale of August 25, 2005**

John Pascale is a long-time employee of the City of West Haven, and works full-time as an assistant in the City Clerk's Office located within West Haven City Hall.  Deborah Evangelista still works part-time at City Hall in the Office of Registrar of Voters.  She states that for weeks after the jury's August 11, 2005 verdict, Mr. DeLucca, in contrast to his previous habit of engaging her in conversation when he saw her in City Hall, avoided her entirely, even going so far as to forgo the City Hall elevator and use a back staircase in order to get to his office without having to pass by Evangelista's office. Evangelista believed that DeLucca avoided her at work because he was mindful that he lied at the trial and  wished to avoid the discomfort of a face-to-face encounter with her.  See Affidavit of Debrorah Evangelista, appended hereto as Exhibit 2.

After approximately two weeks, on August 25, 2005, DeLucca approached John Pascale in a hallway of West Haven City Hall.  He opened the conversation with Pascale by stating, "It's very important to me what you think of me."  See  Affidavit of John Pascale, appended hereto as Exhibit 1.  DeLucca then admitted that he gave false testimony at the jury trial, expressed regret and acknowledged that the plaintiffs might be upset with him given the outcome of the case.  DeLucca

was distraught and appeared on the verge of tears.  Exh. 1 at ¶ 5.  While DeLucca did not give any details of his false testimony, he did explain his lying by stating that he felt "put on the spot" with the Mayor "sitting right there" in the courtroom while he was on the stand. Exh. 1 ¶ 4.  DeLucca was also angry with plaintiffs' counsel before he took the stand for reasons which are discussed below.

The reason for DeLucca's decision to approach John Pascale and not the plaintiffs with this issue remains to be understood.  Certain presumptions, however, can fairly be made.  John Pascale has known Ralph DeLucca for years and has enjoyed a friendly relationship with him.  Pascale, interestingly enough, was a Borer supporter who financially contributed to and aided Borer's 2001 re-election campaign.  Exh. 1 ¶ 2.   Pascale said little of substance in response to DeLucca's comments.  DeLucca implied that it was the outcome of the trial which gave rise to his feelings of guilt as he had not expected Borer to prevail.  Exh. 1 ¶ 4.  John Pascale informed his sister of this conversation.  Exh. 1 ¶ 6.

Subsequent to his conversation with John Pascale, and after two weeks of avoiding Evangelista,  DeLucca passed by Evangelista's office on September 8, 2005 and saw her through the open door.  When Evangelista pleasantly acknowledged him, DeLucca stuck his head in her office, engaged in small talk and then asked if the sisters planned to appeal from the verdict.  Evangelista responded by stating they could not financially afford an appeal and then terminated the conversation by telling DeLucca she could not  speak to him at that moment.  DeLucca left.  Exh. 2.

A short time thereafter, Evangelista sought out DeLucca and engaged him in conversation on

3

the matter.  This time, unbeknownst to DeLucca, Evangelista recorded the conversation.[1]   Exh. 2.

A transcript of the audio recording was prepared by a court reporting service.  The certified transcript

is appended hereto as  Exhibit 3.  Although the transcript speaks for itself, the court is urged to listen

to the actual recording contained on a CD which plaintiffs' counsel is prepared to deliver to chambers

if the Court so permits.[2]

Plaintiffs believe the court's examination of the audio recording is important both for

independent confirmation of content and the additional reason that Mr. DeLucca's tone and inflection

lend to a greater understanding of context, interpretation and meaning.

### DeLucca's Statements and Admissions of September 8, 2005

As the recording and transcript indicate, Ralph DeLucca, Jr. walked into the courtroom on the

day of his testimony clearly angry at plaintiffs' counsel for having divulged to the court and defense

counsel facts surrounding DeLucca's behind-the-scenes support for the plaintiffs' cause, his

disclosure to Evangelista of evidence which he believed would help prove her claim and his previous

---

[1]     Evangelista understandably mistrusted DeLucca and had no confidence that he would confirm his statements to her and John Pascale if questioned about them in this or another proceeding. Inasmuch as DeLucca's first admission of lying was made to the plaintiffs' brother, plaintiffs also understandably feared John Pascale's credibility would be subject to attack on that basis. Accordingly, to avoid still more instances of "she said - he said", Evangelista recorded DeLucca's statements.

[2]     The CD recording is audible on a computer's D Drive and, for those instances where one wishes  to listen a second or third time to a portion of the conversation, functions on Windows Media Player can be used to reverse or back up the conversation in very small increments.

disclosures to and conversations with plaintiffs, among them DeLucca's recount of his discussions with Finance Director Richard Legg on the subject of Mayor Borer's own statements regarding his potential liability for his conduct toward plaintiffs. DeLucca was additionally angered at plaintiffs' counsel's disclosure to the court and counsel of the content of DeLucca's discussion with plaintiffs regarding an affidavit prepared by defense counsel which DeLucca signed and was included in Borer's moving papers in support of his motion for summary judgment.[3]

As the pre-trial background and trial evidence show, plaintiffs' counsel relied on what she was told by her clients based on their discussions with DeLucca, namely, that DeLucca, once placed under oath and on the stand at a federal trial, would not perjure himself.[4]

---

[3]    As the court will recall, issues of admissibility of these matters were raised and argued before the court at the pre-trial conference of July 20, 2005. Believing such evidence to be relevant to the bias and credibility of both DeLucca and Legg, plaintiffs stated their intent to offer evidence that DeLucca: 1) knew plaintiffs' allegations were true and acted in accordance with that belief by privately expressing support for their civil action; 2) disclosed the existence of and led Evangelista to evidence he believed would help prove the case; 3) disclosed to plaintiffs discussions he had with Richard Legg during which both men implicitly acknowledged Borer's wrongdoing and further disclosed Borer's arrogant response to advice that his course of retaliation against plaintiffs may lead not only to liability but punitive damages for malicious acts. Plaintiffs' counsel stated her view of the importance of this evidence in light of the role she expected DeLucca to play in Borer's defense. Since the court presided over the trial, the court no doubt understands plaintiffs' theory of the case which was that DeLucca was but a strawman through whom Borer successfully excluded Lorusso from continued employment after the "abolition" of her job in the budget process. The defense of course portrayed DeLucca as a neutral personnel director applying the job bidding and bumping rules to Lorusso in a manner completely "disconnected" from the Mayor's retaliatory animus toward her.

