Westlaw.

208 F.3d 202 (Table)                                                                                     Page 1

208 F.3d 202 (Table), 2000 WL 268567 (2nd Cir.(N.Y.))
**Unpublished Disposition**

**(Cite as: 208 F.3d 202, 2000 WL 268567 (2nd Cir.(N.Y.)))**

H

**Briefs and Other Related Documents**

NOTICE: THIS IS AN UNPUBLISHED OPINION.

(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTA2 s 0.23 for rules regarding the citation of unpublished opinions.)

United States Court of Appeals, Second Circuit.
David G. BOOTH, Joseph A. Cannaliato, Diane C. Darr, John P. Hakemian, Bruce
Hanson, M. Hanson, B. Hanson, M.O. Hanson, as trustees, Peter Hein, Ira
Hollenberg, Robert S. Krupp, James Monks, Rosalyce Monks, Richard A. Pregiato,
Phyllis Pregiato, Robert M. Schiffer, Morton J. Seligman, Michele Seligman,
Charles R. Shaw, Peter F. Spano, Cathy D. Spano, as trustees, William Tierney,
Mary Tierney, and Robert D. Walter, Plaintiffs-Appellees,
v.
Thomas C. WILSON, Defendant-Counter-Claimant-Appellant.
No. 99-9509.

March 9, 2000.
Paul Shechtman, Stillman & Friedman, P.C.; Sara Beth Savage, on the brief, New York, NY, for appellant.

Stuart Perlmutter, Davidoff & Malito LLP, New York, NY, for appellees.

Present STRAUB, SOTOMAYOR, Circuit Judges, and HURD, Judge. [FN*]

FN* The Honorable David N. Hurd, United States District Judge for the Northern District of New York, sitting by designation.

*SUMMARY ORDER*
**1 UPON DUE CONSIDERATION of this appeal from a judgment of the United States District Court for the Southern District of New York (Richard Owen, Judge), it is hereby

ORDERED, ADJUDGED AND DECREED that the judgment of the district court is REVERSED.

Thomas C. Wilson ("Wilson") appeals from a December 22, 1999 Order of the district court, holding him in civil contempt for refusing to respond to questions at a hearing, and ordering him confined to prison for eighteen months, or until he answered the questions. Wilson appealed the Order, and this Court granted a stay of the contempt sanction pending the appeal's outcome.

This case originated in a fraud suit brought by plaintiffs against Wilson in 1996, which resulted in a $3.3 million judgment against Wilson in January 1997. In February 1997, the district court entered a stipulated order prohibiting Wilson "from mak[ing] or suffer[ing] any sale, assignment, transfer, or interference with any property in which [he or his wife held an] interest" without the court's permission or the plaintiffs' consent, or until he satisfied the $3.3 million judgment. Wilson, however, caused $37,000 owed to a corporation in which he held a majority interest to be paid instead to his wife, Melinda Wilson. By way of Order to Show Cause, the district court directed the Wilsons to explain the violation in a May 1997 hearing.

The Wilsons submitted two documents at the hearing. First, they submitted a 1996 Form W-2 purporting to show that Republic Management

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

208 F.3d 202 (Table)                                             Page 2

208 F.3d 202 (Table), 2000 WL 268567 (2nd Cir.(N.Y.))
**Unpublished Disposition**

**(Cite as: 208 F.3d 202, 2000 WL 268567 (2nd Cir.(N.Y.)))**

Northwest, Inc. ("RMN"), a company in which Wilson held majority ownership, had paid Melinda Wilson $40,000 in wages that year. Second, they submitted an RMN 1995 tax return, and asserted that a $40,000 entry labeled "[l]oan from shareholders" represented a loan from Melinda Wilson to RMN. According to the Wilsons, Melinda Wilson had never actually received the compensation indicated in the W-2, but rather allowed it to be treated as a loan to RMN, which loan was reflected in the $40,000 entry on RMN's return.

The court did not credit the Wilsons' explanation, and directed the U.S. Attorney's Office for the Southern District of New York to investigate the matter; the U.S. Attorney subsequently charged Wilson with criminal contempt for having violated the court's February 1997 order. Wilson pled guilty as charged.

Wilson's plea agreement with the government provided that, in exchange for his guilty plea to criminal contempt,
> the defendant and his wife Melinda P. Wilson, will not be further prosecuted [by the United States Attorney's Office for the Southern District of New York] (except for criminal tax violations as to which this Office cannot, and does not, make any agreement) for any conduct relating to the $37,000 refund that was found to have violated the February 25, 1997 Order....