[4]    DeLucca did not perjure himself in the affidavit which Borer submitted to this court as part of his summary judgment moving papers. His statements therein were true but only in a hyper-technical sense and were misleading largely by omission. DeLucca, no doubt concerned that plaintiffs would

As his September 8, 2005 statements to Evangelista reveal, DeLucca became angry when the content of his previous discussions with Evangelista was disclosed in court proceedings.  Apparently, Mr. DeLucca was of the mind that plaintiffs' counsel breached  a perceived duty to make use of him as a witness while keeping secret the clandestine manner in which he sought to arrange it.  He "hates" plaintiffs' counsel for revealing matters he thought were disclosed "in confidence" and for otherwise revealing him as a "Double agent".  He was so furious that he was poised "to say somethings . . . that were not nice" to plaintiffs' counsel while he was still on the witness stand, things that "came right to the tip of [his] tongue . . ."  He thought plaintiffs' counsel made him "look like a fool".  After the pretrial conference but before the trial,  DeLucca states, he was confronted by defense counsel regarding the pretrial disclosures by plaintiff's counsel of the testimony she expected from DeLucca. DeLucca now claims he also "lied to the lawyers" when he denied the truth of plaintiffs' counsel's representations. He did not want the Mayor to know of his prior disclosures to and conversations with the plaintiffs.   Having lied to the lawyers and denied the accuracy of plaintiffs' counsel's representations to the court at the pretrial conference, DeLucca, with the Mayor and defense counsel sitting in the courtroom, made a conscious decision to perjure himself on this and other subjects.  As the following will show, DeLucca's false testimony not only contaminated the trial and the verdict

---

be upset over his signing such an affidavit, told Evangelista that he signed the affidavit because it was technically true and promised to tell the whole truth at trial when asked.  DeLucca went so far as to tell Evangelista to advise plaintiffs' counsel how to frame the question at trial so to elicit the whole truth.

but his post-judgment admissions and other statements reveal the utter falsity of a critical assumption

which defense counsel asked and caused jurors to make - that DeLucca felt "free" to state his views,

even if they were at odds with the Mayor, that is, DeLucca was a disinterested witness who had no

motive or reason to testify falsely nor any reason to fear retribution by Borer.

**DeLucca's Trial Testimony**

Mr. DeLucca's statements to John Pascale and Deborah Evangelista must be viewed against

the backdrop of DeLucca's prominent role as a witness at trial and the use of his testimony by

defense counsel both in securing the verdict for Borer and in opposing plaintiffs' August 26, 2005

Motion for a New Trial.

At trial, under examination by plaintiffs' counsel, DeLucca denied responding to plaintiffs'

notice of intent to sue by stating, "Good, I don't blame you". "That's not what I said," DeLucca

insisted. When pressed, he admitted he may have said "something like that". T. at p. 432. He also

flatly denied having discussions with Richard Legg regarding the Mayor's acts against the plaintiffs

during which Legg conveyed, and they discussed, statements made by Borer regarding liability for

his actions and the exposure to punitive damages for malicious acts. T. at p. 432. Obviously,

plaintiffs' counsel was surprised at these answers and thus pressed DeLucca further. Once again,

DeLucca adamantly denied it:

Q.    [I]sn't is true that you would have discussions with Mr. Legg and during
the course of one of those discussions, Mr. Legg conveyed to you certain
statements the mayor made regarding this lawsuit and what the outcome

7

might be?

A.    <u>No.</u>

Q.    Did Mr. Legg ever have a discussion with you wherein he quoted the Mayor as making comments about this lawsuit?

A.    <u>No, Ma'am.</u>

T. at pp. 432-433.

Plaintiffs' counsel did not expect this, was taken aback and proceeded further

to inquire as follows:

Q.    Did you ever appear or speak to Debbie or Sandy about this litigation, the accusations against the Mayor and in the context of that discussion, you were in the hallway with the Mayor's office to your right and you pointed your finger like this to the Mayor's office and called him – – excuse me ladies and gentlemen – – an a-hole?

A.    I don't remember that, ma'am.

Q.    You don't remember that?

A.    No, I don't remember that.

Q.    Did you ever go up to Debbie Evangelista and say, how's the lawsuit going?  Right? Did you ever say that?

A.    Yeah, I admitted that I said that.  Yes.

Q.    Did you ever say that there were certain statements being made about the Mayor regarding the accusations against him, correct?  You didn't say that?

A.    No, I don't remember saying that.  No.

Q.    In the context of discussing with Debbie Evangelista this lawsuit and the accusations against the Mayor in this lawsuit, I'm asking you here and now, sir, under oath, did you not point to the Mayor's office and call him an asshole?

A.    <u>No.  Never did that</u>.

Q.    You never did that?

A.    <u>Of course not.</u>

Q.    Did you do something like that?

A.    <u>No, nothing like that.  I'm a professional, I don't act that way, ma'am."</u>

8

T. at pp.433-434. (Emphases supplied)

DeLucca continued unexpectedly to deny flat out that he helped the plaintiffs behind the scenes and pointed Evangelista to the existence of evidence (respecting the Mayor's use of executive authority to grant city-paid health insurance to non-city employees who were not eligible for it):

> Q.    Well, did you give them any assistance behind the scenes with respect
>        to their lawsuit?
> A.    No, ma'am.

T. at p. 434.

DeLucca proceeded to deny that he led Evangelista to information and the documents which were admitted as plaintiffs' Exhibits 25 and 26. T. P. 435.

With respect to the affidavit which he signed for submission by Borer with his motion for summary judgment, DeLucca repeatedly denied recollection of a discussion with Evangelista wherein he explained that the affidavit was technically correct but carefully parsed. He then flatly denied telling either plaintiff to advise her counsel of the need to ask him questions a certain way at trial so as to put the sworn statements in the affidavit in truer context (e.g., by avoiding the parsing employed by defense counsel and asking the question in such a way as to allow the true picture of his (and Legg's) understanding of the Mayor's role in these events.) DeLucca was adamant:

> Q.    Did you make any statement at all to them in a conversation about how
>        I should ask you a question a certain way?
> A.    No, absolutely not.
> Q    You are certain of that?
> A.    I'm certain of it.

T. at pp. 437-38. (Emphases supplied)

DeLucca insisted that the only statement he made to Evangelista was that he "wouldn't lie" - either for them or the Mayor. T. 437. By his unequivocal and emphatic denials, he telegraphed a tacit messages to jurors, which was that the plaintiffs and/or their counsel had contrived this. After all, somebody had to be lying.

Under examination by defense counsel, DeLucca was asked to characterize his relationship with Mayor Borer. He answered, "OK. We're not buddy-buddy" and proceeded to state "absolutely" that he felt free to disagree with the Mayor. T. at 441. DeLucca testified that he alone determined who could bump into a job and that Borer was "absolutely not" involved at all in the process. T. at 444. He testified that he denied Lorusso the Zoning Enforcement job because she was unqualified. T. at 446. He further denied having told LoRusso that her lack of the zoning enforcement certificate called for in the job description was the reason. T. at 397-99. With respect to Thomas Reilly (who had bumped Kevin Clark from his position, leading Clark to the zoning job), DeLucca stated that Reilly was not, to his knowledge, a former Borer supporter. T. at 402. He also claimed Borer knew nothing about Clark getting the zoning job and "as far as he knows", the Mayor had no role in it or influence over it. T. at 402. (Q: "As far as you know?" - - A: "Right")

With respect to LoRusso's repeated failed attempts to be considered for the job of Assistant to the Director of Public Works, in contradiction to the testimony of Arthur Ferris, DeLucca claimed that he consulted Ferris before making a decision to delay filling the position and rewrite the job

10

description.  He claims to have met with Ferris who implicitly agreed to the rewrite by stating to DeLucca, "Do what you have to do." T. 407-409.  DeLucca admitted that the rewrite of the job description did not involve any substantial changes.  He also admitted that he was aware at the time that if LoRusso did not secure a job by July 1, 2002 she would be forced to retire or accept a layoff, and that retirement would be the necessary choice if she wished to retain her health insurance. T. 412, 428; Exh.11.  DeLucca posted the vacancy for the Assistant job within days of LoRusso's retirement. T. 412.  He conceded that LoRusso was well qualified for the job.  He told the jurors he tried to conclude the rewrite process as quickly as possible and before she retired. T. 412.  That the causes of delay resolved right after LoRusso's retirement deadline was a mere coincidence. T. at 405.