The agreement also provided that it did "not bind any federal, state, or local prosecuting authority other than [the United States Attorney's Office for the Southern District of New York]." In July 1997, the district court sentenced him to several months' imprisonment and 300 hours of community service.

**\*\*2** In December 1999, the court learned that the Wilsons may have fraudulently induced plaintiffs to sign a settlement agreement, and subsequently ordered a hearing "to ascertain if frauds or obstruction of justice had been practiced on the Court in connection with the ... criminal charges, and [Wilson's] eventual sentencing ... on July 7,

1999." Both of the Wilsons were ordered to testify. At the hearing, Melinda Wilson conceded that (1) she had never been a shareholder of RMN, (2) she had no awareness of ever lending money to RMN, (3) she only could recall "assembling documents" for two weeks to justify the purported salary, (4) she was never listed as an employee on RMN's books, (5) the W-2 was a fabrication; and (6) the only reason she earlier swore to the contrary was that her husband had asked her to do so.

The following two questions (among many others) were posed to Wilson at the hearing: (1) "[D]id you prepare or cause to be prepared a W-2 ... for the purpose of presenting it to the court [to justify the diversion of the $37,000]?"; and (2) "Did [your wife] Mrs. Melinda P. Wilson make a loan to Republic Management Northwest Company in the year 1995 in the amount of $40,000?" Wilson refused to respond, invoking his Fifth Amendment privileges, *see* U.S. Const.amend. V ("No person ... shall be compelled in any criminal case ... to be a witness against himself ...."), on the grounds that (1) responding to either question could incriminate him in a subsequent tax prosecution, (2) responding to the first question could open him to prosecution in New York state for "possessing or making a forged instrument"; and (3) responding to the first question could open him to prosecution in New Hampshire--his state of residence--for conspiring with Melinda Wilson to obstruct justice.

The district court found Wilson's first objection "meritless" in light of the evidence that Melinda Wilson had never been an RMN employee and therefore had no taxable income flowing from RMN employment, and because Melinda Wilson had never been a shareholder in RMN and therefore her alleged loan "ha[d] nothing to do with nor could [ ] be the subject of any tax question or prosecution." The district court viewed Wilson's remaining fear "that prosecutors' offices in the States of New York or New Hampshire would for some reason gear up to go after him as to matters included in his guilty plea for which he has served a sentence in New York, ... as a 'trifling or imaginary hazard[ ] of incrimination,' [and] not a 'substantial and real [one]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

208 F.3d 202 (Table)        Page 3

208 F.3d 202 (Table), 2000 WL 268567 (2nd Cir.(N.Y.))
**Unpublished Disposition**

**(Cite as: 208 F.3d 202, 2000 WL 268567 (2nd Cir.(N.Y.)))**

...' as is stated in *U.S. v. Rodriguez*, 706 F.2d 31, 37 (2d Cir.1983)." The district court held Wilson in civil contempt and directed that he be incarcerated for eighteen months or until he answered the questions.

The Fifth Amendment "may properly be invoked whenever a witness reasonably believes that his testimony could 'furnish a link in the chain of evidence needed to prosecute' him for a crime." *Fisher v. Commissioner*, 905 F.2d 645, 648 (1990) (quoting **Hoffman** v. United States, 341 U.S. 479, 486 (1951)). The "potential for self-incrimination must be a 'real danger.' " *United States v. Edgerton*, 734 F.2d 913, 921 (2d Cir.1984) (quoting *Zicarelli v. New Jersey State Comm'n of Investigation*, 406 U.S. 472, 478 (1972)).

**\*\*3** We find that Wilson's refusal to answer the two questions at issue was a justifiable invocation of his Fifth Amendment privilege. A response to either question could have furnished a link in the chain of evidence in an eventual tax prosecution, and therefore the danger of self-incrimination was real. At the May 1997 hearing, Wilson, under oath, testified that the $40,000 loan entry in RMN's 1995 tax return represented the loan by Melinda Wilson of the alleged salary reflected in the W-2 form. Admitting at the December 1999 hearing either that he caused the W-2 to be prepared for purposes of justifying the illegal diversion of the $37,000, or that Melinda Wilson had not made the loan, could be used against him by tax prosecutors as an admission that the loan entry in the tax return was false. Either response, therefore, "would add to the sum total of [a] case against him" for tax prosecution. *Edgerton*, 734 F.2d at 921.