DeLucca claimed to have had no knowledge that the Mayor knew LoRusso wanted and was attempting to get the Assistant job.  When confronted, however, with Exhibit 10 (his letter to LoRusso  setting forth the reasons for the denial which indicates a "cc" to Borer), DeLucca then stated, "Yeah - no doubt" the Mayor knew. T. at 429-430.  He denied counsel's suggested purpose of the copy to Borer, i.e., to report compliance with what he knew to be the Mayor's wish that LoRusso be blocked from re-employment. T. at 473.  The copying of the Mayor on this correspondence is in contrast to DeLucca's testimony that the Mayor was uninvolved in any of these post-budget hiring decisions as these decisions are made solely by department heads, free of influence from Borer.  DeLucca characterized his conduct as entirely consistent with his established practice of copying the Mayor on his correspondence.   When confronted with a letter he wrote to union

11

representative Joseph Mayhew, a letter he authored <u>on behalf of the Mayor</u> (in response to a letter from Mayhew to Borer) but did not copy to the Mayor, DeLucca stated that his "secretary must have made a mistake." T. at 472.

When asked about the disparate favored treatment accorded Carol Silverstein, who was retained on the payroll despite the abolition of her job in direct contravention of the very rules invoked against LoRusso, DeLucca stated he had a "little" problem with it as he thought Silverstein should have been laid off along with LoRusso and admitted that Richard Legg bent the rules for Silverstein. T. at 419-423. Although Arthur Ferris, as a department head, could have done for LoRusso what Legg did for Silverstein, which was appoint LoRusso temporarily to the position pending the rewrite of the job description, Ferris was unaware of LoRusso's interest as DeLucca never told him. T. 425-426.

Under examination by defense counsel, DeLucca testified that the Mayor was not involved at all in the bumping process. T. at 444. He denied any discussions with Borer, or anyone on Borer's behalf, concerning LoRusso. He had no discussions with <u>anyone</u> regarding the Mayor's position on LoRusso getting the Assistant's job. T. 452-455. He denied <u>any</u> knowledge of whether Borer had any thoughts with respect to whether LoRusso should be considered for the job. T. 455-456. As to Kevin Clark, DeLucca stated, he had no knowledge that the Mayor was aware Clark was to get the zoning job. DeLucca repeatedly stated that department heads make the hiring decisions. T. at 398-399.

With respect to the Manager job temporarily and then permanently awarded to Silverstein, DeLucca

12

testified that it was Richard Legg who decided to combine the duties of LoRusso's job with those of Silverstein's job.  The two men discussed this.  DeLucca claims he stated to Legg, "Well, you know, give me a draft of how, what you want in the position".  T. at 456.  DeLucca added nothing further to his account of his discussion with Legg regarding the matter. He gave a different story to Evangelista on September 8, 2005.  Exh. 3, p. 5.

**Defense Counsel's Closing Argument To The Jury**

Defense counsel relied on and frequently cited Ralph DeLucca's testimony during her closing argument to the jury.  T. at pp. 975-1000.  Relying largely on DeLucca's role as the witness who described the City's practices respecting hiring, bidding and bumping of employees into jobs and the circumstances surrounding Lorusso's exclusion, defense counsel emphasized the lack of evidence of Mayor Borer's involvement in or influence over any of it.  In contradiction to plaintiffs' theory of the case, which was that the Mayor's involvement was tacit and covert, defense counsel again emphasized DeLucca's testimony that department heads independently made these decisions. Counsel's mantra throughout her summation was the claimed lack of evidence of Borer's knowledge, involvement or influence in plaintiffs' misfortune and DeLucca was the refrain.  See, e.g., T. at 987-991 ( "those decisions are made entirely by DeLucca..."; "DeLucca made this determination . . ."; Silverstein was retained by Legg "without the Mayor's knowledge or consent and solely by his own directive . . ."; "no evidence of direct and personal involvement by the defendant"; "no involvement by the Mayor"; "he was not consulted . . ."; "nor did he nor anyone on his behalf contact DeLucca";

13

"you heard Ralph DeLucca . . . he didn't involve the Mayor . . ."; " The Mayor didn't get involved because that's a personnel function"; "There's no evidence that the mayor had any involvement or that Ralph DeLucca . . . contacted the mayor . . ."; "Likewise, as to the [manager job], the job rewrite and posting was handled by Mr. DeLucca as a personnel function . . ."; "no evidence of the mayor's direct and personal involvement". ) These are but examples. Defense counsel went on to itemize for jurors what she claimed were "disconnects" ("disconnect #1", "disconnect #2", etc.) between plaintiffs' allegations and the trial testimony, again relying in large measure on DeLucca.

Perhaps of equal if not greater significance was defense counsel's statement that jurors should bear in mind  DeLucca's  testimony that he felt "free" to disagree with the Mayor.  That testimony and  the  argument  in  closing  were  obviously  designed  to  buttress  and  underscore  DeLucca's credibility. The inference to be drawn of course was that DeLucca was unafraid of this Mayor and was not  concerned  about  retribution  for  testimony  helpful  to  plaintiffs.   Indeed  defense  counsel,  in reference to the testimony on this point which she elicited from DeLucca, Ferris and Legg, stated to jurors: "All three also told you that they feel free to disagree with the Mayor and they do not fear repercussions in the event they do disagree."  T. at 982. DeLucca's statements to Pascale and Evangelista clearly suggest otherwise.  To both of them, DeLucca made it clear he felt "put on the spot" while on the stand with the "mayor sitting there" in the courtroom.  In reference to Legg's admissions at trial regarding Borer's political animus toward plaintiffs and his own awareness that Borer did not want LoRusso to get back into city service, DeLucca said that "everybody in [city hall]

14

was saying Dick [Legg] better not come back . . ." Exh. 3, p. 16.

DeLucca's September 8, 2005 statements also reveal his understanding of the influence Borer exerts over hiring decisions, which differs markedly from his trial testimony. He stated the Mayor routinely told department heads "who he wanted", including Legg and Ferris.. Exh. 3, pp.14-15. In what is an obvious reference to LoRusso's efforts to "bid or bump on everything she could", as Evangelista had put it, DeLucca responds with the statement, "In other words, I'm saying she (LoRusso) knew he's (meaning Borer) not going to do, he's not going to what do you call it – " , to which Evangelista responds, "No, she knew he (Borer) wasn't going to give her a job." "She should have took the fifteen thousand dollars", DeLucca answers. Later in the conversation when Evangelista commented that Legg knew LoRusso was targeted ("he knew exactly - - well, he said it on the stand what happened . . . everybody in this building knows, let's be real"), DeLucca responded, "you know what, it was assumed. If you ask anybody to assume" and, again in reference to Borer, added the following interesting comment: "Right, but I'm saying Richie was smart in a way, he didn't go around telling people..." Of course, DeLucca's statements are entirely consistent with plaintiffs' claims and arguments in this case - which is that Borer accomplished his unlawful deeds through his subordinates who acted in accordance with his designs and wishes.