If in fact a loan had been made to RMN by a true shareholder and not Melinda Wilson, that fact may provide Wilson with a defense for a charge of tax fraud. Wilson's earlier claim that the entry related to a loan from Melinda Wilson, however, a claim which his answers now would likely render false, would not negate the existence of probable cause for a prosecutor to charge that the tax entry was false. *See* 26 U.S.C. § 7206 (1994) ("Any person who ... willfully makes and subscribes any return, statement or other document, ... which he does not believe to be true and correct as to every material matter ... shall be guilty of a felony....").

Because we find proper Wilson's invocation of his Fifth Amendment privilege on the grounds that responding to the questions would tend to incriminate him in a tax prosecution, we need not address his other two grounds for refusing to respond. We observe, moreover, that the likelihood of a tax prosecution (or any other type of prosecution for possession of a false document or conspiracy to obstruct justice)--whether remote or probable--is irrelevant to our resolution of this case. *See Fisher*, 905 F.2d at 649 (noting that speculation about the likelihood of prosecution is not necessary because the proper inquiry is "whether answering the question would tend to incriminate the witness.") (citation omitted).

For the reasons set forth above, the judgment of the district court is hereby REVERSED and the stay of the contempt order previously entered by this Court is VACATED.

208 F.3d 202 (Table), 2000 WL 268567 (2nd Cir.(N.Y.)), Unpublished Disposition

**Briefs and Other Related Documents (Back to top)**

• 2000 WL 34007003 (Appellate Brief) Reply Brief for Appellant (Feb. 17, 2000)Original Image of this Document (PDF)

• 2000 WL 34007001 (Appellate Brief) Brief for Appellees (Feb. 08, 2000)Original Image of this Document (PDF)

• 2000 WL 34007002 (Appellate Brief) Brief for Appellant (Jan. 25, 2000)Original Image of this Document (PDF)

• 99-9509 (Docket) (Dec. 27, 1999)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                                          Page 1

Not Reported in F.Supp.2d, 2005 WL 1086459 (S.D.N.Y.)

**(Cite as: 2005 WL 1086459 (S.D.N.Y.))**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Maheesh SHARMA Plaintiff,
v.
NEW OPAL CORP., et al., Defendants.
No. 03Civ.9427 (DAB)(THK).

May 6, 2005.

MEMORANDUM OPINION AND ORDER

KATZ, Magistrate J.

*1 This action was brought under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.,* and the New York Labor Law, to obtain unpaid minimum wages, overtime premiums, and liquidated damages on behalf of Plaintiff, Maheesh Sharma, who was employed as an assistant chef in the Manhattan branch of a restaurant doing business as "Dimple Indian Fast Food" (hereinafter "Dimple"). Presently before the Court is Plaintiff's application for an order compelling a third-party, Mannan Motiayan ("Motiayan"), to respond to questions posed to him at his deposition on February 10, 2005. With few exceptions, in response to questions addressed to him, Motiayan invoked his Fifth Amendment privilege against self-incrimination.

The standards governing the propriety of invocation of the Fifth Amendment are straightforward and well-established. The privilege may be invoked in any civil proceeding "whenever a witness reasonably believes that his testimony could furnish a link in the chain of evidence needed to prosecute him for a crime." *Estate of Fisher v. Comm'r of Internal Revenue,* 905 F.2d 645, 648 (2d Cir.1990) (quoting *Hoffman v. United States,* 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951)) (internal quotation marks omitted). "To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." *Id.* at 648-49 (quoting *Hoffman,* 341 U.S. at 486-87, 71 S.Ct. at 818). The danger of self-incrimination must be real, not remote or speculative. *Id.* at 648; *see also Andover Data Servs. v. Statistical Tabulating Corp.,* 876 F.2d 1080, 1082 (2d Cir.1989).

The witness need not prove that the government will, or is likely to prosecute him, but must only show potential incrimination. *See Fisher,* 905 F.2d at 649. "When the danger is not readily apparent from the implications of the question asked or the circumstances surrounding the inquiry, the burden of establishing its existence rests on the person claiming the privilege," and can be done *in camera. Fisher,* 905 F.2d at 649, 650; *accord New York State Organization For Women v. Terry,* 886 F.2d 1339, 1356-57 (2d Cir.1989); *AAOT Foreign Economic Assn'n (VO) Technostroyexport v. Int'l Dev. and Trade Servs., Inc.,* No. 96 Civ. 9056(JGK) (AJP), 1999 WL 970402, at ----8-9 (S.D.N.Y. Oct. 25, 1999).