Borer's statement to Legg, for example, that "LoRusso has to pay for her disloyalty"[5] coupled

---

[5] A statement which Legg did not deny - he claimed a failure of memory. When pressed, he admitted that he told others of it and knew Borer's acts were driven by political animus. T. 332.

with his directive to Legg to "cut her out of the budget" would be all that Legg and DeLucca needed to understand their charge did not end with the budget vote by the city council. Borer denied involvement in or influence over the actions of his subordinates and this alleged lack of "personal involvement" was the central theme of defense counsel's closing argument. For purposes of Section 1983 liability, however, "[p]ersonal involvement does not hinge on who has the ultimate authority for constitutionally offensive decisions. Rather, the proper focus is the defendant's direct participation in, and connection to, the constitutional deprivation. 'The requisite causal connection is satisfied if the defendant set in motion a series of events that the defendant knew or should reasonably have known would cause others to deprive the plaintiff of her constitutional rights'". McClary v. Coughlin, 87 F.Supp. 2d 205, 215 (W.D.N.Y. 2000) quoting Conner v. Reinhard, 847 F.2d 384, 397 (7th Cir.) cert. denied, 488 U.S. 856, 109 S.Ct. 147 (1988) (emphasis supplied). See also Wulf v. City of Wichita, 883 F.2d 842 (10th Cir. 1989) (sufficient personal involvement for §1983 liability where defendant's recommendation ultimately led to unlawful acts by another).

DeLucca's admitted perjury, for example, on the subject of his discussion with Legg regarding Borer's conduct and reaction to advice that he, by such conduct, was exposed to punitive damages for malicious acts, will no doubt be downplayed by defendant. But the lies regarding that subject (and their consequences) cannot be deemed immaterial or otherwise discounted. The lies severely undermined plaintiffs' proof as the very discussion with Legg which DeLucca falsely denied having was one basis for imputing to DeLucca knowledge of the Mayor's designs. This was particularly

important given defense counsel's eliciting from DeLucca testimony that he never spoke to the Mayor directly regarding the Mayor's wishes in respect to LoRusso's re-employment in another position, testimony which defense counsel parlayed to maximum return in her closing argument.

In still another display of his proficiency in the art of testimonial gamesmanship, DeLucca envisioned how he would have fielded a question from plaintiff's counsel as to whether it was Borer's practice to tell him who to hire:  "Now I would have says no, and you would have said 'There he is, lying again.'" Evangelista interjects, "Lying again", to which DeLucca responds, "Lying again, but he(Borer) would tell Artie Ferris who he wanted, or he would tell Dick [Legg] who he wanted, or he would tell so-and-so who he wanted."  ( in kinship to that phrase unfortunately now part of the American lexicon: "it depends on what the meaning of the word 'is' is . . . ")

At this point Evangelista refers to DeLucca's lying in the context of what she would or would not tell plaintiffs' counsel.  DeLucca, ruing, responded:  "I got caught up in it, I'll be honest with you, I got caught up in it too".  He added that he also expressed regret to his wife: "I said to my wife, I said you know, I said some things I shouldn't have said and I should have said some things I didn't say, but I got caught up in it and the attorney - - ."  At the moment he took the stand, DeLucca was of the mind, based on what he had heard of the trial evidence thus far, that plaintiffs would prevail in the verdict.  Thinking that they did not need his truthful testimony and that false testimony would not hurt them, he indulged his desire to maintain the good graces of the Mayor, disregarded the oath and lied. To his credit, he has a conscience and, based on counsel's  research, admissions of perjury are rare

in civil cases.  In light of this, however, to allow defendant to benefit from the judgment  is contrary to civil justice and it should not be allowed to stand.

II.   **ARGUMENT**

A.   **RALPH DE LUCCA JR.'S POST-JUDGMENT ADMISSION THAT HE GAVE FALSE TESTIMONY WARRANTS RELIEF FROM THE JUDGMENT AND THE GRANTING OF A NEW TRIAL.**

Plaintiffs are already before this Court urging a grant of a new trial on the ground that the verdict was against the weight of the evidence.  Defendant, in opposing a new trial on that ground, argues that this case boiled down to credibility of the witnesses.  Mr. DeLucca's role in the events which led to this action and his credibility as a trial witness were central to the case.  DeLucca has admitted to two individuals that he lied under oath to jurors at the trial. While he may be free to deny his statements to John Pascale, he is in no position to deny his statements to Evangelista as they were recorded.  Mr. DeLucca's contrition is all well and nice but is of little solace to the plaintiffs.  Apart from the issue of perjury, DeLucca's explanation for lying should be meaningful for the Court in assessing the initial grounds for plaintiffs' motion for a new trial:  that the verdict was against the weight of the evidence.  By his own admission, DeLucca lied because he didn't think he would hurt the plaintiffs.  He thought the plaintiffs had the verdict.  Although witnesses were sequestered, as is often the case, reports and discussion of how the trial was going apparently circulated.  DeLucca told

18

Pascale he lied because he never thought plaintiffs would lose the case. Exh. 1¶ 4. DeLucca offered the same rationale repeatedly in his conversation with Evangelista. He specifically cited Richard Legg's testimony under cross-examination by plaintiffs' counsel, testimony which led DeLucca, and apparently others, to believe that the outcome would be a plaintiffs' verdict.[6] What DeLucca thought would be the impact of Legg's testimony on the jury obviously drove his decision to lie outright and otherwise parse his answers at trial in a manner designed to please the Mayor and conceal his duplicity. DeLucca's statements to Evangelista in this regard are telling:

> W: Tell me the truth, did you ever think we were going to lose?
>
> M: No.
>
> W: I said to Sandy, You know what, that's what he was thinking, is that we weren't going to lose and you know, he wasn't hurting us. I mean, I said, you know –
>
> M: [I didn't think you were gonna lose, especially] after they said what his testimony was, Dick [Legg], the rumor was going around here – in fact <u>everybody was saying</u> – in fact <u>everybody in here was saying</u> Dick [Legg] better not come back . . .

Exh. at p. 16, lines 4-8.[7]

---

[6]DeLucca no doubt was referring to Richard Legg's admission under cross-examination that Borer's budget actions against the plaintiffs were politically motivated and further, in the post-budget period of May to June 30, 2002, when decisions were being made as to who would get what job by bump or bid, including who would get the newly-merged "manager job," Legg knew that Mayor Borer did not want Sandra Lorusso to get back into city service. T. P. 332.

[7]The court reporter indicates the beginning of DeLucca's answer as inaudible. Upon careful review of the audio recording, plaintiffs believe the Court will agree that Mr. DeLucca can be heard commencing his answer with the words "I didn't think you were gonna lose, especially__."