At first blush, the basis of Motiayan's broad invocation of his Fifth Amendment rights is not readily apparent. Plaintiff asserts that Motiayan is or was the head chef at Dimple, not an owner of the enterprise. Yet, in addition to declining to answer any questions relating to his employment at, or knowledge of, the Dimple business, Motiayan also refused to respond to questions about his residence, his date of birth, his present employment, and whether he knew Plaintiff. Accordingly, the Court directed Motiayan to provide an *in camera* submission to the Court which provided a more

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                  Page 2
Not Reported in F.Supp.2d, 2005 WL 1086459 (S.D.N.Y.)
**(Cite as: 2005 WL 1086459 (S.D.N.Y.))**

explicit basis for his broad invocation of Fifth Amendment privilege. In response, Motiayan's attorney provided a letter to the Court for *in camera* consideration. (*See* Letter from Krishnan S. Chittur, Esq., dated Apr. 18, 2005.) The letter provides a description of Motiayan's Fifth Amendment concerns and cites to various criminal statutes which pertain to those concerns. In fact, in an earlier letter to the Court, which was not submitted *in camera*, Motiayan's attorney described, in general terms, some of the considerations that motivated Motiayan in invoking the Fifth Amendment.

> *2 Here, the circumstances of the case abundantly show the possibility of criminal prosecution under a variety of state and federal laws. The restaurant Dimple appears to have been violating federal criminal laws concerning employment of illegal aliens, and state and federal criminal laws concerning labor and tax. From the questions posed ..., and the plaintiff's own acknowledgments in the Complaint and elsewhere, it is clear that Mr. Motiayan's answers concerning his alleged residence in the United States, alleged employment, alleged receipt of income, and alleged activities at Dimple tend to incriminate him. Moreover, any answer would also obviously suggest criminal complicity in Dimple's violations of federal and state criminal laws, raising the prospect of aiding and abetting liability under federal criminal laws.

(Letter from Krishnan S. Chittur, Esq., dated Mar. 28, 2005, at 4) (citations omitted).

Because it is alleged that Motiayan played a pivotal role in the operation of Dimple, which is alleged to have employed undocumented aliens and violated federal wage and labor statutes, his attorney's concerns about both principal liability, as well as potential liability for conspiracy and aiding and abetting various offenses related to the operation of the restaurant, are not frivolous. *See* 29 U.S.C. § 203(d) (defining an employer under the FLSA as "any person acting directly or indirectly in the interest of an employer in relation to an employee"). Moreover, based upon Motiayan's refusal to respond to questions about his current address, the length of residency at his current address, and his previous employment, it may reasonably be inferred that Motiayan has concerns about his own immigration, employment, and tax status. Plaintiff should have some appreciation of those concerns since he, as well, invoked his Fifth Amendment rights at his deposition when asked about his citizenship, whether he has passport, and when and how he entered the United States. (*See, e.g.,* Deposition Transcript of Mahesh Sharma, dated Feb. 16, 2005, at 6-8, 24-25.)

The privilege against self-incrimination "must be accorded liberal construction." *Hoffman,* 341 U.S. at 486, 71 S.Ct. at 818; *see also Fisher,* 905 F.2d at 648 ("The guarantee must be broadly construed to serve the right it was designed to protect...."). The person invoking the Fifth Amendment need not prove the hazard he faces. It need only be evident "that a responsive answer to the question ... might be dangerous because injurious disclosure could result." *Hoffman,* 341 U.S. at 486-87, 71 S.Ct. at 818. Although there were a few relatively innocuous questions which Motiayan could have answered without fear of incriminating himself, those questions had little likelihood of yielding relevant information to the claims in this action. The thrust of the deposition questioning, however, was addressed to Motiayan's work at Dimple and knowledge of its operation. He has sufficiently demonstrated why he held a reasonable belief that his response to those questions could create a link in the chain of evidence needed to prosecute him for various federal offenses.

*3 Accordingly, Plaintiff's application to compel responses to the deposition questions is denied.

SO ORDERED.

Not Reported in F.Supp.2d, 2005 WL 1086459 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

• 1:03cv09427 (Docket) (Nov. 25, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.