Thus, apart from the issue of Mr. DeLucca's perjury, one of his excuses for lying (to wit: that the trial evidence, including Legg's admissions, led him and "everybody else" at City Hall to believe plaintiffs were going to win) lends all the more support to the argument that Rule 59 relief is available to these plaintiffs on the ground that the verdict is against the weight of the evidence. If anything, DeLucca's confessed lying, when added to the mix in the Court's independent assessment of the weight of the evidence, clearly warrants the grant of a new trial.

Mr. DeLucca's September 8, 2005 disclosures certainly provide the basis for relief from the judgment under Fed. R. Civ. P. 60 (b) which provides in pertinent part:

> On motion and upon such terms as are just, the court may relieve a party ... from a final judgment, order or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59 (b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment.

While the standard for Rule 60 relief is "strict," see Nemaizer v. Baker, 793 F.2d 58, 61 (2nd Cir. 1986), the rule "should be broadly construed to do substantial justice, yet final judgment should not be lightly reopened." Id. at 61 (internal quotations and citations omitted). This motion is committed to the sound discretion of the court. Mendell v. Gollust, 909 F.2d 724, 731 (2nd Cir. 1990). It well appears that Rule 60 (b) (2) is the provision applicable here. Without question, DeLucca's

20

September 8, 2005 admissions constitute "newly discovered evidence."  Moreover, it goes without

saying that it could not, with due diligence, have been discovered in time to move for a new trial

under Rule 59 (b).  To meet the standard, plaintiffs must demonstrate that:

> [1] the newly discovered evidence was of facts that existed at the time of trial or other
> dispositive proceeding, [2] [they] must have been justifiably ignorant of [this
> evidence], despite due diligence, [3] the evidence must be admissible and of such
> importance that it probably would have changed the outcome, and [4] the evidence
> must not be merely cumulative or impeaching.

United States v. Int'l. Bhd. of Teamsters, 247 F.3d 370, 392 (2nd Cir. 2001).[8]

The same considerations which have led trial courts to grant Rule 59 motions in circumstances

where a witness' perjury tainted the process should likewise inform the court's assessment of relief

under Rule 60 (b),  for upon analysis of the situation under either rule, if it can be said that the

outcome  might have been different had counsel and jurors known of  DeLucca's perjury, the

---

[8]Plaintiffs' counsel initially believed she could bring this new evidence and issue to the court by way
of a supplement or amendment to plaintiffs' pending Rule 59 motion for a new trial as this new issue
with Mr. DeLucca relates to and is germane to the issue presented by that motion which is the claim
that the verdict is against the weight of the evidence.  Counsel's research has uncovered no authority
within our circuit which establishes the right to supplement or amend an otherwise timely Rule 59
motion under these circumstances.  Counsel did find and alerts the court to an opinion from a District
Court within the Third Circuit holding that one may not amend an otherwise timely motion for a new
trial by adding new grounds after the expiration of the filing deadline for such a motion.  See Lee v.
Consolidated Rail Corp., 1995 U.S. Dist. LEXIS 18199 (E.D. Pa.).  Although the District Court in
Johnson v. Verisign (see infra p.22) not only allowed but directed counsel to amend a Rule 59 motion
to address new issues of perjury, it appears from the opinion that the court *sua sponte* vacated the
judgment upon suspecting perjury.  The vacatur may have dispensed with any issue of deadlines.
While plaintiffs believe that Mr. DeLucca's post-judgment disclosures are germane to the pending
Rule 59 motion, plaintiffs in an exercise of caution also move for relief under Rule 60 (b).

judgment should not stand.

"The law is well-established that it is the duty of the trial judge to set aside the verdict and grant a new trial if, in his opinion, the verdict is based upon evidence which is false or the verdict results in a miscarriage of justice.  The trial court is empowered to do this <u>even though there may be substantial evidence which would prevent the direction of a verdict</u>." <u>Isley v. Motown Record Corp.</u>, 69 F.R.D. 12, 17 (S.D. N.Y. 1975) citing <u>Aetna Cas. & Surety Co. v.Yeats</u>, 122 F. 2d 350 (4th Cir. 1941); <u>Reyes v. Grace Line, Inc.</u>, 334 F.Supp 1104 (S.D. N.Y. 1971).  (Emphasis supplied)  Although a  trial court has discretion to set aside a verdict and order a new trial if, after comparing and weighing the evidence itself, the court finds the verdict is against the clear weight of the evidence, and  may do so notwithstanding the existence of evidence to support the verdict, upon evidence that the jury's verdict was based on or tainted by fabricated evidence or perjury, the trial court is obligated to order a new trial to prevent the miscarriage of justice.  <u>Williams v. United Dairy Farmers</u>, 188 F.R.D. 266, 275 (S.D. Ohio 1999) (citation omitted) (setting aside jury verdict and granting new trial in civil case alleging employment discrimination upon post-judgment discovery of perjury of a material witness).

In <u>Johnson v. Verisign</u>, 2002 U.S. District LEXIS 13229 (E.D. Va.), an employment discrimination case alleging retaliatory lay-off which resulted in a defendant's verdict, the plaintiffs, as here, filed a timely motion for a new trial and later amended the motion to include newly-

22

discovered evidence of perjury by defense witnesses.  Id. at *37.[9]  In Johnson, the perjury was  more

nuanced.  Company officials had repeatedly referred to a "lay-off list" which included the plaintiff

among those being considered for an economy-based lay-off.  While they never expressly stated that

the list was a tangible document, the District Court found the witnesses' phrasing served to mislead

the court and jury to assume the existence of a tangible list.  The Court found the witnesses' linguistic

parsing and omissions served to buttress defendant's claim of a legitimate, non-pretextual reason for

the plaintiff's termination: a reasoned, deliberate and non-discriminatory consideration of the plaintiff

among others on a list for possible lay-off.  Id at *54.  In another instance which also brings to mind

the instant case, the Court also found the witnesses' testimony that others in plaintiff's group were

laid off to be misleading by omission, for the witnesses failed to mention that the others worked in

another state.  It is noteworthy that these witnesses expressly denied lying and attempted rather

strenuously to convince the Court that they did not lie, and alternately, if the court found that they did,

the lie related to a detail which, in the overall scheme of things, did not implicate the integrity of the

verdict.  The District Court rejected these arguments, reasoning that such a lie can permeate,

especially where a case turns entirely, as it did here by Borer's own admission, on questions of

credibility:

> Having found that the testimony given by several material witnesses was false, the

---

[9] Apparently, upon discovery of possible perjury, the District Court actually directed the plaintiff to
amend his motion.  Id. at *37.

next question is whether the jury might have reached a different conclusion without the false testimony. [Citation omitted.] The court holds that the jury may have reached a different verdict if they were presented with all the relevant facts, and combined with the appearance of impropriety, a new trial was warranted.

This case turned on questions of credibility, quintessential questions for a jury. See Williams [v. United Dairy Farmers], 188 F.R.D. at 276 (finding that possibility that jury verdict might have been tainted by false testimony in employment discrimination case was sufficient to warrant new trial where issues at trial 'turned on accusations and denials.')

Johnson v. Verisign at *52.

The instant case likewise turned in every respect on witness credibility. In Johnson, the dishonesty was confined to the issue of the existence of a tangible lay-off list as opposed to a "mental" list and the omission of the location of other laid-off employees. Nonetheless, the District Court reasoned that the witnesses' false portrayal served generally to bolster the credibility of the company's defense. "Defendants' consistent testimony about a written tangible lay-off list including the Plaintiff unquestionably bolstered the credibility of defendants in a case where credibility was key." Id at *53. Such dishonesty, if known to jurors at trial, the court reasoned, could have led them to "reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose ... The fact-finder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt." Id at *54 citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147, 120 S.Ct. 2097 (2000).

In the instant case, while DeLucca did not fully itemize his false testimony, what is known is

24

that in one brief conversation with John Pascale and in another hushed, hallway conversation with Evangelista, DeLucca admitted outright lying on these issues: 1) his statements to Evangelista surrounding the signing of his summary judgment affidavit, its misleading character and his stated intent to offer the full truth at trial; 2) his private support for the merits of plaintiffs' claims and his directing Evangelista to the existence of facts and documentary evidence to support her claims; and 3) his discussions with Richard Legg regarding Borer's conduct and his reaction to being advised that he was exposed to liability and to punitive damages if malice were proved, including his opening of the conversation with plaintiff by pointing to the Mayor's office and stating, "Do you know what that asshole said?")

Apart from these explicit indications, the  conversation between DeLucca and Evangelista, when viewed as a whole and in context, casts serious doubt on the veracity of DeLucca's entire testimony.  For example, DeLucca well appears to have conceded that Lorusso, in his opinion, could have performed the duties of the job of Zoning Officer.  <u>See</u> Exh. 3  at p. 9, lines. 22-24.[10]  In response to Evangelista's  acknowledgment ("of course she could have"), DeLucca responds, "All

_____

[10]While defendant no doubt will argue otherwise based on the actual wording of DeLucca's statement, a review of the transcript reveals that DeLucca's speech patterns and syntax, including the use of double negatives, must be taken into account and understood.  It is for this reason that plaintiffs believe it is important for the court to listen to the audiotape for it lends a better understanding of the entire conversation.

right, but I just couldn't, because she didn't have the qualifications, I couldn't do that."[11] In response to this, Evangelista points out that no one else who held the position had the qualifications and adds, "Come on, Ralph, they do what they want when they want to do it. The point is they didn't want Sandy, you know they didn't want Sandy," to which DeLucca responds, "It's the same thing with Reilly."[12] Their discussion of Reilly is meaningful. In reference to Reilly, DeLucca comments, "What I'm getting at, you remember when he [Reilly] came in, we held that electrical job open for him – for like six months."[13] With that, Evangelista commented: "That's why I say, when you're on the mayor's side, they'll do anything for you. When you're not on the Mayor's side, then they find a way to get rid of you or they find a way to screw you". To this DeLucca responded, "But you know what, that's politics, that's going to happen." He then recalled a conversation he had with John

---

[11]This is contrast to what DeLucca implied to the jury, which was that Lorusso not only lacked the technical qualifications spelled out in the job description but that she was otherwise unqualified for the job. On this point, it is worth noting that DeLucca first denied but then later admitted that Lorusso's lack of the required zoning certificate came up in the meeting at which her attempt to bump into this job was discussed. When pressed, DeLucca also conceded that neither the predecessor in the job nor the person granted the job possessed the required certificate.

[12]The court will recall that "Reilly" is Tom Reilly, another Picard supporter whose job was eliminated by the Mayor in the budget process. Reilly, an electrical inspector, bumped Tom Clark out of his position and Clark was thereafter awarded the Zoning Enforcement Officer position.

[13]Placing this in context, Evangelista informs that this was a reference to a time when Reilly was a political supporter of Mayor Borer. The same rules regarding the posting and filling of vacancies which served to exclude Lorusso were bent by DeLucca to favor Reilly at that time. DeLucca delayed posting the vacancy for six months so no one else could apply for it while Reilly obtained a needed certification. See Exh. at para. 12.

Pascale, "in the beginning" when plaintiffs "started having this trouble", in which Pascale voiced concern that his sisters' decision to withdraw support for Borer would cause them harm. According to DeLucca, Pascale could not understand why his sisters could not just do what he (Pascale) did (that is, just support Borer). Evangelista answered, "because we're not like him, Ralph, and that's the difference". DeLucca responded, "I know that" and later added, "I know, but here you are, you're in a political situation . . ."

That fact that DeLucca was a material witness is not only borne out by the trial record (including defense counsel's summation), but pointedly underscored by defendant's own September 16, 2005 Memorandum Of Law In Opposition To Plaintiffs' Motion For New Trial. In opposing the grant of a new trial defendant relies extensively on DeLucca's testimony. Indeed, the portion of defendant's memorandum which recounts the evidence with citations to the trial transcript reveals no fewer than eighteen references to his testimony. In arguing repeatedly that the evidentiary record suffices to support the jury's verdict, defendant relies on DeLucca's testimony in support of the following alleged facts:

1) Citing DeLucca's testimony, defendant claims that with respect to Lorusso's attempt to bump into a position, the determination of her qualifications for the job was made solely by DeLucca. Def.'s Brief at 7;

2) Lorusso's qualifications for the position of Zoning Enforcement Officer were determined solely by DeLucca. Def.'s Brief at 8 (citing DeLucca's testimony at T.

27

395-401);

3) DeLucca alone determined Lorusso's qualifications for that position based on the written job description. Def.'s Brief at 7.

4) DeLucca determined Lorusso could not do the job because she had deficiencies which rendered her unqualified. Def.'s Brief at 8;

5) DeLucca "acted independently and properly" in denying Lorusso consideeration for the position of Assistant to the Commissioner of Public Works. Def.'s Brief at 8;

6) DeLucca "acted independently from the Mayor" with respect to the Risk/Procurement Manager position ("manager position"). Def.'s Brief at 8-9;

7) DeLucca "was constrained in certain ways and empowered in other ways by the City Charter, the union contract and specific actions taken by the union regarding approval of the job descriptions for these positions." Def.'s Brief at 9 (citing DeLucca's testimony at T. 394;

8) DeLucca alone was responsible for the decision to rewrite job descriptions, allow the Union to "approve them" first before jobs were posted and was otherwise constrained by the Union's power over these issues to Lorusso's unfortunate detriment. Def.'s Brief at 9-10 (citing DeLucca's testimony at T. 404-405, 449-450, 452, 453, Exhibits 7, 509 and 510);

9) The delay in posting the assistant position was due to innocent reason, DeLucca's

28

decision that the job description should be rewritten to "accurately reflect the duties of the job".  Def.'s Brief at 11;

10) The Mayor had no involvement in the job rewrite process or the posting of the job for bid.  Likewise, the Mayor had no involvement in the evaluation of the candidates who expressed an interest in the position. Def.'s Brief at 11 (citing DeLucca's testimony at T. 412);

11) DeLucca could not post or fill a position without the Union's approval.  Defendant implied that management's right to hire and transfer depends entirely on the Union's cooperation. Def.'s Brief at  10 (citing DeLucca's testimony at T. 412-413, 452-453, 460, 474-479. 486-487; Exhibit 509.);

12) Despite the hiring of Carol Silverstein into the manager's position before the job description was rewritten and the job was posted, DeLucca insisted that Lorusso could not be awarded the assistant position or considered for the manager's position because the jobs were not posted.  Def.'s Brief at 11 (citing DeLucca's testimony at T. 411-412, 425. 427-429, 482);

13) Lorusso could not be considered for the manager's position because she retired prior to the rewrite of the job description.  Def.'s Brief at 12 (citing DeLucca's testimony at T. 456-460, 486-487);

14) The Mayor played no role in this event.  Def.'s Brief at 13 (citing  DeLucca's

29

testimony at T. 456);

15) Had Lorusso taken a lay-off instead of retiring, she would have enjoyed further opportunity for re-employment. Def.'s Brief at 14 (citing DeLucca's testimony at T. 466-467.);

16) The Union contract, defendant implies, afforded Lorusso a remedy through the grievance procedure (despite the express provisions of the management rights clause). Def.'s Brief at 14 (citing DeLucca's testimony at T. 464-465);

17) The Mayor was completely unaware of Evangelista's efforts to restore her health benefits and DeLucca alone denied the request, indicating that to grant it would "violate the City Council resolution." Def.'s Brief at 15 (citing DeLucca's testimony at T. 462-463);

18) Mayor Borer "played no role [in any of] these decisions. DeLucca testified that the Mayor was not involved in the bumping process when Lorusso sought the position of Zoning Enforcement Officer and [DeLucca] made this decision alone." Def.'s Brief at 18 (citing DeLucca's testimony at T. 444);

19) "[T]he evidence shows the real reasons for the post-budget decisions made and that no one but DeLucca, Legg, Ferris, Lorusso and Evangelista were involved. As to the Zoning position, DeLucca denied Lorusso re-employment because she was not qualified ... " Def.'s Brief at 19 (citing DeLucca's testimony at T. 446-447):

20) Defendant argues once again that DeLucca alone determined the need to rewrite the Assistant job description for purely legitimate reasons and any delays were a result of constraints imposed by the Union.  Def.'s Brief at 19 (citing DeLucca's testimony at T. 404-405, 444, 449-453, 474-479.);

21) "DeLucca operated within these constraints <u>without any input from the Mayor</u> and as quickly as possible to make the job available."  Def's Brief at 19 (citing DeLucca's testimony at T. 411-413, 429-430, 4449-452, 477-479);

22) The <u>only</u> reason Lorusso was unable to bid for a job was because she retired.  Def's Brief at 19 (citing DeLucca's testimony at T. 411-412, 425, 427-429, 482);

23) "(<u>U)nion delays</u> again prevented DeLucca from posting the [manager's] job before Lorusso's retirement."  Def's Brief at 19-20 (citing DeLucca's testimony at T. 460).

Clearly, the extent to which defendant cites to and relies on DeLucca's testimony in urging this Court to deny a new trial completely belies any suggestion that DeLucca's confessed perjury is meaningless or should otherwise be discounted or ignored by this Court.

As one would expect, after cataloguing DeLucca's testimony on all these points, defendant concluded his brief by arguing, ironically now it seems, that this case turned entirely on credibility determinations which were the sole province of the jury and these determinations must be given deference by this Court.  <u>See</u> Defendant's Memorandum of Law, Argument C at p. 20.

"Where a new trial is granted on the grounds that 'some undesirable or pernicious influence has intruded into the trial', the trial court's discretion is broader than if the new trial 'is granted on the ground that the verdict is against the weight of the evidence'". <u>Johnson v. Verisign</u> at *40 citing <u>A.I. Massey v. Gulf Oil Corp.</u>, 508 F.2d 92, 94 (5th Cir. 1975). "A verdict based on perjury is one example of the injustice to be avoided through the grant of a new trial, if necessary." <u>Id</u> at *41 citing <u>Isley v. Motown Record Corp.</u>, 69 F.R.D. 12, 16-17 (S.D.N.Y. 1975). In the instant case, Ralph DeLucca, Jr. was a material witness and played a prominent role in buttressing Borer's defense. He was cast by defense counsel as a neutral personnel director with no motivation to lie, unafraid of retribution, and  who recounted his legitimate application of various rules to Lorusso's attempts to remain employed in a manner free of any pernicious influence. DeLucca's post-judgment admissions and statements call into question the truthfulness of virtually everything he said on the witness stand.

**B.    DELUCCA'S  POST-JUDGMENT  STATEMENTS AND OMISSIONS, IF AVAILABLE  AT  TRIAL,  WOULD  LIKELY  HAVE  PRODUCED  A DIFFERENT  RESULT  AND  THUS  RELIEF  FROM  THE  JUDGMENT  IS WARRANTED.**

Evidence is "newly discovered" for purposes of Rule 60 (b) (2) if it "existed at the time of the [trial] but ... was discovered by the movant only after the entry of judgment." <u>Johnson v. Askin Capital Mgmt.</u>, 202 F.R.D. 112, 114 (S.D. N.Y. 2001) (citation omitted). In addition, the newly discovered evidence must be such that, had it been known and available at the time of trial, the

outcome likely would have been different.  See, e.g., Ag Pro, Inc. v. Sakraida , 512 F.2d 141, 143 (5th

Cir. 1975) (newly discovered evidence must be "such that a new trial would probably produce a new

result"); Securities and Exchange Commission v. U.S. Environmental, Inc. U.S. Dist. LEXIS 20271

at *13 ("the evidence must make a prima facie showing that a different result should have been

reached initially")(Internal quotations and citations omitted.)

     For the reasons repeated elsewhere in this brief, the admissions and other statements made by

DeLucca both to Pascale and especially to Evangelista implicate the integrity of this verdict.  Not only

were jurors unfairly deprived of information that DeLucca is untrustworthy and evidence of the

facility with which he lied under oath, but may have been led by DeLucca's various and emphatic

denials to question the credibility of the plaintiffs.  Jurors may well have suspected or concluded that

Lorusso and Evangelista either lied about or embellished upon their prior conversations with

DeLucca.  Jurors may also have questioned whether plaintiffs' counsel had her facts right when she

posed various questions to DeLucca with an air of confidence in the answers, only to have him

answer, "No, Ma'am,  Absolutely not", "I would never do that",  and so on.  After all, jurors

understood that both plaintiffs and their counsel had an interest in the outcome.  In contrast, DeLucca

appeared, and was cast by defense counsel, as a neutral, non-party witness, "free" to differ with the

Mayor,  "unafraid" of retribution.

     Put another way, if the audio recording and transcript of DeLucca's statements and

admissions of September 8, 2005 were presented to jurors, is it probable the outcome would have

been different?  We know conclusively from DeLucca's own words that the verdict in Borer's favor gave rise to his guilt.  Let us suppose, however, that. DeLucca came to grief immediately after he left the witness stand, later that evening approached Evangelista and made the same statements and admissions before the case went to the jury.  Suppose further that Evangelista recorded the conversation and plaintiffs' counsel thereafter recalled her to the witness stand and played the recording for jurors.  Indeed, counsel would have put DeLucca back up on the stand as a rebuttal witness to himself.  Plaintiffs submit that not only should  the outcome of the trial been affected  but we may have see one of those rare and talked about courtroom scenes where a witness invoked  the fifth amendment.  There is  nothing in the case authority which suggests that plaintiffs need to show the probability that the different outcome would have been a plaintiffs' verdict.  A hung jury (with the right to a retrial) may also have been the "different" outcome.

Albeit in the context of criminal trials, the Second Circuit recognized the pernicious  effect that perjury can have on the judgment of a jury.  In United States v. Wallach, 935 F.2d 445 (2nd Cir. 1991), a government witness committed perjury when he testified that he had stopped his compulsive gambling the previous year.  In assessing whether there was "any reasonable likelihood that the false testimony could have affected the judgment of the jury," the Court of Appeals rejected the trial court's conclusion that the testimony was not material and that the falsehoods were "merely minor, cumulative additions" to the discrediting of the witness throughout the trial:

Guariglia was the centerpiece of the government's case.  Had it been brought to the

34

attention of the jury that Guariglia was lying after he purportedly had undergone a moral transformation and decided to change his ways, his entire testimony may have been rejected by the jury.  It was one thing for the jury to learn that Guariglia had a history of improprieties; <u>it would have been an entirely different matter for them to learn that after having taken an oath to speak the truth he made a conscious decision to lie</u>.

935 F.2d 445 at 457.

The Court concluded that Guariglia's "false testimony regarding his gambling directly call[ed] into question the veracity of the rest of his statements."  <u>Id</u>.  Likewise, in <u>United States v. Seijo</u>, 514 F.2d 1357 (2nd Cir. 1975), the Second Circuit considered the import of newly discovered evidence that a witness lied when he testified that he had never been convicted of a drug offense.  The court again rejected the argument that the lie was inconsequential since,  if jurors were aware of the lie, it would not only have impacted the assessment of the credibility of the witness but the assessment of the elements of the government's case.

Applying this reasoning to the instant case, one must envision a jury's probable reaction upon learning of and hearing the very evidence which plaintiffs now present.  Not only would plaintiffs' counsel have capitalized on this evidence but defense counsel would have had to script an entirely different closing argument. In addition, in light of the sequestration order in effect throughout the trial, the Court may have wished to inquire as to whether and how DeLucca, before he took the stand, was aware of the substance of  Legg's trial testimony, as DeLucca's September 8, 2005 remarks suggest.

"[C]ourts should not countenance verdicts that even appear to be based on false testimony."

Johnson v. Verisign at *57.  The interests which drove the Johnson court to act are equally at stake

in the instant proceeding:

> There is a class of cases where some irregularity so taints the trial that the appearance
> of impropriety compels a new trial as a prophylactic rather than a remedial measure.
> As was stated long ago, the fountains of justice must be kept free from suspicion, or
> the citizen will lose all respect for the laws and the rights of persons, and property will
> become insecure.  (Internal quotes and citations omitted).  Defendant's evidence
> regarding the layoff is so thoroughly undermined by the false testimony involving a
> layoff list that failing to grant a new trial would be tantamount to approving the use
> of false evidence to garner a favorable jury verdict.

Id. at *56-57.  For the same reasons, this court should not permit this verdict to stand for the parties

to this and other cases will be encouraged to have little regard for the oath and to view the district

courts as allowing each man his allotment of lies.

### C.   AT A MINIMUM THIS COURT SHOULD CONDUCT A HEARING TO DETERMINE THE FULL EXTENT OF AND HARM CAUSED BY DELUCCA'S FALSE TESTIMONY.

Plaintiffs believe  Ralph DeLucca's statements of September 10, 2005 suffice to warrant the

granting of a new trial without more, but should the Court disagree, plaintiffs submit that the Court

may not deny the motion but must, at a minimum, conduct an evidentiary hearing on the matter.  In

<u>Phillips v. Crown Central Petroleum Corp.</u>, 556 F.2d 702 (4th Cir. 1977), the Court of Appeals addressed the issue of the trial court's reaction to evidence that one of the plaintiffs committed perjury, both in pre-trial depositions and at the bench trial on plaintiffs' injunction action under the Clayton Act.  The District Court, upon the plaintiff's admission of false testimony, did not inquire further into the extent of the perjury and denied defendant's motion for a new trial or other relief pursuant to Rules 59 (b) and 60 (b).  While acknowledging the latitude to be accorded to the findings of a trial court respecting the credibility of witnesses, especially in the context of a bench trial, the Court of Appeals nevertheless  held the District Court committed reversible error by not conducting a plenary hearing to determine just how pervasive the perjury was:

> The record makes it indisputable that defendant sought that it have an opportunity in which [plaintiff] would be examined *ore tenus*, that [defendant] be permitted to offer additional testimony which had become relevant in view of the perjury of [plaintiff], and that, thereafter, the District Judge should reappraise the case and then determine the appropriate findings and conclusions.

<u>Id</u> at 705.

The District Court was of the opinion that the plaintiff's false testimony was "no more than cumulative," and "not necessary to the court's ultimate decision on the various issues." <u>Id</u>.  The Court of Appeals held that this was "not a sufficient reason for not conducting a plenary hearing".  "Just how pervasive was that perjury, neither the judges nor the parties other than [plaintiff] can know.  It is possible that large parts of the intricate web of findings may be affected.  It is possible that the perjury is limited, and there remains a solid structure for the injunction.  One must hear before one

37

decides.  *Audi alteram partem* is a fundamental rule of procedural fairness."  Id.  The Court added that only upon such an evidentiary hearing will a court be able to determine a basis for "invoking the always treacherous maxim *falsus in uno, falsus in omnibus*."  Id.

In the instant case, DeLucca's admitted lying on several material matters and his other misleading testimony should suffice without more for a grant of the requested relief.  At a minimum, an evidentiary hearing should be conducted in order to resolve any unanswered questions the court has.

### CONCLUSION

For all of the foregoing reasons, and in the interest of justice, plaintiffs respectfully request that this motion be granted.

THE PLAINTIFFS,
SANDRA LORUSSO and
DEBORAH EVANGELISTA

BY:_____
    KAREN LEE TORRE
    Fed. Bar No. ct01707
    Law Offices of Karen Lee Torre
    51 Elm Street, Suite 307
    New Haven, Connecticut 06510
    Tel. (203) 865-5541
    Fax: (203) 865-4844

    Their Attorney

38

**<u>CERTIFICATION</u>**

  I hereby certify that a copy of the foregoing was mailed, postage paid, on this 19th day of October, 2005 to:

Jennifer L. Schancupp, Esq.
Thomas Katon, Esq.
Susman, Duffy & Segaloff, P.C.
PO Box 1684
New Haven CT 06507

Paul J. Dorsi, Esq.
Donahue Votto & DeGennaro PC
415 Main Street
PO Box 411
West Haven CT 06516-0411

           _____

           Karen Lee Torre